IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SUSIE ZAPATA and MONICA GARCIA

      Plaintiffs,

v.                           No. _____

JAMES YATES, JOHN DOES,
ROBERTA LUCERO-ORTEGA,
ARTHUR SANCHEZ, BESHEEN ESTEVAN,
and SUMMIT FOOD SERVICE, LLC

      Defendants.

## COMPLAINT FOR THE RECOVERY OF DAMAGES CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS

Plaintiffs bring this complaint for damages caused by the violation of their civil and constitutional rights. Plaintiffs file this complaint under the federal Civil Rights Act, and the Constitution of the United States. They also bring a claim under New Mexico common law. In support of this complaint, Plaintiffs allege the following:

### JURISDICTION AND VENUE

1. Jurisdiction over the subject matter of this action is conferred by 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983 and 1988. Venue is proper as the acts complained of occurred exclusively within Cibola County, New Mexico.

### PARTIES

2. Plaintiffs Susie Zapata and Monica Garcia are individuals and current residents of Bernalillo County, New Mexico.

3. Susie was incarcerated at Western New Mexico Correctional Facility (hereinafter "WNMCF" or "the women's prison") in Cibola County, New Mexico from approximately early 2017 to December 11, 2019.

4. Monica was incarcerated at WNMCF from approximately March 2018 to approximately June 2019.

5. Upon information and belief Defendant James Yates was the warden at WNMCF during events material to this complaint.

6. Upon information and belief Defendants John Does served as the warden at WNMCF during events material to this complaint that occurred prior to Defendant James Yates' tenure as warden.

7. Upon information and belief Defendant Roberta Lucero-Ortega was the warden at WNMCF during events material to this complaint that occurred prior to Defendants John Does' tenure as warden.

8. Defendant Arthur Sanchez is Fire Safety Sanitation Officer at WNMCF and was responsible for pest control and maintaining safety and sanitation standards at the prison during the events material to this complaint.

9. Defendant Summit Food Service, LLC, is a South Dakota corporation doing business in New Mexico.

10. Defendant Summit Food Service, LLC was contractually responsible for the provision of food service at WNMCF during the events material to this complaint.

11. Upon information and belief Defendant Besheen Estevan is an employee of Defendant Summit Food Service, LLC. In that role, she was responsible for overseeing food service at WNMCF during the events material to this complaint.

12. Defendants are being sued in their individual capacities.

13. Defendant Yates, Defendants John Does, Defendant Lucero-Ortega, Defendant Sanchez and Defendant Estevan were acting within the scope of their employment at all material times.

14. All Defendants were acting under color of state law at all material times.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

15. WMNCF is a prison operated by the New Mexico Corrections Department (hereinafter "NMCD").

16. WNMCF only incarcerates women.

17. A horrific and widespread rodent infestation has been ongoing at the women's prison for many years.

18. In addition to evidence of rodents being clearly visible throughout many areas of WNMCF, the distinctive sour, putrid smell of rodent urine, rodent feces and decaying rodent bodies was a constant presence in and near the prison's kitchen and cafeteria at all material times.

19. The infestation makes the women's prison a dangerous place for the inmates detained there because they are forced to live, work and sleep in close proximity to large numbers of rodents, and to large quantities of rodent feces and rodent urine.

20. In particular, the pervasive presence of rodents, rodent feces, and rodent urine in the food that is served at the women's prison poses a serious and ongoing threat to the physical health of inmates detained at the women's prison.

21. As the person in charge of food service at WNMCF, Defendant Estevan was well aware of the rodent infestation at WNMCF during events material to this complaint.

22. Defendant Estevan regularly saw and smelled evidence of the appalling magnitude of the rodent infestation because the infestation was centered in the kitchen she supervised.

23. Defendant Estevan regularly heard complaints about the infestation from inmates and other staff employed by Defendant Summit.

24. As the individual in charge of sanitation and safety at the women's prison, Defendant Sanchez also was well aware of the rodent infestation at WNMCF during events material to this complaint.

25. He often saw and smelled evidence of the unsanitary and hazardous rodent infestation at the women's prison.

26. In particular, Defendant Sanchez was well aware that the infestation was completely out of control in the WNMCF kitchen.

27. As the warden ultimately responsible for the safety of inmates and staff at the women's prison, Defendant Yates, Defendants John Does, and Defendant Lucero-Ortega were well aware that the rodent infestation was widespread throughout their facility and that it was completely rampant in the areas in and around the kitchen and cafeteria.

