## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SUSIE ZAPATA and MONICA GARCIA,**

    **Plaintiffs,**

    **vs.**                                     **Case No. 1:21-CV-00083 MV/JFR**

**LEON MARTINEZ, ROBERTA LUCERO-ORTEGA,**
**ARTHUR SANCHEZ, BERLEEN ESTEVAN,**
**and SUMMIT FOOD SERVICE, LLC,**

    **Defendants.**

### DEFENDANT ROBERTA LUCERO-ORTEGA'S MOTION
### FOR SUMMARY JUDGMENT

COMES NOW Defendant Roberta Lucero-Ortega ("Defendant"), by and through counsel of record, Kennedy, Moulton & Wells, P.C., by Debra J. Moulton, and hereby moves the Court for summary judgment under Fed.R.Civ.P. 56. The Court should grant Defendant's motion for summary judgment because Plaintiffs' claim is barred by res judicata/claim preclusion and Defendant is entitled to qualified immunity.

### INTRODUCTION

Plaintiffs have filed a lengthy "First Amended Complaint for the Recovery of Damages Caused by the Deprivation of Civil Rights" (Doc. 39). The gravamen of Plaintiffs' Complaint is that their civil rights under the Eighth Amendment of the United States Constitution were violated due to an infestation of mice at the Western New Mexico Correctional Facility ("WNMCF") in Grants, New Mexico, which housed female inmates at all times relevant. Defendant Lucero-Ortega was the Warden of WNMCF during 2017 and 2018. Plaintiff Zapata was incarcerated at WNMCF from May 2017 to December 2019. Plaintiff Garcia was incarcerated at that facility from August to October 2017 and then again from March 2018 to

1

June of 2019.  Plaintiffs allege that Defendant Lucero-Ortega was deliberately indifferent to the

Plaintiffs' health and safety in violation of their right to be free from cruel and unusual

punishment as guaranteed by the Eighth Amendment to the United States Constitution.  (Doc.

39, ¶ 259 - ¶260).

Prior to the filing of the present lawsuit, Plaintiffs were members of the class in a class

action lawsuit entitled *Duran, et al. v. Michelle Lujan Grisham, et al*., No. 1:77-cv-00721-KG-

KK. As the *Duran* litigation redeveloped in 2017, Plaintiffs alleged ongoing violations of the

Eighth and Fourteenth Amendment to the United States Constitution, including "environmental

conditions including vermin." *See*, Order Granting Final Approval of Second Revised Settlement

Agreement, ¶5, attached hereto as Exhibit A.  On June 3, 2019, while both Plaintiffs remained

incarcerated, the parties reached a Settlement Agreement wherein it was agreed that the New

Mexico Corrections Department ("NMCD") would retain professionally licensed exterminators

to be deployed at least monthly for the duration of this agreement at Western New Mexico

Correctional Facility to mitigate concerns about rodents and vermin at that facility.  *See*,

Settlement Agreement, ¶ 10, dated June 3, 2019, attached hereto as Exhibit B.  On February 14,

2020, the court in *Duran* approved a class action Second Revised Settlement (referred therein as

the "Revised Settlement Agreement") for claims related to alleged "ongoing violations of the

Eighth and Fourteenth Amendments to the United States Constitution, including unreasonable

risks due to class members' health and safety due to "… environmental conditions including

vermin...."  *See*, Second Revised Settlement Agreement, dated February 14, 2020, attached

hereto as Exhibit C.  Under the terms of the settlement, Plaintiff Class was defined to include all

female inmates in New Mexico Corrections Department's custody, regardless of classification

level.  *See*, Exhibit A, ¶ 29.a.  Also, the Second Revised Settlement Agreement "constitutes the

entire set of obligations and duties necessary for Defendants' full release from this litigation…."

*See*, Exhibit A, ¶ 31, F.  Thus, the issues in *Duran* have been litigated on their merits and a

settlement has been reached.  Plaintiffs are now attempting to circumvent the settlement by

reasserting Eighth Amendment claims against employees or those acting in privity with the New

Mexico Corrections Department; however, such claims are barred by claim preclusion/*res

judicata*.

Defendants are further entitled to qualified immunity, as the law was not clearly

established that an infestation of mice constituted a constitutional violation of the Eighth

Amendment.  Nor are Plaintiffs able to establish either the objective or subjective component of

deliberate indifference.  As such, Defendants are entitled to summary judgment as a matter of

law.

## STATEMENT OF UNDISPUTED MATERIAL FACT

1.    Defendant Roberta Lucero-Ortega became the Warden at Western New Mexico

Correctional Facility, in Grants, New Mexico in January of 2016 and held that post until October

30, 2018, retiring on December 31, 2018.  *See*, Deposition of R. Lucero-Ortega, pp. 9, l 14-18

and pp. 12, l 17 – 20, attached hereto as Exhibit D.

2.    Plaintiff Zapata was incarcerated at Western New Mexico Correctional Facility

between May 25, 2017 and December 19, 2019.  *See*, Deposition of Susie Zapata, pp. 118, l 17 -

19 and pp. 118, l 20 – pp. 119, l 4, attached hereto as Exhibit E.

3.    Plaintiff Monica Garcia was incarcerated at Western New Mexico Correctional

Facility between August 22, 2017 and October 2, 2017 and then again from March 15, 2018 until

June of 2019.  *See*, Master Record Entry of Monica Garcia, attached hereto as Exhibit F and

deposition of Monica Garcia, pp. 16, l 3 – 17 pp. 23, l 7 – 18 and pp. 83, l 2 – 5, attached hereto

as Exhibit G.