28. Many different kinds of illness and disease can be transmitted by rodents.

29. Rodents, rodent feces and rodent urine can contaminate food.

30. Some illnesses and diseases can be transmitted directly by rodents. Others can be transmitted indirectly by them.

31. Some illnesses and diseases transmitted by rodents can have severe long-term health impacts.

32. Some illnesses and diseases transmitted by rodents can be difficult to diagnose.

33. The impacts of some illnesses and diseases can materialize long after a person has been exposed to rodents.

34. Some maladies spread by rodents can be lethal to humans.

35. Hantavirus Pulmonary Syndrome (hereinafter "HPS") is a severe respiratory illness that can be deadly to humans.

36. HPS can be transmitted by infected rodents through their urine, droppings, or saliva.

37. Humans can contract HPS when they inhale the aerosolized virus.

38. Rodent control is the primary strategy for preventing HPS.

39. According to the Centers for Disease Control and Prevention, New Mexico has the highest cumulative number of HPS cases of any state in the country.

40. The case fatality rate for HPS in the United State is 36 percent. In New Mexico, the case fatality rate for HPS is 44 percent.

41. Of New Mexico's 33 counties, Cibola County had the fourth highest number of HPS cases from 1975-2019 while having only the 17th highest number of residents.

42. Because WNMCF is located in an isolated rural area in Cibola County, New Mexico, a species of wild mouse that carries hantavirus (*Peromyscus maniculatus*) was potentially present in the prison during the events material to this complaint.

43. Rodents capable of transmitting a wide variety of other dangerous diseases and illnesses were certainly present in the women's prison during the events material to this complaint.

44. Plaintiff Susie Zapata worked in the kitchen at WNMCF from approximately November 2017 through approximately December 2018.

45. Plaintiff Monica Garcia worked in the kitchen at the women's prison from approximately March 2018 through approximately February 2019.

46. Women incarcerated at WNMCF commonly view a job in the kitchen at WNMCF as the worst job an inmate can have at the prison.

47. A primary reason inmates view a job in the WNMCF kitchen as undesirable is because the rodent infestation is completely out of control in that area of the facility and has been for many years.

48. The widespread presence of rodents in the kitchen and adjoining cafeteria has caused food service at the women's prison to be shockingly unsanitary.

49. At all material times, the WNMCF kitchen was never cleaned adequately except when an inspector was expected.

50. At various times, inspectors of WNMCF included staff from the New Mexico Environment Department (hereinafter "NMED"), NMCD and Defendant Summit.

51. Inspections of government facilities are of limited utility when facility staff are notified in advance of an inspection.

52. Advance notice of inspections of NMCD facilities would provide NMCD staff and contractors with opportunities to conceal violations of state law, state regulations and NMCD policies.

53. Defendant Yates, Defendants John Does, Defendant Lucero-Ortega and Defendant Sanchez wouldn't allow inspectors to inspect WNMCF without providing advance notice.

54. Defendant Sanchez and Defendant Estevan were always told multiple days in advance when an inspection was about to occur at WNMCF.

55. After being alerted to an upcoming inspection, Defendant Estevan would require that Susie, Monica and other inmates scrub the entire kitchen from top to bottom.

56. Susie, Monica and the other inmates would take approximately two full days to clean the kitchen, typically staying up past 10 p.m. to finish the task.

57. In addition to Susie, Monica and other inmates who worked in the kitchen, Defendant Estevan would recruit additional inmate volunteers to help clean the kitchen before an inspection.

58. Defendant Estevan would entice inmate volunteers to help clean the kitchen by offering them sack lunches.

59. Sack lunches were extremely attractive to inmates at the women's prison partly because the food in these lunches was mostly prepackaged and was therefore much less likely to be contaminated by rodents.

60. Defendant Yates, Defendants John Does, Defendant Lucero-Ortega and Defendant Sanchez required Defendant Estevan to conduct these pre-inspection cleanings.

61. Because the unsanitary conditions in the WNMCF kitchen were partially concealed by the actions of individual Defendants, Susie, Monica and the other inmates who worked in the kitchen were always profoundly disappointed by the ineffectiveness of the inspections.

62. Susie and Monica never witnessed an inspection in which the inspector noticed the magnitude of the rodent infestation at the women's prison.

63. Through their actions, individual Defendants blocked any opportunity for Susie, Monica or other inmates to reveal the true scope of the rodent infestation at WNMCF to the inspectors.

64. Susie, Monica and the other inmates were never allowed by Defendant Sanchez or Defendant Estevan to speak directly to inspectors about the enormity of the infestation.

65. NMED is responsible for ensuring that food service establishments throughout New Mexico, including WNMCF's kitchen, serve food that is safe for human consumption and free from adulteration, spoilage and contamination.