4.      On July 5, 2017, class counsel in *Dwight Duran, et al. v. Michelle Lujan Grisham, et al.*, Civ. No. 77-721 KK/SCY filed Plaintiffs' Motion for Declaratory, Injunctive, and Remedial Relief regarding Violations of the court's Stipulated Orders, alleging that Defendants were violating a 1991 Consent Decree and a Settlement Agreement from 2016.[1] In that motion, the Plaintiff class alleged ongoing  inadequate bathroom facilities and plumbing, constitutionally inadequate healthcare, and failure to timely release inmates at prison facilities operated by the New Mexico Corrections Department ("NMCD"). *See,* Exhibit A, ¶ 5.

5.      *Duran* Defendants opposed Plaintiffs' options and also filed motions to dismiss seeking termination of all prospective relief and an automatic stay on December 8, 2018. Defendants subsequently withdrew these motions without prejudice to allow the parties to pursue settlement negotiations.  *Id.*, ¶ 6.

6.      The issue of hygiene and environmental conditions at WNMCF arose on December 20, 2018, when Plaintiffs filed a Motion for Order to Postpone Automatic Stay, pursuant to the automatic stay provision of PLRA, 18 U.S.C. §3226 (e).  In support of Plaintiffs' motion for a sixty day postponement, Plaintiffs alleged current and ongoing violations outside of the prior provisions of the 1991 Consent Decree.  Plaintiff class stated that: "Rodent infestations have been reported by numerous inmates at WNMCF and NWNMCF, both in Grants, NM,

---

[1] *Duran* is a class action originally brought in 1977 alleging violations of the federal constitutional rights of certain inmates in the State of New Mexico's custody.  By the parties' agreement, the Court entered an order on July 15, 1980, noting that the Plaintiff class had been certified under the Federal Rule of Civil Procedure 23(b)(1) and (2). After extensive litigation, on June 10, 1991, the parties entered into a settlement agreement resolving all then-pending motions.  The Court issued an order ("1991 Consent Decree") adopting the parties' agreement on September 20, 1991.  By July 16, 1999, all of the substantive requirements in the 1991 Consent Decree had been satisfied and vacated, except for certain restrictions on overcrowding.  According to the decree, the overcrowding restrictions were to remain in place in perpetuity.  The litigation was dormant from late 1999 to 2015, when a class member revived it by filing *pro se* motions for emergency injunction and a contempt order.  Class counsel resumed active participation of the Plaintiff class and on August 5, 2016, the parties reached a settlement of then pending disputes.  The Court approved that settlement on August 31, 2016.  *See,* Exhibit A, ¶¶ 2 – 4.

where hantavirus is prevalent.  Class members at WNMCF report rodents running through the kitchen and cafeteria and being served food with rodent droppings in it."  *See*, Plaintiffs' Motion for Order to Postpone Automatic Stay, dated December 20, 2018, attached hereto as Exhibit H.

7.    The parties had conducted extensive investigation and discovery regarding the claims and defenses raised in their respective motions.  *Id.*, ¶ 6.

8.    On May 14, 2019, the parties signed a settlement agreement and sought the Court's approval of the settlement agreement on June 3, 2019 in a Joint Motion for Preliminary Approval of Settlement Agreement.  The Court held a hearing on the motion on June 11, 2019, after which the parties conferred and clarified language in the agreement.  *Id.,* ¶ 8.

9.    On August 14, 2019, the parties incorporated their clarifications into a Revised Settlement Agreement, which was executed on August 14, 2019.  The parties then filed a second Joint Motion for Preliminary Approval of Settlement Agreement on August 21, 2019.   In that motion, the parities sought the Court's preliminary approval of the Revised Settlement Agreement and represented that the revised agreement was "the operative version of the Settlement Agreement and … supersedes the May 14, 2019 version of the Agreement."  *Id.* ¶ 9.

10.    On August 28, 2019, the Court held a hearing on the *Duran* parties' August 21, 2019 joint motion.  The Court then entered an Order Granting Preliminary Approval of Class Action Settlement Agreement and Approving and Directing the Issuance of Notice to Plaintiff Class Members on September 5, 2019.  In the Order. The Court preliminarily held that the Revised Settlement Agreement was fair, adequate, reasonable, and likely to meet the requirements of Federal Rule of Civil Procedure 23(c) and the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. §3626.  *Id*., ¶¶ 10 – 11.

11.    The Court approved the Notice to Plaintiff Class Members and found that it

satisfied the requirements of Rule 23 and due process.  The Court then directed Defendants to provide the Notice and Revised Settlement Agreement to class members by posting them in English and Spanish in the law library, general library, dining facilities, recreational facilities, and on a bulletin board in every unit in every NMCD facility in New Mexico, from September 24, 2019 through December 23, 2019.The Court further directed the Defendants to provide the Notice and Revised Settlement Agreement to each inmate housed in any segregated housing unit between September 24, 2019 and December 23, 2019, in English or Spanish at the inmate's election.  *Id.*, ¶ 12.

12.    In its Order Granting Preliminary Approval of Class Action Settlement Agreement and Approving and Directing the Issuance of Notice to Plaintiff Class Members, the Court directed any class member who wished to object to the Revised Settlement Agreement to file his or her objections in writing by December 23, 2019 and directed Defendants to allow class members to submit timely objections free of charge.  *Id.*, ¶ 14.

13.    Between September 12, 2019 and January 27, 2020, approximately 152 members of the Plaintiff class filed objections to the Revised Settlement Agreement.  The Court meticulously reviewed all of these objections and has considered them carefully in deciding whether to approve the proposed settlement.  The Court also carefully reviewed and considered objections sent to class counsel between September 24, 2019 and December 23, 2019 and filed with the Court on February 10, 2020.  *Id*., ¶ 15 – 16.

14.    The parties filed a Joint Memorandum in Support of Final Court Approval of the Revised Settlement Agreement on January 22, 2020, and the Parties Joint Motion for Final Approval of Revised Settlement Agreement on January 30, 2020.  *Id*., ¶ 18.