66. Ramon Orona is an environmental scientist who is employed by NMED.

67. His office is located in Milan, New Mexico, approximately a 15-minute drive from WNMCF.

68. Mr. Orona has been responsible for conducting NMED inspections at WNMCF for many years.

69. According to Mr. Orona, inspections by NMED of food service establishments are supposed to be unannounced.

70. Mr. Orona believes that announcing inspections beforehand makes them of limited utility because, in his experience, most violations of New Mexico Food Service and Processing Regulations are discovered during unannounced inspections.

71. When NMED staff members inspect a commercial food establishment that is open to the general public, they typically arrive unannounced, show the owner of the food establishment their NMED badges, and immediately proceed to inspect the establishment.

72. Unfortunately, prior to every inspection of WNMCF, Mr. Orona was required to notify Defendant Sanchez that he was coming.

73. Defendant Yates, Defendants John Does, Defendant Lucero-Ortega and Defendant Sanchez would not allow Mr. Orona to show up unannounced to do independent inspections at WNMCF in the manner that NMED conducts inspections of commercial food establishments that serve the general public.

74. According to Mr. Orona, he was at the mercy of Defendant Yates, Defendants John Does, Defendant Lucero-Ortega and Defendant Sanchez regarding when he could do inspections and where he could go in the facility to conduct those inspections.

75. This made it possible for Defendant Yates, Defendants John Does, Defendant Lucero-Ortega, Defendant Sanchez and Defendant Estevan to partially hide the gruesome scale of the rodent infestation from inspectors.

76. Despite efforts by individual Defendants to conceal the magnitude of the rodent infestation at WNMCF, inspections by NMED have cited violations since at least 2017 based on the failure of Defendants to control rodents at the women's prison.

77. On January 31, 2018, a "Food Establishment Inspection Report" by NMED documented the presence of mouse droppings in WNMCF's dry storage areas. This same inspection cited violations for the presence of rodents as well as for the poor maintenance and cleanliness of the prison.

78. Defendant Sanchez signed the January 31, 2018 NMED "Food Establishment Inspection Report" as the "person in charge" during the inspection.

79. On January 23, 2019, another "Food Establishment Inspection Report" by the NMED once again documented the presence of mouse droppings as well as the presence of holes in walls used by rodents to access the dry storage area.

80. This same inspection again cited violations at the women's prison for the presence of rodents as well as the poor maintenance and cleanliness of the prison.

81. This inspection also cited a violation at WNMCF for failing to prevent contamination during food preparation and storage.

82. Defendant Sanchez signed the January 23, 2019 NMED "Food Establishment Inspection Report" as the "person in charge" during the inspection.

83. According to Mr. Orona, if the rodent infestation at WNMCF occurred at a commercial food establishment serving the general public, that establishment would immediately be shut down until the infestation was eliminated.

84. Unfortunately, because the actions of Defendant Yates, Defendants John Does, Defendant Lucero-Ortega, Defendant Sanchez and Defendant Estevan hid the true horrifying scope of the infestation from inspectors like Mr. Orona, Susie and Monica were forced to live in degrading and grotesque conditions and to survive by eating food contaminated by rodents.

85. On countless occasions, Susie and Monica were present when Defendant Estevan saw rodents in the WNMCF kitchen.

86. On several occasions, when Defendant Estevan saw a rodent, Susie and Monica heard Defendant Estevan order inmates working in the kitchen to "kill it."

87. Defendant Estevan had authority over every inmate who worked in the kitchen at the women's prison.

88. If Defendant Estevan demanded that an inmate working in the kitchen do something, that inmate was expected to do it.

89. An inmate who failed to follow Defendant Estevan's orders would either be "written up" or they would be subjected to another form of informal punishment.

90. Informal punishment sometimes included additional or less desirable kitchen chores.

91. During her time working in the kitchen at WNMCF, Susie's primary job was "floater."

92. In Susie's role as a "floater," she was required to accomplish a variety of different tasks related to food service at the prison.

93. Susie's tasks in the kitchen included doing inventory, cleaning, dishwashing, prepping food trays and occasionally cooking when a regular cook didn't show up for work.

94. During her time working in the WNMCF kitchen, one of Susie's unofficial tasks was to kill rodents.

95. Many inmates working in the kitchen at the women's prison would scream and try to get away from rodents whenever they saw them.

96. However, there was a small number of other inmates, including Susie, who were obligated to kill rodents in the WNMCF kitchen.