15.    On January 31, 2020, the parties filed a Joint Motion and Memorandum in Law

for Approval of a Modification to Paragraph 12 of the Revised Settlement Agreement, the modification of which the Court found did not necessitate a new notice and objection period before the Court finally approve the parties' proposed settlement. *Id.*, ¶¶ 19, 21.

16.    The parties filed their Joint Motion for Final Approval of the Second Revised Settlement Agreement on February 10, 2020. *Id.*, ¶ 28.

17.    In the Court's Order Granting Final Approval of Second Revised Settlement Agreement, the Court found that the Plaintiff class, which was defined in the 1991 Consent Decree as "all those inmates who are now, or in the future may be, incarcerated in the Penitentiary of New Mexico at Santa Fe or at any maximum close or medium security facility open for operation by the State of New Mexico after June 12, 1980" included all female inmates in NMCD's custody, regardless of classification level. *Id.*, ¶ 29 a.

18.    In each of the settlement agreements, the parties agreed that "NMCD will retrain professionally licensed exterminators to be deployed at least monthly for the duration of this revised settlement agreement at WNMCF and NWNMCF to mitigate concerns about rodents and vermin at the facilities."

19.    Plaintiffs were and are members of the *Duran* class. *See*, Exhibit A.

20.    Defendant was an employee of the New Mexico Corrections Department and was acting in her scope of employment with NMCD during the time she was Warden at WNMCF. *See*, First Amended Complaint, ¶13.

21.    Defendant, as Warden, was required to do, and did, weekly inspections of the facility. *See* Exhibit D, pp. 38, l 13 through pp. 39, l 12.

22.    Defendant never saw rodents at the facility.  See Exhibit D, pp. 53, l 10-18.

23.    Defendant observed rodent feces occasionally at the facility in the admin areas but

never observed rodent feces in the kitchen area, food hall or housing units.  *See* Exhibit D, pp. 53, l 19 through pp. 54, l 16.

24.    Defendant heard reports of rodents in and around food service from the two Fire and Safety Sanitation Officers ("FSSO's") and maybe from Pete Perez, one of the Deputy Wardens.  *See* Exhibit D, pp. 54, l 17 through pp. 55, l 10.

25.    The cleanliness of the kitchen was a subject that requited supervision and was monitored by Defendant's immediate staff on a weekly basis.  *See* Exhibit D, pp. 63, l 1 – 16.

26.    Ultrasonic Mice Repellers were purchased for the facility in 2017 and placed in the. admin areas and the kitchen.  *See* Exhibit D, pp. 68, l 23 through pp. 69, l 19.

27.    Sticky tape traps were also used at the facility and were effective as long as they were not interfered with by the inmates.  *See* Exhibit D, pp. 69, l 20 through pp. 70, l 9.

28.    Defendant never received any complaints directly from inmates regarding the presence of rodents.  *See* Exhibit D, pp. 70, l 16 – pp. 71, l 24.

29.    Defendant never saw any informal complaints or formal grievances at the facility regarding the presence of rodents.  *See* Exhibit D, pp. 72, l 6 through pp. 73, l 2.

30.    Defendant does not recall any conversations with inmates about rodents and its impact on food service.  *See,* Exhibit D, pp. 79, l 10 – 18.

31.    Defendant never had conversations with anyone regarding rodents breeding in the walls of the facility.  *See* Exhibit D, pp. 77, l 24 through pp. 78, l 11.

32.    Plaintiff Susie Zapata never had a conversation with Defendant Lucero-Ortega. *See* Exhibit E, pp. 172, l 10 – 14.

33.    Plaintiff Monica Garcia never had a conversation with Defendant. *See* Exhibit G, pp. 96, l 19 – 22.

34.    On January 26, 2017, the NMED Environmental Health Bureau conducted an inspection of the WNMCF kitchen.  There is no reference to mice or mouse droppings in the report.  See, Food Establishment Inspection Report dated 1/26/17, attached hereto as Exhibit I.

35.    On April 10, 2017, NMED Environmental Health Bureau conducted another inspection of the WNMCF kitchen.  In that inspection, it was noted that there were "mice droppings present in facility only 2 traps available."  It was also noted that there was a gap at the bottom of the double doors to the kitchen and walk in cooler #4 needed repair where mice have chewed through the insulation.  *See*, Food Establishment Inspect Report dated 4/10/17, attached hereto as Exhibit J. In the corresponding EID Corrective Action Plan Form, these issues were immediately dealt with, i.e. on 4/10/17, the "Bio Hazard Crew was called out and cleaned the area where there were mice droppings and set more traps." Also on 4/10/17, the maintenance crew replaced the weather stripping on the front door to the kitchen and "[R]eplaced molding on the bottom freezer door" and "[S]ealed up all cracks on the bottom."  *See*, EID Corrective Action Plan Form dated 4/12/17, attached hereto as Exhibit K.

36.    On July 24, 2017, NMED Environmental Health Bureau conducted another inspection of the WNMCF kitchen.  On that date, the inspector noted: "Evidence of mouse dropping found in cooler #4 area."  *See,* Food Establishment Inspection Report dated July 24, 2017, attached hereto as Exhibit L. In the corresponding EID Corrective Action Plan Form, dated July 26, 2017, it is noted that the Bio Hazard Crew was sent to the Main Kitchen to clean up what appeared to be a dead rodent.  It is further noted that "After cleaning the area, it was found to be a buildup of lint and not a dead rodent."  It was also noted that maintenance would be ordering stainless steel to seal up the holes in Cooler #4. *See,* EID Corrective Action Plan Form dated July 26, 2017, attached hereto as Exhibit M.