97. The inmates who took on the task of killing rodents tried to share this duty because the chore was so disgusting.

98. Monica saw inmates like Susie killing rodents almost every day that she worked in the kitchen.

99. In coordination with other inmates, whenever a rodent was spotted in the kitchen, Susie would attempt to corner it.

100.    Whenever she had an opportunity, Susie would attempt to smash rodents with a broom or mop.

101.    Although killing rodents in this manner was both challenging and nauseating, Susie got lots of practice because of the enormous number of rodents in the WNMCF kitchen.

102.    Susie killed rodents almost every day she worked in the kitchen.

103.    Over time, Susie became very skilled at killing rodents.

104.    Unfortunately, Susie's extermination efforts did little to reduce the enormous number of rodents infesting the kitchen.

105.    During her time working in the kitchen at WNMCF, Monica's primary jobs were to work at the dishwashing station and to serve as the special diet cook.

106.    Because Monica typically had the morning shift, whenever she entered the kitchen to start her shift she always found rodent feces on the floor, counters, food trays and other surfaces.

107.    One of Monica's first duties every day was to help clean up the rodent feces that covered the kitchen.

108.    Although rodent traps were set in various locations around WNMCF, including in the kitchen, the traps were completely ineffective because of the enormous scope of the rodent infestation.

109.    Live rodents regularly got caught in glue traps in and around the WNMCF kitchen.

110.     Unfortunately, catching rodents in these traps did almost nothing to reduce the huge number of rodents infesting the kitchen.

111.     On one occasion, Monica, Susie and other inmates found the remains of a small bloody leg stuck in a glue trap that a rodent had chewed off to escape from the trap.

112.     On several occasions, Defendant Estevan handed Monica a plastic trash bag and gestured toward a live rodent stuck in a glue trap on the kitchen floor.

113.     Monica understood Defendant Estevan's gestures to mean that she was being ordered to place the live rodent into the plastic bag, stomp on it until it was dead, and then throw it away.

114.     On these occasions, Monica followed Defendant Estevan's implicit orders, placing the glue trap with the live rodent into the plastic bag, stomping on it, and then throwing it into the trash.

115.     Both Susie and Monica regularly witnessed rodents crawling across food that was about to be served to inmates.

116.     Defendant Estevan would often demand that food be used even when she knew or suspected that rodents had contaminated it.

117.     On one occasion, Susie was present when a rodent jumped into a pot of stew that was about to be served.

118.     Another inmate scooped the live rodent out of the stew.

119.     Once the rodent had been removed, Defendant Estevan demanded that inmates working in the kitchen serve the contaminated stew.

120.     Susie and the other inmates who were present complained that it would be disgusting, degrading and unsafe to serve the stew, but Defendant Estevan ordered them to serve it anyway.

121.     When Defendant Estevan went to her office, however, the inmates ignored her orders and threw the contaminated stew away.

122.     When Defendant Estevan found out that the inmates had discarded the adulterated stew, she at first threatened to have them formally disciplined.

123.     Defendant Estevan wanted to avoid any official documentation of this event.

124.     For that reason, instead of formally disciplining the inmates who had disobeyed her, she forced them to do extra kitchen chores as informal punishment.

125.     On another occasion, Susie was present when inmates working in the kitchen found rodent feces on a tray of sausages being served for breakfast.

126.     After inmates discarded the feces-covered sausages, Defendant Estevan forced them to serve the remaining sausages to the inmates.

127.     Susie and the other inmates complained, but Defendant Estevan made them serve the sausages anyway.

128.     Rodents were heard regularly inside a rectangular vent that extended from the ceiling to the floor in the WNMCF kitchen.

129.     Defendant Estevan and Defendant Sanchez were both aware that rodents were constantly exiting and entering the kitchen via this vent.

130.     On multiple occasions, Susie and Monica were present when other inmates shook the vent causing nests of rodents to fall out of the opening and onto the floor of the kitchen.

131.     Among the debris, they often saw numerous hairless pink rodent babies.

132.     On one occasion, Susie was present when the inmates working in the kitchen were instructed by Defendant Estevan to retrieve an old food cart that hadn't been used for a while.

133.     The inmates found a rodent nest on the cart that included numerous hairless pink rodent babies.

134.     Some of the babies in the rodent nest were alive and others were dead.

135.     Defendant Estevan ordered an inmate to clean the rodent nest off the cart so it could be used for food service.

136.     The inmate started to clean off the cart but she felt so distraught and nauseated by the sickening chore that she began vomiting.

137.     Concerned for the inmate, Susie intervened to help rinse off the cart with soap and water so it would be fit for use.