37.    On January 10, 2018, NMED Environmental Health Bureau conducted another inspection of the WNMCF kitchen.  The inspector noted that mice droppings were present in the tool room and dry storage.  *See,* Food Establishment Inspection Report dated January 10, 2018, attached hereto as Exhibit N. A Corrective Action Plan was sent to Defendant from Berleen Sanchez, the Food Service Director and she advised that she had asked FSSO Arthur Sanchez to clean the area, but that FSSO Sanchez had "refused," suggesting she have an inmate who was Bio Hazard trained clean the area*.  See*, Corrective Action Plan dated January 10, 2018, attached hereto as Exhibit O. FSSO Sanchez testified that he and his porters cleaned the area that same day.  *See*, Deposition of Arthur Sanchez, pp. 94, l 18 – pp. 95, l 9, attached hereto as Exhibit P.

38.    On December 5, 2019, the NMED Environmental Health Bureau conducted another inspection at WNMCF's kitchen.  In that inspection there was no mention of the presence of rodents or mice droppings.  *See,* Food Establishment Inspection Report dated December 5, 2018, attached hereto as Exhibit Q.

## LEGAL ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Martinez v. CO2 Services, Inc.,* 12 Fed. Appx. 689 (10th Cir. 2001) (interpreting New Mexico law), *citing Kaul v. Stephan,* 83 F.2d 1208, 1212 (10th Cir. 1996).  Summary judgment is appropriate if there is not sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  *Biester v. Midwest Health Servs., Inc.,* 77 F.2d 1264, 1266 (10th Cir. 1996).

To be entitled to summary judgment, defendant is not required to disprove or negate plaintiff's claims but need only point to an absence of evidence to support those claims. *Martinez, supra, citing Kaul, supra.* In order to defeat summary judgment, plaintiff may not rest upon his pleadings, but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which he carries the burden of proof. *Id.* Unsupported conclusory allegations. . . do not create a genuine issue of fact." *L & M Enters., Inc. V. BEI Sensors & Sys. Co.,* 231 F.3d 1284, 1287 (10th Cir. 2000). *See also Peterson v. Shanks,* 149 F.3d 1140, 1144-45 (10th Cir. 1998)(Mere speculation unsupported by evidence is insufficient to resist summary judgment.) Entry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which it will bear the burden of proof at trial. *Zuls v. U.S.,* 60 F.3d 838 (10th Cir. 1995)(unpublished disposition) *citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

**B**.    **The *Duran* Settlement Agreement prohibits the Plaintiffs from asserting their claims as they are barred by *res judicata*.**

The doctrine of *res judicata* prevents litigants "from relitigating issues that were or could have been raised" in prior litigation. *Clark v. Haas Group, Inc*., 953 F.2d 1235, 1238 (10th Cir. 1992). Under Tenth Circuit law, *res judication* or "claim preclusion" requires (1) "a judgment on the merits in the earlier action," (2) "identity of the cause of action in both suits," and (3) "identify of the parties or their privies in both suits." *Yapp v. Excel Corp.*, 186 F.3d 1222, 1226 (10th Cir. 1999).

Each of the elements of claim preclusion are satisfied here.

1.    There has been a final judgment in *Duran*.

The Second Revised Settlement Agreement, filed on February 14, 2020, in *Duran* falls within the PLRA's definition of a "consent decree" and thus, must comply with the PLRA's

requirements for prospective relief.  18 U.S.C. § 3626(c)(1) ("consent decree" is "any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties").  *See,* Exhibit A, ¶ 29 p.  Thus, in compliance with the PLRA, the Court noted that (1) the prospective relief is "narrowly drawn," extends no further than necessary to correct the violation of the federal constitutional rights of the Plaintiff class and is the least intrusive means necessary to correct the violation of the federal constitutional rights of the Plaintiff class.

"A consent decree is a negotiated agreement that is entered as a judgment of the court. Consent decrees … have characteristics both of contracts and of final judgments on the merits." *Johnson v. Lodge #93 of Fraternal Order of Police*, 393 F.3d 1096, 1101 (10th Cir. 2004) (internal quotation marks omitted); *see also V.T.A., Inc.. v. Airco, Inc.,* 597 F.2d 220, 224 (10th Cir. 1979) (noting that when "the underlying judgment was by consent [it] has the same force and effect for [Rule] 60(b) purposes as a judgment rendered on the merits following trial").  In *Jackson v. Los Lunas Community Program, et al.*, 880 F.3d 1176, 1190 - 91 (10th Cir. 2018) the Tenth Circuit Court of Appeals found that a Consent Decree, such as in the *Duran* case, is a final decision, even though the district court may continue to monitor Defendants' compliance with the decree. In *Jackson*, the Court of Appeals was considering whether the Court had jurisdiction to review the claims raised in a motion to vacate the consent decrees.  The Plaintiff class argued that because the district court may have to continue to oversee Defendants' compliance with the consent decree, the consent decree was not final.  The Court of Appeals found that the continued oversight by the District Court of Defendants' compliance did not deprive the Court of jurisdiction and found that the consent decree was a final appealable order.

The same is true here.  In *Duran,* the Second Revised Settlement Agreement, which the Court recognized as a Consent Decree, is a final decision and has the same force and effect as a

judgment rendered on the merits following trial, even if the District Court continues to monitor Defendants' compliance.

      2.  The cause of action asserted by Plaintiff in this case is identical to that asserted by the Plaintiff class in *Duran*.

"[I]dentity of the cause of action" exists where claims arise "out of the same 'transaction or series of connected transactions.'" *Yapp*, 186 F.3d at 1227. Moreover, as long as the same set of operative facts are at issue, it makes no difference whether the plaintiff purports to assert his or her claims under a different legal theory. *See Plotner v. AT&T Corp*., 224 F.3d 1161, 1170 (10th Cir. 2000) ("The fact that [plaintiff] now presents some of her claims under the rubric of slightly different legal theories … does not obscure the fact that they all arise out of a single transaction.").