138.     The dry storage area of the WNMCF kitchen was also infested with rodents.

139.     Rodents regularly were seen entering and exiting holes in the walls of the dry storage area.

140.     These holes were only very rarely plugged up and sealed by WNMCF staff.

141.     As a result, rodents regularly gnawed their way into cereal and cake mix bags in WNMCF's dry storage area.

142.     When Susie did inventory, she regularly saw holes created by rodents in these bags.

143.     Monica also sometimes saw holes chewed in these bags when she entered the dry storage area.

144.     On one occasion, Susie told Defendant Estevan about a hole she had discovered in a cake mix bag, but Defendant Estevan simply ordered Susie to put another bag around the bag with the hole in it.

145.     Knowing that Defendant Estevan was indifferent to the rodent infestation, Susie sometimes notified other employees of Defendant Summit when she saw holes in bags of food.

146.     Despite Susie's attempts to raise concern about the holes in bags of food with Defendant Estevan and other employees of Defendant Summit, the issue was never resolved.

147.     Occasionally, Susie, Monica and other inmates working in the kitchen would even find live rodents inside the dry food bags.

148.     Rodents would often gnaw into bags of Frito chips.

149.     Despite protests by Susie, Monica and the other inmates working in the kitchen, Defendant Estevan would insist on still using the contaminated chips for making Frito pies to serve to inmates.

150.     The large numbers of rodents gaining access to food in the dry storage area contaminated much of the stored food with rodent feces and urine.

151.     Although the concentration of rodents at the women's prison was highest in the kitchen, the infestation extended to many other parts of the prison.

152.     The infestation was particularly extensive in the cafeteria.

153.     Susie, Monica and other inmates regularly saw rodents running around the cafeteria while they were eating.

154.     Inmates frequently found rodent feces in the food they were served.

155.     On one occasion, Susie and Monica were eating in the cafeteria when a dead rodent was discovered in the oatmeal that had already been served to inmates.

156.     About half of the inmates being served had already eaten some of the oatmeal.

157.     When inmates discovered that a dead rodent had been found in the oatmeal, some of them became so distressed and nauseated that they began to vomit.

158.     Susie and Monica saw an inmate vomiting into a trash can in the cafeteria.

159.     Although neither of them vomited, both Susie and Monica felt intense nausea and couldn't finish the remainder of their food.

160.     On another occasion, Monica was served a hamburger patty with rodent feces on it.

161.     She had already eaten some of the hamburger patty when she noticed the feces.

162.     Monica felt intense nausea when she saw the feces on her food.

163.     Sickened by the sight, Monica tried to complain to staff of Defendant Summit.

164.     Staff of Defendant Summit told Monica the feces were just a burned part on her hamburger patty.

165.     As a worker in the WNMCF kitchen, Monica knew that hamburger patties at the women's prison aren't grilled but are precooked and then baked in an oven.

166.     Because she knew how hamburger patties at the women's prison were prepared, Monica knew that the incongruous brown splotch on the hamburger patty was rodent feces.

167.     For that reason, Monica threw the remainder of her meal in the garbage and left the cafeteria hungry.

168.    In addition to contamination of food caused by the rodent infestation, Defendant Estevan also regularly insisted on serving inmates food that had expired or was spoiled.

169.    When Susie was doing inventory and discovered food that was spoiled or contaminated by rodents, she often would attempt to either throw it away when Defendant Estevan wasn't looking or drop it on the floor to justify throwing it away.

170.    During the period when Susie and Monica worked there, the WNMCF kitchen was almost always dirty and unsanitary.

171.    Only on those rare occasions when they were preparing for an inspection would inmates be given adequate supplies to clean the kitchen.

172.    Unless they were preparing for an inspection, Susie, Monica and other inmates working in the kitchen were never given enough dish soap or sanitizer to adequately clean the kitchen.

173.    Under the instructions of Defendant Estevan, inmates were only allocated two partially filled Styrofoam cups of cleaner to use for cleaning the entire kitchen each day, one for the dishwashing area, the other for the rest of the kitchen.

174.    Defendant Sanchez knew that inmates were only provided with this inadequate amount of soap to clean the kitchen.

175.    Unless an inspection was expected, Defendant Sanchez never took steps to ensure that inmates were given adequate cleaning supplies.

176.    Despite the unsanitary conditions, inmates working in the kitchen were rarely given protective gear, including rubber gloves.

177.     Defendant Estevan never sampled the food from the kitchen that she supervised because she knew it was unfit for human consumption.

178.     Defendant Estevan and other staff employed by Defendant Summit at WNMCF refused to eat the contaminated food prepared in the kitchen and instead brought food from outside the prison for their own consumption.

179.     Susie, Monica and the other inmates regularly watched them eat this food through a large glass window separating the main kitchen from the office used by Defendant Estevan and other staff of Defendant Summit.