The Tenth Circuit employs the transactional approach of the Restatement (Second) of Judgments to determine whether the claims raised in a previous lawsuit share an identity with the claims raised in a second lawsuit. *Id.,* 186 P.3d at 1227. Under this test, claims "arising out of the same 'transaction, or series of connected transactions' as a previous suit" are precluded. *Id.* (quoting *Restatement (Second) of Judgments* §24 (1982)). What constitutes the same transaction or series of transactions is "to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Id*. Moreover, the mere fact that different claims "emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief," does not create different cause of action to allow a plaintiff's subsequent action to move forward. *Id.* "Transactional analysis extinguishes the right to pursue second lawsuit "even though the plaintiff is prepared in the second action … (2) [t]o seek

remedies or forms of relief not demanded in the first action." *See Restatement (Second) of Judgments* § 25 (1982).

Under the transactional analysis, the *Duran* Plaintiff class and the Plaintiffs here address the same cause of action—the violation of federal constitutional law as a result of vermin in the correctional facilities. The two lawsuits differ only in the avenues of recovery—one sought injunctive and declaratory relief and the other seeks monetary damages, both under federal law. This difference is insufficient to overcome *res judicata*. *See Restatement (Second) of Judgments* § 24 (1982). As Plaintiffs' First Amended Complaint asserts the same cause of action as that presented in *Duran*, the second element of *res judicata* has been satisfied.

> 3. The parties to this action are all in privity with NMCD, a party in *Duran*, and thus, the parties are identical for purposes of *res judicata*.

While there is no definition of privity which can be automatically applied in all cases involving the doctrine of *res judicata*, privity requires "a substantial identity between the issues in controversy and showing that the parties in the two actions are really and substantially in interest the same." *Deflon v. Sawyers,* 2006-NMSC-025, at ¶ 4. "Parties have been found in privity where they represent the same legal right." *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1175 (10th Cir. 1979).

Plaintiffs were members of the Plaintiff class in Duran by virtue of their presence at Western New Mexico Correctional Facility in Grants, New Mexico in 2017 – 2019. While Defendant was not named in *Duran*, she is in privity with NMCD who was a named Defendant, because their interests are the same in this matter. At all material times, Defendants was acting within the scope of her duties and employment with NMCD, and any liability she may have incurred as a result of her actions, are thereby attributed to NMCD. Additionally, the legal rights which Plaintiff alleges were violated by Defendant are the same in both cases, and if Defendant

were to be found to have violated those rights, she would have done so only in her official capacity as the Warden of the WNMCF. "An individual in privity with a party is one whose legal interests were litigated in the former proceeding." *Briggs v. Newberry County School Dist.*, 838 F.Supp. 232, 235 (D.S.C. 1992 ).

In *Maestas v. Seidel*, Case. No 16:CV-00614-WJ-WPL, the Court meticulously considered the issue of privity between the Town of Taos and its Human Resource Director, the Defendant in the case. Judge Johnson concluded that Defendant Seidel had met the burden of showing that she and the Town of Taos were "really and substantially in interest the same." Specifically the Court pointed out that Ms. Seidel was being sued exclusively for acts undertaken in the course and scope of her employment with the Town and that there were no allegations that she did anything outside the scope of her employment. Rather, the challenged actions and the basis of the claims against her, occurred in the course of her role as HR Supervisor for the Town and any liability she would have incurred would be attributed to the Town. The Court relied on several district court decisions analyzing Tenth Circuit authority, finding privity exists between an employer and the employee in his or her individual capacity. In *Zizumbo v. Ogden Medical Center, 2012 WL 4795655,* at *5 (D. Utah, 2012), the Federal District Court for the District of Utah, Northern Division analyzed Tenth Circuit law in finding privity between the employer and its employee where the plaintiff's claims were premised on the actions of the employee, which is the case here. In *Zizumbo,* the plaintiff made 42 U.S.C. § 1981 claims against the employer in the first case and made the same claims against an employee in his individual capacity in the second case. *Id.* at *1-2. The court concluded that although the employee was not a named defendant in the first lawsuit, he was in privity with the employer because all the claims in the two suits were based on actions the employee took in his employment capacity. *Id.* at *5. Also,

in *Van Deelen v. City of Kansas City,* 218 p.3d 814, at *4 (Kan.Ct.App. 2009), the Kansas Court of Appeals applied Tenth Circuit authority and concluded that individual supervisors were in privity with their employer because any alleged liability against the individual defendants arose from the acts they undertook on behalf of their employer. *Id.*

In *Maestas*, the Court also relied on *Mambo v. Vehar* 185 Fed.Appx. 763, 764 (10th Cir. 2006), which Defendant Siedel referenced to establish that the Tenth Circuit has recognized privity between an employer and an employee under certain circumstances. Defendant Seidel also cited *Benson v. City of Texas*, 2014 WL 948901, at*3 (S.D. Tex. Mar. 11, 2014) for the recognition that there is privity between parties where the employer is vicariously liable for the employee's conduct. Additionally, in *Tyler v. Horizon Project Inc.,* 26 F.Supp. 2d 1250, 1255 (D.Or. 1998), the U.S. District Court of Oregon found that privity exists between the State and its employees because the Legislature has authorized the Attorney General of Oregon, through statue, to defend and indemnify state officers who are sued for damages arising from acts in the performance of their duties. As Defendant Seidel pointed out in *Maesta,* in New Mexico the Legislature similarly has provided indemnification and defense costs for "any public employee when liability is sought for…any violation of property rights, privilege or immunities secured by the constitution and laws of the United States or the constitution and laws of New Mexico when…acting within the scope of his duty."