180.     Defendant Estevan regularly told Susie, Monica and other inmates that she didn't have to eat "that food," meaning the food served in the WNMCF kitchen that she supervised.

181.     When Susie, Monica and other inmates complained to Defendant Estevan about the contaminated, unsanitary, dangerous food served by the WNMCF kitchen, she simply responded: "Then don't eat it."

182.     On several occasions, Susie and Monica were present when Defendant Estevan bragged to inmates that she tried to spend as little as possible on food in the WNMCF kitchen.

183.     Other staff employed by Defendant Summit told Susie, Monica and other inmates that Defendant Estevan received bonuses from Defendant Summit when she spent below a certain threshold on food served by the WNMCF kitchen.

184.     Defendant Estevan knew that most inmates at WNMCF had no choice but to eat the contaminated, dangerous food served by her kitchen even though that food was unfit for human consumption.

185.     Susie filed grievances about the rodent infestation and the lack of sanitary food service at WNMCF on approximately five occasions.

186.     Monica filed approximately two grievances about the rodent infestation and the lack of sanitary food service at WNMCF.

187.     On one occasion, Susie and Monica filed a grievance together with approximately a dozen other inmates to complain about the rodent infestation and the impact it had on food served to inmates at the women's prison.

188.     Susie and Monica stopped filing grievances about the rodent infestation because they never got an adequate response.

189.     Because the rodent infestation at the women's prison was so obvious, shocking and persistent, and because of the large volume of inmate grievances about the problem over a period of many years, Defendant Yates, Defendants John Does, Defendant Lucero-Ortega, and Defendant Sanchez were well aware that WNMCF inmates were fearful of the impact the rodents were having on their physical health.

190.     Susie, Monica and other inmates were traumatized at the thought of the various diseases, including Hantavirus Pulmonary Syndrome, that they could contract due to the rodent infestation at WNMCF.

191.     During their incarceration at WNMCF, Susie, Monica and other inmates were deeply concerned that they or other inmates might contract HPS and die.

192.     In an attempt to prevent themselves from getting ill and dying, Susie and Monica avoided eating oatmeal, baked goods, breakfast sausages, stews or other foods they believed to be contaminated by rodents.

193.     Susie and Monica felt constant trepidation and fear about the food served in the WNMCF cafeteria.

194.     Susie and Monica were constantly hungry while they were incarcerated at the women's prison because they tried to avoid eating food contaminated by rodents.

195.     Susie and Monica tried to eat commissary food as much as possible because of their firsthand knowledge of the food contamination caused by the rodent infestation at WNMCF.

196.     Because of the extremely low wages paid to inmates and the exorbitant prices charged for commissary food at the women's prison, it was impossible for Susie and Monica to fully substitute the contaminated food served by the WNMCF kitchen with food they purchased from the commissary.

197.     Inmates at WNMCF frequently experience "lockdowns" during which they aren't able to purchase food from the commissary and must rely almost entirely on food served by the WNMCF kitchen.

198.     Because of both the exorbitant prices of food sold by the commissary as well as the frequency of lockdowns, Susie and Monica were often forced to eat food that they knew was almost certainly contaminated by rodents, rodent feces and rodent urine.

199.     In August 2018, while the women's prison was on lockdown, Monica suffered a perilous bout of food poisoning.

200.     She believes she contracted it after eating breakfast sausage served by the WNMCF kitchen.

201.     Monica asked for medical care that morning but initially received none.

202.     She spent approximately five to six hours in the bathroom suffering from extremely intense bouts of vomiting and diarrhea.

203.     During most of that time, Monica was curled up in a ball on the floor next to a toilet.

204.     WNMCF staff seemed unaware that Monica was in the bathroom during most of this period.

205.     Susie helped take care of Monica while she was suffering from food poisoning in the bathroom.

206.     The severity of Monica's sickness grew so extreme that Susie and Monica both became terrified that she might die.

207.     Susie begged for help from WNMCF staff.

208.     WNMCF finally took Monica to receive medical care at approximately 5 p.m. that afternoon, after many hours of intense suffering in the bathroom.

209.     On the way to receive medical care, Monica vomited again into a plastic bag that Susie gave her.

210.     When the nausea finally ended, Monica still felt very weak.

211.     It took several days for Monica to fully recover.

212.     Sometime in early 2018, Susie also suffered from a bout of extreme food poisoning that caused her to vomit whenever she ate.

213.     Susie told WNMCF that she was severely ill and required medical attention.

214.     WNMCF staff instructed Susie to vomit into a bag to prove that she was really sick.

215.     Susie only received medical attention after she vomited into a bag and then showed the vomit-filled bag to WNMCF staff.