Here, Defendant Lucero-Ortega is in privity with NMCD. Any alleged liability against her would have arisen from the acts she undertook on behalf of NMCD as a Warden of WNMCF. Plaintiff has alleged that all actions she took were within the course and scope of her employment with NMCD and that she was at all times material acting under color of state law. For these reasons, Defendant Lucero has established privity, the third element of *res judicata*.

R*es judicata* forecloses the Plaintiffs' attempt to assert duplicative claims for violations of the Eighth Amendment to the United States Constitution, including, environmental conditions including vermin that have already been released in the Duran settlement. Defendant requests the Court grant her motion for summary judgment for the foregoing reasons.

**C.    Defendant is entitled to Qualified Immunity.**

The qualified immunity defense "protects law enforcement officials who are required to exercise their discretion by shielding them from liability for harm caused by reasonable mistakes." *G.M. ex rel B.M. v. Casalduc*, 982 F.Supp 2.d 1235, 1241 (D.N.M. 2013)(citing *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Qualified immunity grants such officials "an entitlement not to stand trial or face the other burdens of litigation…." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

"When a defendant moves for summary judgment on the basis of qualified immunity, the burden shifts to the plaintiff to demonstrate, on the facts alleged, that (1) the defendant violated his constitutional or statutory rights and (2) the right was clearly established at the time of the alleged unlawful activity." *Castillo v. Day*, 790 F.3d 1013, 1019 (10th Cir. 2015)(citing *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). This is a heavy burden for the plaintiff. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)(citing *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995). Under the qualified immunity analysis, the conduct of each individual capacity defendant must be isolated and analyzed, as opposed to an analysis of the defendants' conduct cumulatively. *Matthews v. Bergdorf*, 889 F.3d 1136, 1145 (10th Cir. 2018). "The contour of the right must be sufficiently clear that a reasonable official

would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S.

635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).  "A right is clearly established if 'it would be

clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"

*Casalduc*, 982 F.Supp.2d at 1241 (quoting *Courtney v. Okla. ex rel Dep't of Pub. Safety*, 722

F.3d 1216, 1222 (10th Cir. 2013).  In other words, in the light of pre-existing law, the

unlawfulness of the official's actions must be apparent.  *Id*.  "If the plaintiff cannot meet either

part of this burden, the defendant is entitled to qualified immunity."  *Castillo*, 790 F.3d at 1019

(citing *Swanson v. Town of Mountain View*, 577 F.3d 1196, 1199 (10th Cir. 2009)).  The Court

may address either prong of the two-step analysis first.  *Casalduc*, 982 F.Supp.2d at 1242 (citing

*Courtney*, 722 F.3d at 1222).

    1.  The Plaintiff cannot establish that the law was clearly established at the time of the alleged unlawful activity.

Clearly established law must be an on-point decision by the Supreme Court, Tenth

Circuit or the New Mexico Supreme Court, or the clearly established weight of authority from

other circuits. *Davis v. Scherer,* 468 I.S. 183, 194-96 (1984); *Albright v. Rodriguez*, 51 F.3d

1531, 1535 (10th Cir. 1995).  In addition, a plaintiff must identify a preexisting case or cases that

bear "factual correspondence" to the situation at issue.  *See Armijo v. Wagon Mound Public

Schools*, 159 F.3d 1253, 1260 (10th Cir. 1998); *Powell v. Mikulecky,* 891 F.2d 1454, 1456-57

(10th Cir. 1989) (plaintiff must show that the constitutional right as applied by the case law was

sufficiently clear that a reasonable official would understand his or her conduct violated that

right); *Hannula v. City of Lakewood,* 907 F.2d 129, 131 (10th Cir. 1990) (plaintiff must

demonstrate a substantial correspondence between the conduct in question and the prior law

allegedly establishing that the defendant's actions were clearly prohibited").

The bedrock principle of qualified immunity—that the right allegedly violated must be clearly established by case law that is "particularized" to the actual facts of the case and should not be based on a "high level of generality" has been reaffirmed by the Supreme Court in a recent per curium decision, *City of Tahlequah, et al., v. Austin P. Bond*, 595 U.S. ____ (2021). The Court stated:

> We have repeatedly told courts not to define clearly established law at too high a level of generality. See, *e.g. Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). It is not enough that a rule be suggested by then-existing precedent; the "rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 583 U.S., at ___ (slip op., at 14) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Such specific is "especially important in the Fourth Amendment context," where it is "sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (*per curiam*) (internal quotation marks omitted).

The Court then concluded that none of the decisions relied upon by the Tenth Circuit Court of Appeals "comes close to establishing that the officers' conduct was unlawful," nothing that the facts were dramatically different from the facts than those in *Bond*.

There are no cases in the Supreme Court, Tenth Circuit or the New Mexico Supreme Court with particularly analogous fact patterns. As such, Defendant is entitled to qualified immunity.

2. Plaintiff is unable to satisfy either the objective or subjective component of an Eighth Amendment claim.

A successful Eighth Amendment claim requires a plaintiff to demonstrate evidence of both objective and subjective components. *Skelton v. Bruce*, 409 Fed.Appx. 199, 202 (10th Cir. 2010). To satisfy the objective component, the plaintiff must show that "the deprivation alleged [is] objectively 'sufficiently serious…'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 114

S. Ct. 1970, 128 L.Ed.2d 811 (1994)(internal citation omitted)).  To satisfy the subjective

component, the plaintiff must establish that the official subjectively acted with "deliberate

indifference to his health or safety." *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970 (citations

omitted); see also *Skelton*, 409 Fed.Appx. at 202.  Plaintiff cannot establish either the objective

or subjective prong.