216.     When her nausea finally ended, Susie still felt very weak.

217.     It took several days for Susie to fully recover.

218.     Because of the grotesque working conditions in the kitchen at the women's prison, Susie and Monica both struggled to secure jobs at the prison that didn't involve preparing food.

219.     They eventually succeeded in securing work at WNMCF that didn't require them to work in food service.

220.     After they stopped working in the WNMCF kitchen, Susie and Monica continued to be incarcerated at the women's prison.

221.     During this period, although they felt relieved to no longer have to work at ground zero of the rodent infestation, both Susie and Monica became even more apprehensive and fearful about consuming any of the contaminated food prepared at the women's prison for inmates.

222.     Of the various units housing inmates at WNMCF, units 1 and 2 were the most heavily infested with rodents because they are located closest to the kitchen and cafeteria.

223.     Susie and Monica were housed for much of their time at the women's prison in Unit 2.

224.     They saw or heard rodents almost every night while they were detained at WNMCF.

225.     They would attempt to tape various materials to the bottom of their doors to keep rodents from entering their cells, but many would still find a way in.

226.     While detained at WNMCF, despite never being given adequate cleaning supplies, Susie and Monica cleaned their cells obsessively every morning and evening as best they could.

227.     They took every precaution possible to block rodents from entering their cells because of the threat posed to their health by the infestation.

228.     The rodent infestation made it difficult for them to sleep while they were detained at WNMCF.

229.     Even though they now have been released from prison, Susie and Monica continue to experience a sense of panic whenever they encounter food that reminds them of the food contaminated by rodents at WNMCF.

230.     They continue to feel a deep sense of anxiety when they think about how they were forced to live, eat, work and sleep in a facility with such a horrific infestation of rodents.

231.     To this day, Susie and Monica are traumatized by the very real possibility that exposure to the rodent infestation at WNMCF will cause long-term health problems for them and other inmates who are or have been detained at the women's prison.

## COUNT I: VIOLATION OF EIGHTH AMENDMENT:
## INHUMANE CONDITIONS OF CONFINEMENT
## (ALL DEFENDANTS)

232.     Plaintiffs restate each of the preceding allegations as if fully stated herein.

233.     It is common knowledge that infestations of rodents can cause illness and disease in humans.

234.    The lethal danger posed by Hantavirus Pulmonary Syndrome in New Mexico is common knowledge throughout the state.

235.    Defendant Yates, Defendants John Does, Defendant Lucero-Ortega, Defendant Sanchez and Defendant Estevan all knew that rodents were breeding in large numbers in many parts of the women's prison, but especially in and near the WNMCF kitchen and cafeteria.

236.    Defendant Yates, Defendants John Does, Defendant Lucero-Ortega, Defendant Sanchez and Defendant Estevan were also well aware of the extreme risk posed to inmates' physical health by the ongoing rodent infestation at the women's prison.

237.    Defendant Summit was directly responsible for the unconscionable, degrading and dangerous actions of its employee, Defendant Estevan, during all material times.

238.    Class counsel in *Duran v. Grisham*, the civil rights class action lawsuit focused on addressing overcrowding at NMCD facilities, has put NMCD on notice that inmates have reported enormous numbers of rodents at WNMCF, especially in and near the kitchen.

239.    NMCD's own policies require that it engage in adequate pest control at its prisons.

240.    NMCD's own policies also require that it provide adequate health protection for inmates detained in its facilities, including those who work in food service.

241.    A request by Plaintiffs' counsel under the New Mexico Inspection of Public Records Act revealed that despite repeated alarms raised by NMED, class counsel in *Duran* and inmates at the women's prison, Defendant Yates, Defendants John Does, Lucero-Ortega and Defendant Sanchez made no documented effort prior to 2020 to control the rodent infestation at the women's prison.

242.     All individual Defendants were well aware that the rodent traps at the women's prison were completely ineffective in addressing the infestation.

243.     By utterly failing to take reasonable steps to end the rodent infestation at WNMCF, Defendant Yates, Defendants John Does, Defendant Lucero-Ortega and Defendant Sanchez were in continuous violation of New Mexico law and NMCD's own policies.

244.     By failing to provide safe and sanitary food to inmates at the women's prison, Defendant Yates, Defendants John Does, Defendant Lucero-Ortega, Defendant Sanchez and Defendant Estevan were in continuous violation of New Mexico law and NMCD's own policies.

245.     Defendant Yates, Defendants John Does, Defendant Lucero-Ortega, Defendant Sanchez and Defendant Estevan knew they were violating these laws and policies.