  As noted, the conditions Plaintiffs complain of "must be 'sufficiently serious to implicate

constitutional rights.'" *DeSpain v. Uphoff (DeSpain II)*, 264 F.3d 965, 973 (10th Cir. 2001). The

objective component requires consideration of both the severity of the potential harm and the

likelihood that such serious harm will occur. *See Brown v. Budz*, 398 F.3d 904, 910 (7th

Cir. 2005) (observing that the objective component of Farmer's two-prong test includes a

requirement that "that there was a substantial risk beforehand that the serious harm might

actually occur"); *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (the risk of injury

should be such that there is "'a strong likelihood, rather than a mere possibility'" of

serious injury (quoting *Edwards v. Gilbert*, 867 F.2d 1271, 1276 (11th Cir. 1989)).

  It is questionable that these conditions were of such severity or duration as to rise to the

level of a constitutional violation because there is no objective indication that the conditions

were so severe as to pose a substantial risk of serious harm. *See Rocha v. CCCF Admin,* No. 1—

1158, 2011 WL 167264, at *2 (10th Cir. Jan. 20, 2011) (concluding that prisoner's allegations of

exposure to extremely cold conditions when air conditioning was turned up "are deficient

because there is no objective indication that the cold was so severe as to pose a substantial risk of

serious harm"); *Nickerson v. Providence Plantation* (D.R.I. 2021) (plaintiff's allegations that he

had found mouse urine, feces, and bite marks, while concerning, fail to state a constitutional

violation as the allegations lacked the details needed to determine the severity of the problem and

plaintiff failed to identify any specific health problem he has suffered or is likely to suffer based on the alleged conditions).  As in *Nickerson* and *Rocha*, this Court cannot discern whether Plaintiffs alleged "serious physical and mental harm" for which neither have sought treatment either during or after incarceration, are sufficiently serious to constitute a substantial risk of serious harm.  For example, both Plaintiff Garcia and Zapata complained about having a "bout of extreme food poisoning.  *See*, First Amended Complaint, ¶ 199 and ¶ 212.  (Doc. 39).  A review of Ms. Garcia's medical records reveals that Ms. Garcia did complain to medical on August 25, 2018 of nausea, vomiting and diarrhea.  The record makes no mention of a subjective complaint from Ms. Garcia that she believed she had a "perilous bout of food poisoning."  She received Phenergan and Imodium.  There are no further records that indicate Ms. Garcia sought additional care thereafter.  *See*, Interdisciplinary Progress Note dated August 25, 2018, attached hereto as Exhibit R.  Ms. Zapata alleged that she sought medical care in early 2018 for a bout of extreme food poisoning.  On January 16, 2018, Ms. Zapata sought medical attention for "severe abd cramping/nausea."  *See*, Interdisciplinary Progress Note dated January 16, 2018, attached hereto as Exhibit S.  Her record makes no mention of a subjective complaint from Ms. Zapata that she believed she had food poisoning.  Her diagnosis was gastroenteritis, and she was told to return to medical if she was "worse in anyway."  There are no further records indicating Ms. Zapata sought follow up medical care from her January 16, 2018 visit.

Neither Plaintiff has any evidence that the cause of the symptoms was food poisoning. To suggest the symptoms were caused by food poisoning from eating at the kitchen at WNMCF is a mere conclusory statement lacking evidentiary support and speculative.  Both plaintiffs fail to causally link their nausea and vomiting symptoms to any food obtained from the kitchen.  Nor do they allege that any other inmate or staff member at WNMCF become ill after eating the same

food they ate, which would surely occur in a case of food poisoning from a communal facility like a prison.

Most significantly, in suits such as this one, a single incident of food poisoning is not serious enough to constitute a violation of the Eighth Amendment. *See Watkins v. Trinity Serv. Group Inc.,* 2006 U.S. Dist. LEXIS 85592 (M.D. Fla Nov. 27, 2006) (isolated food poison and maggot incident were not sufficiently serious deprivations to violate prisoner's constitutional rights, as physical injuries of diarrhea, vomiting, cramps, and nausea were considered *de minimis*); *George v. King,* 837 F.2d 705, 707 (5th Cir. 1988) (holding that a single incident of prisoner food poisoning is not a constitutional violation); *Bennett v. Misner*, 2004 U.S. Dist. LEXIS 19568, 2004 WL 2091473 *20 (D. Or., Sept. 17, 2004) ("Neither isolated instances of food poisoning, temporary lapses in sanitary food service, nor service of meals contaminated with maggots are sufficiently serious to constitute an Eighth Amendment violation."). In short, Plaintiff have not established the objective component of deliberate indifference.

"The subjective component requires the … official to have a 'sufficiently culpable state of mind.'" *DeSpain I*, 2000 WL 1228003, at *3 (quoting *Wilson v. Seiter*, 50 U.S. at 297, 111 S.Ct. 2321). Where a plaintiff claims inhumane conditions of confinement, "the required state of mind is one of 'deliberate indifference to inmate health and safety.'" *Id*. (quoting *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970 (internal citation omitted)). "In other words," Defendants will only be liable if they knew "of and disregard[ed] an excessive risk to [Plaintiff's] health and safety…." *Id*. (quoting *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970). Defendants must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and" they must have drawn the inference. *Id*. (quoting *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970). This awareness requirement exists because prison officials who lacked knowledge

of a risk cannot be said to have inflicted punishment in a manner that violates the Eighth

Amendment. *Farmer*, 511 U.S. at 844. "It is not enough to establish that the official should have

known of the risk of harm." *Id*. (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir.