246.     They also knew the risks posed to the health and well-being of inmates created by violations of these laws and policies.

247.     Defendant Yates, Defendants John Does, Defendant Lucero-Ortega, Defendant Sanchez and Defendant Estevan were indifferent to these risks.

248.     Plaintiffs had a constitutional right to conditions of confinement that did not threaten their physical or mental health and well-being.

249.     Defendants were constitutionally obligated to provide Plaintiffs with nutritionally adequate food prepared and served under conditions that did not present a danger to their health and well-being.

250.     While incarcerated at the women's prison, Plaintiffs were forced to eat food that was contaminated by rodent feces and urine.

251.    This contaminated food presented a danger to their physical and mental health and well-being.

252.    Each day that Susie and Monica worked in the kitchen in the conditions created by Defendants was an ongoing nightmare for them.

253.    After they left the kitchen, the horror of what they had experienced working in food service at the women's prison intensified their fears that they and other inmates would succumb to potentially deadly illnesses or diseases because of the rodent infestation that Defendants utterly failed to address.

254.    Subjecting Plaintiffs and other inmates to the appalling torment caused by the rodent infestation was inhumane and dangerous.

255.    By numerous accounts, the infestation at the women's prison continues to this day.

256.    Subjecting Plaintiffs and other inmates to the constant nightmare created by the rodent infestation at WNMCF is antithetical to human dignity and repugnant to the conscience of a civilized society.

257.    By subjecting Plaintiffs to these dangerous, degrading and dehumanizing conditions of confinement, Defendants imperiled Plaintiffs by forcing them to live, eat, work and sleep while under constant exposure to serious physical health risks caused by the infestation.

258.    Defendants knew of the constant, obvious and substantial risk of serious harm to Plaintiffs, and they consciously disregarded it.

259.    As a result of Defendants' deliberate indifference to Plaintiffs' health and safety, Plaintiffs suffered serious physical and mental harm during their incarceration.

260.     Defendants' actions and inactions violated Plaintiffs' rights to be free of cruel and

unusual punishments as guaranteed by the Eighth Amendment to the U.S. Constitution.

<u>COUNT II: NEGLIGENCE</u>
**(DEFENDANTS SUMMIT FOOD SERVICE, LLC AND BASHEEN ESTEVAN)**

261.     Plaintiffs restate each of the preceding allegations as if fully stated herein.

262.     Defendant Summit was contracted by NMCD to provide food services to all

inmates at WNMCF, including Plaintiffs.

263.     Defendant Summit agreed to supply inmates at the women's prison with sanitary

and nutritionally adequate food.

264.     Defendant Summit had a duty to provide Plaintiffs with sanitary and nutritionally

adequate food while they were incarcerated at WNMCF.

265.     This duty was created in part by New Mexico law and NMCD policies, which both

require that inmates in New Mexico prisons receive meals that meet basic nutritional and

sanitary standards.

266.     This duty is also required by basic human decency.

267.     Although every provider of food services has a duty to provide food that is fit for

human consumption, that duty is even more crucial when people don't have any option but

to consume the food given to them by the provider.

268.     In many circumstances, Plaintiffs had no choice but to eat the unsanitary,

contaminated food provided to them by Defendant Summit and its employees, including

Defendant Estevan.

269.     Defendant Summit and Defendant Estevan failed in their duty to consistently provide Plaintiffs with food fit for human consumption while they were incarcerated at the women's prison.

270.     Defendant Summit and Defendant Estevan also had a duty to treat the inmates who were employed in the WNMCF in a humane manner.

271.     By creating a work environment in which Susie and Monica were continuously subjected to horrifically repulsive food service practices, Defendant Summit and Defendant Estevan completely breached their duty to treat Plaintiffs with basic human decency.

272.     Defendant Summit's and Defendant Estevan's negligence caused Plaintiffs to suffer physical and mental harm during their incarceration.

273.     Defendant Summit's and Defendant Estevan's failure to consistently provide Plaintiffs with sanitary, uncontaminated food and to create an adequately clean, safe and sanitary work environment was the proximate and actual cause of the harm suffered by Plaintiffs.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all counts so triable.

WHEREFORE, Plaintiff requests judgment as follows:

1. Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including emotional harm.

2. Punitive damages in an as yet undetermined amount severally against all Defendants.

3. Reasonable costs and attorney's fees incurred in bringing this action.

4. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

NEW MEXICO PRISON & JAIL PROJECT

  /s/ Steven Robert Allen
Steven Robert Allen
Attorney for Plaintiffs
3800 Osuna Road NE, Ste 2
Albuquerque, NM 87109
(505) 515-0939