1998). Simply stated, a "'should-have-known' standard, is not sufficient to support a finding of

deliberate indifference." *Spruce v. Sargent*, 149 F.3d 783,786 (8th Cir. 1998)(citing *Farmer*, 511

U.S. at 837). Proof of the subjective component as to each Defendant is required, as the

Supreme Court rejected "a reading of the Eighth Amendment that would allow liability to be

imposed on prison officials solely because of the presence of objectively inhumane prison

conditions." *Farmer v. Brennan*, 114 S.Ct. at 1979 (quoting *Wilson v. Seiter*, 501 U.S. 294, 299-

302, 111 S.Ct. 2321, 2324 – 2326 (1991). "In addition, prison officials who actually knew of a

substantial risk to inmate health or safety may be found free from liability if they responded

reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

There is nothing to suggest that Defendant Ortega-Lucero was aware of a substantial risk

to inmate health or safety. She testified that she never saw a rodent during her rounds at

Western. She never saw rodent droppings or other clear signs that rodents were present while

making her rounds.

As noted in *Farmer*, "[W]hether one puts it in terms of duty or deliberate indifference,

prison officials who act reasonably cannot be found liable under the Cruel and Unusual

Punishments Clause." *Farmer*, 511 U.S. at 845.

As noted, a defendant will only liable if they knew "of and disregard[ed] an excessive

risk to [Plaintiff's] health and safety…." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. At no time

was Defendant aware of an excessive risk to Plaintiffs' health and safety. When she realized that

there was evidence of mice in the kitchen, she required each of her staff to conduct weekly

inspections, so that one member of management was in the kitchen for at least five of the seven days. When she became aware of bags of food being chewed in the dry storage areas, she insisted that plastic bins be purchased so that the rodents could not chew into the bags of food. She had Ultrasonic Mice Repellers purchased in an effort to eliminate mice. During the time that she was warden, the weather stripping was replaced on the front door to the kitchen, the threshold to the kitchen door was replaced, all cracks on the bottom of the cooler door were sealed and sticky traps were set. If inspections revealed the presence of mice, the Bio Hazard crew was called out and cleaned the area and set more traps, if necessary.

In sum, there is no evidence that Defendant was aware of an excessive risk of serious harm to Plaintiffs or that she possessed the requisite culpable state of mind to satisfy the subjective component of the Eighth Amendment test.

Further, to the extent that Defendant was a supervisor, she cannot be held liable solely because she supervised another individual whose conduct violates the Constitution. Rather, she can only be held liable if she was personally involved in conduct, or if she promulgated an official policy that led to the constitutional violation. *See Dodd v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (holding that wardens and other supervisors can face § 1983 liability based on the "promulgation, creation, implementation, or utilization of a policy that caused a deprivation of plaintiff's rights"). Here, all of the policies followed at WNMCF were the policies of the New Mexico Corrections Department, not of Defendant Lucero-Ortega. Plaintiffs have not alleged nor have they established a particular policy of Defendant's that caused a deprivation of their constitutional rights.

For the foregoing reasons, Defendant is entitled to summary judgment as a matter of law on the claim of an Eighth Amendment violation of cruel and unusual punishment, as Plaintiffs

cannot establish either a substantial risk of serious harm or that Defendant Lucero-Ortega knew of and disregarded any risk of harm to the Plaintiffs.

## CONCLUSION

Plaintiffs were members of the *Duran* class when they were incarcerated in 2017 at WNMCF. At that time, the only issue in the litigation was overcrowding. However, as discovery continued, new issues emerged and were brought before the Court and new claims were added to litigation. One such claim was unreasonable risk to class members health and safety due to environmental conditions including vermin at WNMCF. That claim was first raised in pleadings in *Duran* in December of 2018, while both Plaintiffs were incarcerated at that facility, but arose as Plaintiffs' counsel in the case conducted inspections of the facility, had contact with inmates, engaged in discovery, etc. in late 2017 and 2018. A settlement was reached in May of 2019 and ultimately approved, with revisions, in January of 2020. Inasmuch as Defendant was acting in privity with a defendant in Duran, specifically NMCD, Plaintiffs' lawsuit in 2021 is barred by claim preclusion. Additionally, Plaintiff cannot establish that the law was clearly established that the presence of mice at a correctional facility constitutes a violation of the Eighth Amendment or that the conditions that existed were sufficiently serious to implicate constitutional rights. Finally, there is absolutely no evidence of a sufficiently culpable state of mind, i.e. that Defendant Lucero-Ortega knew of the risk of substantial harm and deliberately disregarded that risk. As such, Defendant is entitled to summary judgment.

KENNEDY, MOULTON & WELLS, P.C.

*/s/ Debra J. Moulton*
Debra J. Moulton
Counsel for Defendants Martinez, Lucero-Ortega and Sanchez
2201 San Pedro NE, Bldg. 3, Suite 200
Albuquerque, NM 87110
(505) 884-7887

25

I HEREBY CERTIFY that a true
and correct copy of the foregoing
was transmitted via CM/ECF to:

Steven Robert Allen
New Mexico Prison and Jail Project
3800 Osuna Rd. NE, Suite 2
Albuquerque, NM 87109
steve@nmpjp.org
*Attorney for Plaintiffs*

Lisa Entress Pullen, Esq.
David M. Wesner, Esq.
Civerolo, Gralow & Hill, P.A.
P.O. Drawer 887
Albuquerque, NM 87103
wesnerd@civerolo.com
pullenl@civerolo.com
*Attorneys for Defendants Berleen Estevan*
*and Summit Food Service, LLC*

Harriet Hickman, Esq.
Resnick & Louis, P.C.
5600 Eubank Blvd., NE, Suite 220
Albuquerque, NM 87111
(505) 652-1339
hhickman@rlattorneys.co
*Attorneys for Defendants Summit Food*
*Service, LLC, and Berleen Estevan*

on this 29th day of June

*/s/ Debra J. Moulton*
DEBRA J. MOULTON