**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

DWIGHT DURAN *et al.*,

        Plaintiffs,

                                  Civ. No. 77-721 KK/SCY

v.

MICHELLE LUJAN GRISHAM *et al.*,

        Defendants.

**ORDER GRANTING FINAL APPROVAL OF
SECOND REVISED SETTLEMENT AGREEMENT**

        THIS MATTER is before the Court on the following motions: (1) the Parties' Joint Motion for Final Approval of Revised Settlement Agreement (Doc. 3184), filed January 30, 2020; (2) the parties' Joint Motion and Memorandum of Law for Approval of a Modification to Paragraph 12 of the Revised Settlement Agreement (Doc. 3186), filed January 31, 2020; and, (3) the parties' Joint Motion for Final Approval of the Second Revised Settlement Agreement (Doc. 3200), filed February 10, 2020.[1]  The Court, having reviewed the parties' submissions, the record, and the relevant law, having heard the parties' presentations at a hearing on February 3, 2020 (Doc. 3195), and being otherwise fully advised, FINDS:

1.  The Court has jurisdiction over the parties and the subject matter in this case.

2.  This is a class action originally brought in 1977 alleging violations of the federal constitutional rights of certain inmates in the State of New Mexico's custody.  By the parties' agreement, the Court entered an order on July 15, 1980, noting that the Plaintiff class had been certified under Federal Rule of Civil Procedure 23(b)(1) and (2), and redefining the class as:

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned United States Magistrate Judge to conduct any and all proceedings (including a jury or nonjury trial) and to enter a final judgment in this matter.  (Docs. 3089, 3090.)

Exhibit A

all those inmates who are now, or in the future may be, incarcerated in the Penitentiary of New Mexico at Santa Fe or at any maximum, close, or medium security facility open for operation by the State of New Mexico after June 12, 1980.[2]

(Doc. 101 at 1; Doc. 405 at 1.)

3. After extensive litigation, on June 10, 1991, the parties entered into a settlement agreement resolving all then-pending motions. (Doc. 2851-3.) The Court issued an order ("1991 Consent Decree") adopting the parties' agreement on September 20, 1991. (Doc. 1748.) By July 16, 1999, all of the substantive requirements in the 1991 Consent Decree had been satisfied and vacated, except for certain restrictions on overcrowding. (Doc. 2851-1 at 3-4.) According to the decree, these overcrowding restrictions were to remain in place in perpetuity. (Doc. 2851-3 at 7, 19.)

4. The litigation was dormant from late 1999 to late 2015, when a class member revived it by filing *pro se* motions for an emergency injunction and a contempt order. (Docs. 2692, 2694.) Class counsel resumed active representation of the Plaintiff class, and on August 5, 2016, with the assistance of then-United States Chief Magistrate Judge Karen B. Molzen, the parties reached a settlement of the then pending disputes. (Doc. 2764.) The Court approved this settlement on August 31, 2016. (Doc. 2769.)

5. Almost a year later, on July 5, 2017, class counsel filed Plaintiffs' Motion for Declaratory, Injunctive, and Remedial Relief regarding Violations of the Court's Stipulated Orders, alleging that Defendants were violating the 1991 Consent Decree and the parties' 2016 settlement agreement. (Doc. 2837.) That motion remains pending, as do two additional motions for declaratory, injunctive, and remedial relief that class counsel later filed. (Docs. 2928, 2929.)

---

[2] The class had previously been certified as "all inmates who are now or in the future may be incarcerated at the Penitentiary of New Mexico at Santa Fe." (Doc. 33 at 3; Doc. 101 at 1.)

The Plaintiff class has alleged ongoing violations of the Eighth and Fourteenth Amendments to the United States Constitution, including unreasonable risks to class members' health and safety due to overcrowding, violence, misclassification, disproportionate discipline, understaffing, environmental conditions including vermin and constitutionally inadequate bathroom facilities and plumbing, constitutionally inadequate healthcare, and failure to timely release inmates at prison facilities operated by the New Mexico Corrections Department ("NMCD"). (Doc. 3009 at 4-10.)

6. Defendants opposed Plaintiffs' motions. (Docs. 2851, 2976, 2977.) They also filed motions to dismiss seeking termination of all prospective relief and an automatic stay on December 5, 2018. (Docs. 3003, 3004.) However, Defendants subsequently withdrew these motions without prejudice to allow the parties to pursue settlement negotiations. (Doc. 3023.) The parties have conducted extensive investigation and discovery regarding the claims and defenses raised in their respective motions.

7. The parties participated in a settlement conference with United States Magistrate Judge Steven C. Yarbrough on February 25, 2019, March 29, 2019, and April 30, 2019. (Docs. 3029, 3034, 3040.) At a status conference on May 3, 2019, counsel advised the Court that the parties had reached a settlement in principle. (Doc. 3044.)

8. On June 3, 2019, the parties filed a Joint Motion for Preliminary Approval of Settlement Agreement. (Doc. 3047.) In the motion, the parties sought the Court's preliminary approval of a settlement agreement signed on May 14, 2019. (*Id.* at 1; *see* Doc. 3047-1.) The Court held a hearing on the motion on June 11, 2019, after which the parties conferred and clarified language in the agreement. (Docs. 3055, 3067.)

9.  The parties incorporated their clarifications into a Revised Settlement Agreement, which they
    executed on August 14, 2019.  (Doc. 3067-1.)  The parties then filed a second Joint Motion for
    Preliminary Approval of Settlement Agreement on August 21, 2019.  (Doc. 3067.)  In their
    August 21, 2019 motion, the parties sought the Court's preliminary approval of the Revised
    Settlement Agreement and represented that the revised agreement was "the operative version
    of the Settlement Agreement and . . . supersedes the May 14, 2019 version of the Agreement."[3]
    (*Id.* at 1.)  The parties attached the Revised Settlement Agreement and a proposed Notice to
    Plaintiff Class Members to their August 21, 2019 motion.  (Docs. 3067-1, 3067-2.)

10. On August 28, 2019, the Court held a hearing on the parties' August 21, 2019 motion.  (Docs.
    3070, 3073.)  At the hearing, counsel and NMCD Cabinet Secretary Alisha Tafoya Lucero
    made presentations and responded to the Court's questions regarding the parties' agreement.
    (*Id.*)

11. The Court entered an Order Granting Preliminary Approval of Class Action Settlement
    Agreement, and Approving and Directing the Issuance of Notice to Plaintiff Class Members
    ("Order Granting Preliminary Approval") on September 5, 2019.  (Doc. 3072.)  In its Order
    Granting Preliminary Approval, the Court preliminarily held that the Revised Settlement
    Agreement was fair, adequate, reasonable, and likely to meet the requirements of Federal Rule
    of Civil Procedure 23(e) and the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626.
    (*Id.* at 8.)

12. The Court also approved the Notice to Plaintiff Class Members ("Notice") attached to the
    Order Granting Preliminary Approval and found that it satisfied the requirements of Rule 23
    and due process.  (*Id.*; *see* Doc. 3072-2.)  The Court directed Defendants to provide the Notice

---

[3] In light of the parties' August 21, 2019 motion, the Court denied their June 3, 2019 motion as moot.  (Doc. 3068.)

and Revised Settlement Agreement to class members by posting them in English and Spanish in the law library, general library, dining facilities, recreational facilities, and on a bulletin board in every unit in every NMCD facility in New Mexico, from September 24, 2019 through December 23, 2019. (Doc. 3072 at 8-9.) The Court further directed Defendants to provide the Notice and Revised Settlement Agreement to each inmate housed in any segregated housing unit between September 24, 2019 and December 23, 2019, in English or Spanish at the inmate's election. (*Id.* at 9.)

13. Defendants provided notice of the proposed settlement to the Plaintiff class as the Court directed, including at covered NMCD facilities operated by private contractors. (Docs. 3195, 3198.) Defendants monitored whether the Notice and Revised Settlement Agreement remained posted as prescribed during the objection period and, when inmates at the Guadalupe County Correctional Facility ("GCCF") removed some posted copies, replaced them reasonably promptly. (*Id.*) In fact, Defendants went beyond the Court's requirements to ensure that all class members at GCCF received notice of the proposed settlement, posting extra copies of the Notice and Revised Settlement Agreement in the required locations and placing these documents on an "inmate television systems information channel." (*Id.*)

14. In its Order Granting Preliminary Approval, the Court directed any class member who wished to object to the Revised Settlement Agreement to file his or her objections in writing by December 23, 2019 and directed Defendants to allow class members to submit timely objections free of charge. (Doc. 3072 at 9.)

15. Between September 12, 2019 and January 27, 2020, approximately 152 members of the Plaintiff class filed objections to the Revised Settlement Agreement.[4] (*See* Docs. 3075, 3077-

---

[4] Calculating the exact number of objectors is not the simple exercise it would appear to be at first glance. For example, one class member purported to file objections on behalf of himself and the other 71 inmates in his dormitory. (Doc.

84, 3091, 3096, 3098, 3100-01, 3106-14, 3116, 3118-32, 3142-44, 3146-57, 3159-64, 3169-70, 3175-77; *see also* Docs. 3093-95, 3097, 3099, 3102-03, 3105, 3133-41, 3158, 3165-68.) The Court has meticulously reviewed all of these objections and has considered them carefully in deciding whether to approve the proposed settlement.[5]

16. The Court has also carefully reviewed and considered the objections that seven class members sent to class counsel between September 24, 2019 and December 23, 2019 and later directed counsel to file. (Doc. 3199.) Counsel filed these objections on February 10, 2020, but the Court deems them timely because they were sent to class counsel within the prescribed objection period. (*See id.*)

17. The objections to the proposed settlement take issue with: (a) the loss of the provision providing that certain overcrowding restrictions in the 1991 Consent Decree would remain in place in perpetuity; (b) the reduction of the required dimensions for dormitories and multiple occupancy cells from 60 to 50 square feet per inmate; (c) the reduction in total good time awarded for completion of the Residential Drug Abuse Program ("RDAP"); (d) the exclusion of some class members from the award of good time as remedial relief and the adequacy of

---

3157 at 1.) All of these class members are included in the Court's calculation of the total number of objectors. Likewise included are the 19 class members who raised objections in their Motions to Stay and Terminate and the one class member who raised objections in his Motion for Extension of Time to File Objections to Settle[ment] Agreement. (*See* Docs. 3093-95, 3097, 3099, 3102-03, 3105, 3133-41, 3158, 3165-68.) Not included, however, are two class members who filed pleadings styled as objections expressing unreserved support for the proposed settlement. (Docs. 3109-10.) Also, the Court tried to avoid double-counting those class members who filed objections more than once, as well as those who filed separate objections and memoranda of law in support of their objections. (*See, e.g.*, Docs. 3075 and 3100 (filed by S. Jacobs); Docs. 3091 and 3101 (filed by P. Cain); Docs. 3102 and 3139 (filed by J. Kame); Docs. 3127 and 3128 (filed by C. Buccigrossi); Docs. 3129 and 3130 (filed by M. Whitehead); Docs. 3131 and 3132 (filed by R. Tucker).) Nevertheless, some objectors may have been counted twice.

[5] The Court has also reviewed one unsigned and twelve signed objections to the parties' original Settlement Agreement (Doc. 3047-1), which class members filed before the Court entered its Order Granting Preliminary Approval of the proposed settlement. (*See* Docs. 3058, 3063, 3065-66.) In deciding whether to grant final approval of the proposed settlement, the Court has considered these objections insofar as they address provisions found in the Revised Settlement Agreement and Second Revised Settlement Agreement as well as the original Settlement Agreement. (*See* Doc. 3200-1 at 1.) In addition, the Court has reviewed and considered the objections of former class member Calupp Henderson. (Doc. 3104.)

this relief; (e) the proposed population reduction at the Otero County Prison Facility ("OCPF"), which objectors contend will not alleviate overcrowding at that facility; and, (f) class counsel's alleged collusion with Defendants' counsel in reaching the proposed settlement. (Doc. 3174 at 12.) In addition, there were several miscellaneous objections, including complaints about: the absence of photographic evidence of class members' living and sleeping space; lack of natural light; unregulated temperatures in the pods; absence of hooks for uniforms in cells; claimed medical injuries resulting from overcrowding; phone-to-inmate ratio; quality of the food; family visitation; availability and implementation of educational programs; mail services; absence of monetary compensation to class members; access to medical services and medical staff; staff behavior towards inmates; potential reduction of staff physical fitness standards; violations of the American with Disabilities Act for geriatric inmates; exclusion of serious violent offenders from eligibility for parole reduction recommendations; and, excessive wait times for the parole of sex offenders.

18. The parties filed a Joint Memorandum in Support of Final Court Approval of the Revised Settlement Agreement (Doc. 3174) on January 22, 2020, and the Parties' Joint Motion for Final Approval of Revised Settlement Agreement (Doc. 3184) on January 30, 2020.

19. On January 31, 2020, the parties filed a Joint Motion and Memorandum of Law for Approval of a Modification to Paragraph 12 of the Revised Settlement Agreement. (Doc. 3186.) In this motion the parties indicated that, after the Court entered its Order Granting Preliminary Approval, they agreed to modify Paragraph 12 of the Revised Settlement Agreement to state:

> The Classification Supervisor will ensure that the Parole Board Docket Form is accurate and that it, along with the Parole Plan, is submitted to the Adult Parole Board ("Board") via e-mail no later than ~~30 days prior to a class member's hearing date~~ *90 days prior to a class member's projected release date for class members that will serve parole in New Mexico and no later than 120 days prior to the class member's projected release date if the*

> *class member will serve parole out of state*. NMCD will ensure that class members are timely released on their certified release date following receipt of parole board certificate and, where applicable, when there is available space at a halfway house, transitional living center, or long-term residential treatment center. Substantial compliance with this provision means that NMCD complies with the provisions of this section at least 85% of the time. Beginning no later than thirty days after the entry of this Court's final approval order, NMCD will provide Plaintiffs' counsel with monthly reports documenting production of the Parole Board Docket Form, Parole Plan, and release date for all class members.[6]

(*Id.* at 2; *see also* Doc. 3200-2 at 9.)  According to the parties, after the Court preliminarily approved the Revised Settlement Agreement, they learned that an inmate's parole hearing is not scheduled until after NMCD submits the Parole Board Docket Form and Parole Plan to the Parole Board.  (Doc. 3186 at 2-4.)  As such, the parties realized, it would be meaningless to require NMCD to submit the Parole Board Docket Form and Parole Plan 30 days before the inmate's hearing date.  (*Id.*)  The change to which the parties agreed remedies this problem by using the inmate's projected release date, rather than a non-existent hearing date, to determine when NMCD must submit the Parole Board Docket Form and Parole Plan to the Parole Board.  (*Id.*)  The purpose of the change is to realize the parties' intent to ensure that parole planning for class members begins well in advance of their projected release dates, thereby reducing the number of class members serving in-house parole.  (*Id.*)

20. Rule 23 does not specifically address whether a new notice to class members and a new objection period are required when parties agree to modify a class action settlement agreement. *See generally* Fed. R. Civ. P. 23(e).  "Material alterations to a class settlement generally require a new round of notice to the class and a new Rule 23(e) hearing." *Pearson v. Target Corp.*, 893 F.3d 980, 986 (7th Cir. 2018).  However, courts have generally found

---

[6] Throughout this Order, language that the parties have agreed to delete from the Revised Settlement Agreement is marked as stricken, and language that they have agreed to add is underlined and italicized.

8

that a second notice and objection period is *not* required if the agreed-upon modifications

merely expand the rights of the class. For example, in *In re Integra Realty Resources, Inc.*,

262 F.3d 1089 (10th Cir. 2001), the Tenth Circuit agreed that a modification allowing class

members to opt out of a class action settlement did not require a second notice to class

members, stating:

> the addition of opt-out rights merely expanded the rights of class members
> . . . . Therefore, we see no way that the court's failure to provide new notice
> of the opt-out rights prior to accepting the settlement gave rise to a risk that
> unfavorable terms would be forced upon some class members or otherwise
> diminished class members' ability to bring objections before the court.
> Accordingly, we hold the district court did not abuse its discretion by failing
> to notify class members of their opt-out rights prior to conducting a fairness
> hearing of the settlement's terms.

*Id.* at 1111. Similarly, in *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine)*

*Products Liability Litigation*, 763 F. App'x 237 (3d Cir. 2019), the Third Circuit affirmed the

district court's ruling that "supplemental, classwide notice of an amendment to a settlement

agreement is required only where the amendment has a material adverse effect on the rights

of class members." *Id.* at 241-42 (quotation marks omitted); *see also, e.g., In re Anthem, Inc.*

*Data Breach Litig.*, 327 F.R.D. 299, 330 (N.D. Cal. 2018) ("[W]hen the modification makes

the settlement more valuable to the class, courts have routinely concluded that notice is

unnecessary.") (citing cases); *Keepseagle v. Vilsack*, 102 F. Supp. 3d 306, 313 (D.D.C. 2015)

("[A]n amendment [to a class action settlement agreement] requires supplemental notice only

when it would have a material adverse effect on the rights of class members.") (quotation

marks omitted); *Harris v. Graddick,* 615 F. Supp. 239, 244 (M.D. Ala.1985) ("Under these

limited circumstances where the amendment is narrow and it is clearly apparent that the

interests of the classes are not substantially impaired, the court is of the opinion that the notice

already given is adequate and that additional notice is not required pursuant to Rule 23(e).").

9

21. The Court has carefully reviewed the parties' Joint Motion and Memorandum of Law for Approval of a Modification to Paragraph 12 of the Revised Settlement Agreement, including the attached Affidavit of Hope Salazar (Doc. 3186), as well as the Declaration of Cisco McSorley[,] Executive Director of the New Mexico Parole Board.  (Doc. 3187.)  The Court, having considered these documents and the parties' responses to the Court's inquiries at a hearing held on February 3, 2020, (Doc. 3195), and being otherwise fully advised in the premises, finds that the limited modification to Paragraph 12 to which the parties have agreed merely expands the rights of the members of the Plaintiff class and in no way impairs their interests.  In particular, the Court is persuaded that the earlier parole planning the modification is intended to secure will not delay class members' timely release upon completion of their sentences and will in fact provide more time for the parties to address problems that could otherwise prevent class members from being paroled on schedule.  The Court therefore finds that the modification to Paragraph 12 does not necessitate a new notice and objection period before the Court may finally approve the parties' proposed settlement.

22. On February 3, 2020, four attorneys for the Plaintiff class filed declarations regarding their work on this case.[7]  (Docs. 3190-92, 3194.)  These declarations describe class counsel's sustained, extensive contacts with members of the Plaintiff class before, during, and after the negotiations resulting in the proposed settlement.  These contacts include:  (a) meetings with class members during twenty-one (21) tours of covered NMCD facilities (including at least one tour of each such facility); (b) "hundreds of phone calls with" class members; (c)

---

[7] The attorneys who filed declarations are Alexandra Freedman Smith, Philip Davis, Katherine Loewe, and Mark Donatelli.  (Docs. 3190-92, 3194.)  Mr. Davis and Mr. Donatelli have represented the Plaintiff class since before the 1991 settlement agreement, and Mr. Donatelli participated in the negotiations that led to the 1991 agreement and signed it.  (Doc. 3191 at 1; Doc. 3194 at 1.)  Further, attorney Peter Cubra, who participated in the negotiations leading to the proposed settlement and consulted with and advised class members before, during, and after these negotiations, has also represented the Plaintiff class since before the 1991 settlement agreement, and participated in the negotiations that led to that agreement.  (*See* Doc. 2851-3 at 20.)

"hundreds of letters" from class members; and, (d) "hundreds of letters" to them.  (Doc. 3190 at 2-4; Doc. 3191 at 1-3; Doc. 3192 at 2-6; Doc. 3194 at 2.)   For example, during the negotiations resulting in the Revised Settlement Agreement, counsel

> spoke with dozens of inmates on telephone calls regarding the conditions . . . in which they were living and sent out hundreds of letters to clients asking for information about the conditions in the prisons and what they were most concerned about.  Clients sent us approximately 100 letters explaining the issues they were experiencing.  We also engaged in phone calls where they told us their concerns.

(Doc. 3190 at 4; Doc. 3192 at 3.)   In this manner, counsel identified the problems class members were seeking to remedy and "used this information to formulate the settlement demands" they made.  (Doc. 3190 at 4-5; Doc. 3192 at 3-4.)   "The relief [class counsel] obtained was directly informed by what [class members] had told [them]."  (Doc. 3190 at 5; Doc. 3192 at 5; Doc. 3194 at 3-4.)   Class counsel also received letters from and spoke with "numerous class members" regarding the Revised Settlement Agreement during the objection period.  (Doc. 3190 at 6; Doc. 3192 at 5-6.)   Many class members expressed their approval of the proposed settlement, and "the sentiment of the hundreds of class members with whom [class counsel] met" at the OCPF and Southern New Mexico Correctional Facility ("SNMCF") "was overwhelmingly favorable to the [Revised Settlement Agreement]."[8]  (Doc. 3190 at 6; Doc. 3191 at 3.)

23. The pleadings filed by class members Alison Comstock and Ronaele Sanchez corroborate counsel's declarations, stating that:  (a) class members "collab[o]rated together to state [their] disagree[ment] with the way [they] were housed"; (b) the litigation was a "team effort"; and, (c) Ms. Comstock and Ms. Sanchez "completely agree" with the terms of the proposed

---

[8] This is particularly significant because, as counsel noted, the majority of class members who objected to the proposed settlement were housed at OCPF, SNMCF, and Northeast New Mexico Correctional Facility.  (Doc. 3190 at 6.)

settlement. (Docs. 3109, 3110.) Also, during a tour of Springer Correctional Center ("SCC") with counsel for both sides in April 2018, the undersigned observed some of class counsel's communications with numerous class members, the substance of which clearly evinced ongoing and extensive contacts. (*See* Doc. 2923.)

24. The Court held a hearing on the parties' Joint Memorandum in Support of Final Court Approval of the Revised Settlement Agreement (Doc. 3174) and Parties' Joint Motion for Final Approval of Revised Settlement Agreement (Doc. 3184) on February 3, 2020. (Doc. 3195.) At this hearing, counsel and Secretary Tafoya Lucero made presentations and responded to the Court's questions regarding the proposed settlement.

25. At the hearing, the parties agreed to modify the Revised Settlement Agreement in two respects. First, the parties agreed that Paragraph 1(d)(ii)(3) should state:

> No more than five prisoners per dayroom shall be assigned to dayrooms in any facility and the dayroom housing must provide a minimum of 50 square feet of combined living and sleeping space *per inmate* (excluding the cell left open for hygiene, as set forth below).

(Doc. 3200-2 at 6.) The purpose of this modification is not to change the meaning of Paragraph 1(d)(ii)(3), but rather to eliminate an unintended ambiguity to which some class members objected. (*See, e.g.*, Doc. 3129 at 4-5; Doc. 3131 at 4-5.) On its face, this minor modification merely expands the rights of the Plaintiff class and in no way impairs its interests. The Court therefore finds that the modification to Paragraph 1(d)(ii)(3) does not necessitate a new notice and objection period before the Court may finally approve the proposed settlement. *In re Integra Realty Res., Inc.*, 262 F.3d at 1111; *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*, 763 F. App'x at 241-42; *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. at 330; *Keepseagle*, 102 F. Supp. 3d at 313; *Harris,* 615 F. Supp. at 244.

26. Second, the parties agreed that, in addition to eligible inmates at Northwest New Mexico Correctional Facility ("NWNMCF"), SCC, and Western New Mexico Correctional Facility ("WNMCF"), eligible inmates at OCPF should receive the remedial relief provided for in Paragraph 17 of the parties' agreement.[9] (Doc. 3200-2 at 11.) Specifically, the parties agreed to modify Paragraph 17 as follows:

> As remedial relief, NMCD agrees to award one month's worth of good time consistent with NMSA 1978, § 33-2-34(A) (2015) to the following inmates: (1) any inmate who was housed for at least 60 days in dormitories at NWNMCF from March 1, 2014 until the date the Court finds that Defendants are in substantial compliance with subparagraph (1)(b)(i) of this Revised Settlement Agreement; (2) any inmate who was housed for at least 60 days at SCC from October 1, 2016 until the date the Court finds that Defendants are in substantial compliance with subparagraph (1)(b)(ii) of this Revised Settlement Agreement; and (3) any inmate housed for at least 60 days in dormitories at WNMCF from October 1, 2016 until the date the Court finds Defendants are in substantial compliance with subparagraph (1)(b)(iii) of this Revised Settlement Agreement*; and (4) any inmate housed for at least 60 days in dormitories at OCPF from October 1, 2016 until the date the Court finds Defendants are in substantial compliance with subparagraph (1)(b)(iv) of this Revised Settlement Agreement*.[10] Only one award will be made to eligible inmates. Excluded from this provision are any inmates who have a sustained finding of assault against a staff member. Also excluded from this provision are those inmates who have less than 45 days of time left to serve on their sentence as measured from the entry of this Court's final approval order. These good time awards shall be made within 30 days of this Court's final approval order. For inmates who become eligible for these good time awards after the date of the final approval order, the awards shall be made within 30 days of the date the inmate becomes eligible.

(*Id.*) Many OCPF inmates objected to the Revised Settlement Agreement because it excluded them from receiving this remedial relief. (*See, e.g.*, Docs. 3199-1 to 3199-3.) The parties' agreement to modify Paragraph 17 addresses these objectors' concerns. The modification

---

[9] The purpose of Paragraph 17 is to provide remedial relief to class members who have endured unconstitutional conditions while residing in overcrowded dormitories during the specified time frames. (*See* Doc. 3200 at 3-6.)

[10] At the February 3, 2020 hearing, the parties clarified that "60 days" as used in Paragraph 17 means 60 days total, rather than 60 consecutive days.

confers a benefit that the proposed settlement previously lacked, and as such operates solely to expand the rights of the Plaintiff class. The Court therefore finds that the modification to Paragraph 17 does not necessitate a new notice and objection period before the Court may finally approve the proposed settlement. *In re Integra Realty Res., Inc.*, 262 F.3d at 1111; *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*, 763 F. App'x at 241-42; *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. at 330; *Keepseagle*, 102 F. Supp. 3d at 313; *Harris,* 615 F. Supp. at 244.

27. At the February 3, 2020 hearing, the Court took the Parties' Joint Motion for Final Approval of Revised Settlement Agreement (Doc. 3184) and Joint Motion and Memorandum of Law for Approval of a Modification to Paragraph 12 of the Revised Settlement Agreement (Doc. 3186) under advisement pending the filing of a superseding joint motion requesting final approval of the Revised Settlement Agreement with the agreed-upon modifications to Paragraphs 1(d)(ii)(3), 12, and 17.

28. The parties filed their Joint Motion for Final Approval of the Second Revised Settlement Agreement on February 10, 2020. (Doc. 3200.) In this motion, the parties jointly ask the Court to finally approve the parties' Second Revised Settlement Agreement, which incorporates the modifications to Paragraphs 1(d)(ii)(3), 12, and 17 described above.[11] (*See generally id.*)

---

[11] The Second Revised Settlement Agreement also includes the following modified introductory language:

> The parties ~~have~~ incorporated those clarifications into ~~this~~ *a* Revised Settlement Agreement and they, through their undersigned counsel, executed ~~this~~ *the* Revised Settlement Agreement on August 14, 2019. *Following the Court's preliminary approval of the Revised Settlement Agreement on September 5, 2019, the parties agreed to certain modifications to the Revised Settlement Agreement, which have been incorporated into this Second Revised Settlement Agreement.* This *Second* Revised Settlement Agreement *(referred to herein as the "Revised Settlement Agreement")* is now the operative version of the Settlement Agreement and it supersedes the May 14, 2019*, and August 14, 2019,* version*s* of the Agreement.

14

29. The Court finds that the Second Revised Settlement Agreement should be finally approved under the standards set forth in Rule 23(e) and the PLRA, and makes the following findings in this regard:

    a) The Plaintiff class is composed of all men confined to a medium or higher custody facility and all women of any classification level in the New Mexico Corrections Department's custody. (Doc. 3072 at 8 ¶ A; Doc. 3174 at 9 ¶ 1; Doc. 3200-1 at 10 ¶ 14.) Although the language used to identify the Plaintiff class has been clarified, the composition of the class is the same as it was when the Court entered the 1991 Consent Decree in September 1991. As previously noted, by September 1991, the class was defined as "all those inmates who are now, or in the future may be, incarcerated in the Penitentiary of New Mexico at Santa Fe or at any maximum, close, or medium security facility open for operation by the State of New Mexico after June 12, 1980." (Doc. 101 at 1; Doc. 405 at 1.) At that time, all female inmates in NMCD's custody, regardless of classification level, were housed at the New Mexico Women's Correctional Facility, a "maximum, close, or medium security facility open for operation by the State of New Mexico after June 12, 1980." (*Id.*; Doc. 2837 at 17; Doc. 2851 at 10.) Thus, then as now, all female inmates in NMCD's custody, regardless of classification level, are class members.[12]

---

(Doc. 3200-2 at 1.) These changes simply reflect the most recent procedural history of the proposed settlement and do not alter class members' rights in any way. As such, they do not necessitate a new notice and objection period.

[12] At the February 3, 2020 hearing, the parties confirmed that the Plaintiff class has never included, and does not now and is not intended to include, women who are on parole or in community corrections outpatient programs, though these women are technically still in NMCD's custody.

b) As of February 14, 2020, there are 6,822 inmates in NMCD's custody, most of whom are members of the Plaintiff class.  https://cd.nm.gov/ (last visited Feb. 14. 2020); (Doc. 3195).

c) The settlement is "a proposed settlement, voluntary dismissal, or compromise" of "[t]he claims, issues, or defenses of a certified class," and as such is subject to the requirements of Rule 23(e).  Fed. R. Civ. P. 23(e).

d) As required by Rule 23(e)(1), the Notice and the notice procedure outlined therein were reasonably calculated to inform all class members of the pendency of the action and the terms of the proposed settlement, and to afford them an opportunity to object to the proposed settlement.  Fed. R. Civ. P. 23(e)(1); *Fager v. CenturyLink Commc'ns, LLC*, 854 F.3d 1167, 1171 (10th Cir. 2016); *DeJulius v. New England Health Care Employees Pension Fund*, 429 F.3d 935, 944 (10th Cir. 2005).  Both as prescribed and as actually implemented, the Notice and notice procedure constituted the best notice practicable under the circumstances.

e) Rule 23(e)(2)(A) requires the Court to consider whether "the class representatives and class counsel have adequately represented the class."   Fed. R. Civ. P. 23(e)(2)(A).  The named class representatives in this case have either died or failed to remain in contact with class counsel.  However, class counsel have ensured that counsel's contact information is available to all class members and have communicated directly with hundreds regarding class members' positions and concerns with respect to this case before, during, and after the negotiations resulting in the proposed settlement, by letter and telephone and during multiple visits to

16

covered facilities.[13]  Class counsel fully advised class members of their efforts to address class members' concerns and undertook settlement negotiations with the authority of the majority of the class members with whom they have spoken over the last several years.  Despite ample notice to class members and class members' ability to object free of charge, only about 2.5 % of inmates in NMCD custody objected to the proposed settlement.[14]  Class counsel confirmed on the record in open court that most of the class members with whom they have communicated have approved of the proposed settlement.  Thus, in the parties' judgment, the settlement is fair and reasonable.  *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984).  Further, class counsel had the authority to negotiate and agree to the Second Revised Settlement Agreement on behalf of the Plaintiff class, and the class members with whom counsel have communicated have adequately represented the class.  Fed. R. Civ. P. 23(e)(2)(A).

f) Class counsel have also adequately represented the Plaintiff class.  Fed. R. Civ. P. 23(e)(2)(A).  Broadly, they have pursued class interests zealously, conscientiously, and consistently for a very long time.  Specifically with respect to the proposed settlement, they have negotiated access to and toured covered facilities, conducted independent investigations (including taking their own measurements of class members' living and sleeping spaces), taken discovery, engaged in motions

---

[13] The Court notes that Reilly Johnson, one of the many class members with whom class counsel communicated, was a member of an inmate committee during the negotiations leading to the 1991 Consent Decree.  According to class counsel, Mr. Johnson expressed his understanding and approval of the Revised Settlement Agreement.

[14] This percentage assumes 172 objectors out of 6,822 inmates.  The Court arrived at 172 objectors by adding the 13 class members who filed objections before the prescribed objection period, the 152 class members who filed objections during the prescribed objection period, and the seven class members whose objections counsel filed on February 10, 2020.

practice, and participated in extensive, arms-length settlement negotiations. Class counsel have demonstrated steadfast devotion to the best interests of the class members. As a result of their efforts and their considerable knowledge, skill, resources, and experience, class counsel have obtained a favorable settlement agreement for the Plaintiff class.

g) The Second Revised Settlement Agreement was negotiated fairly, honestly, without collusion, and at arm's length within the meaning of Rule 23(e)(2)(B). Fed. R. Civ. P. 23(e)(2)(B); *Jones*, 741 F.2d at 324. The parties vigorously litigated this case prior to resolution and reached the proposed settlement only after lengthy and contentious negotiations and with Judge Yarbrough's assistance.

h) The relief to be provided to the class is adequate, taking into account the factors listed in Rule 23(e)(2)(C). With respect to the costs, risks, and delay of trial and appeal, Fed. R. Civ. P. 23(e)(2)(C)(i), class counsel agreed to a compromise regarding the relief they sought only after careful consideration of the relevant circumstances, including possible benefits to the class that could be achieved by further litigation, the length of time this action has been pending and is likely to continue, the expense of further litigation, the risks and costs of further delay, the complexity of the litigation, and the risk to the class of achieving a less favorable outcome.

i) In particular, in agreeing to cede the provision in the 1991 Consent Decree providing that its overcrowding restrictions would remain in place in perpetuity, class counsel weighed the substantial likelihood that this provision would not survive the termination provisions of the PLRA. *See* 18 U.S.C. § 3626(b). In this

regard, counsel prudently exchanged a provision that Congress' enactment of the PLRA rendered unenforceable for real, binding benefits for the class. Also, by agreeing to a reduction from 60 to 50 square feet of combined living and sleeping space per inmate, class counsel obtained Defendants' agreement that the 50 square feet per inmate excludes bathrooms and dayrooms, which Defendants had previously disputed.[15] Further, class counsel obtained Defendants' agreement to award 30 days of good time after completion of each stage of the Residential Drug Abuse Program ("RDAP"), instead of a single lump-sum award after completion of all three stages, by agreeing to a reduction of the total good time awarded from 120 to 90 days.[16] This substantially benefits the Plaintiff class because, previously, members who failed to complete all three stages received no good time for the stages they did complete; and, class members who were unable to complete all three stages, *e.g.*, because the waiting list was too long or their sentences were too short, could not benefit from the program at all. Additionally, the change brings good time awards for participation in the RDAP into compliance with Section 33-2-34 of the New Mexico Statutes Annotated. *See* N.M. Stat. Ann. § 33-2-34(D)(1) (prisoners are eligible for good time award of one month "for successfully completing an approved . . . substance abuse . . . program"). In these respects, as in many others, "serious questions of law and fact" existed that placed the ultimate

---

[15] At the February 3, 2020 hearing, the parties clarified that the requirement of no less than 50 square feet of combined living and sleeping space per inmate, excluding dayrooms and bathrooms, applies to all multiple occupancy cells, including double occupancy cells. (*See* Doc. 3200-1 at 2 ¶ 1(a).) The parties also clarified that "bathrooms" include in-cell toilets and sinks.

[16] According to the Second Revised Settlement Agreement, the three individual stages of the RDAP are: (1) Orientation and Rational Thinking; (2) Criminal Lifestyle – Living with Others; and, (3) Recovery, Maintenance, and Transition Living. (Doc. 3200-1 at 8 ¶ 5.)

outcome of the litigation in doubt, and informed class counsel's positions during settlement negotiations. *Jones*, 741 F.2d at 324.

j)  Also, class counsel reasonably determined that "the value of an immediate recovery outweigh[ed] the mere possibility of future relief after protracted and expensive litigation." *Id.* In this regard, class counsel was properly cognizant that "[a]ny motion to modify or terminate prospective relief made under" the PLRA operates as an automatic stay of the prospective relief beginning 30 to 90 days after the motion is filed. 18 U.S.C. § 3626(e)(2), (3). Thus, had Defendants not withdrawn their motion to terminate the 1991 Consent Decree's overcrowding restrictions pursuant to the parties' agreement to engage in settlement negotiations, the restrictions would likely have been stayed after 30 to 90 days while the parties litigated Defendants' motion.

k)  With respect to the second consideration listed in Rule 23(e)(2)(C), the proposed method of distributing relief to the class is likely to be effective. Fed. R. Civ. P. 23(e)(2)(C)(ii). The Second Revised Settlement Agreement provides for entry of "an access order that reasonably permits Plaintiffs to monitor compliance" with the agreement and requires the parties to "collaborate in the exchange of information necessary to ensure the Defendants' compliance with and expeditious resolution" of the agreement. (Doc. 3200-1 at 12 ¶¶ 19-20.) Also, "[w]here absolutely necessary," Plaintiffs may seek formal discovery. (*Id.* at 12 ¶ 20.) Finally, the Second Revised Settlement Agreement allows the parties to obtain judicial determinations regarding Defendants' substantial and sustained compliance with

the agreement's terms, should the parties disagree about whether such compliance has been achieved.[17] (*Id.* at 12-13 ¶ 21.)

l) With respect to the third consideration under Rule 23(e)(2)(C), the Second Revised Settlement Agreement does not address the award of attorneys' fees and costs to class counsel, except to preserve the parties' rights to litigate this issue at a later date. Fed. R. Civ. P. 23(e)(2)(C)(iii); (Doc. 3200-1 at 13 ¶ 26.) Whether attorneys' fees are awarded, and in what amount, in no way affects the relief that class members will receive pursuant to the agreement.

m) With respect to Rule 23(e)(2)(C)'s final consideration, counsel have stated that the Monitoring and Access Agreement they filed on January 27, 2020 is the only "agreement made in connection with" the proposed settlement. Fed. R. Civ. P. 23(e)(2)(C)(iv), (e)(3); (*see* Doc. 3178.) The Monitoring and Access Agreement does not affect the relief that class members will receive pursuant to the Second Revised Settlement Agreement.

n) Turning to Rule 23(e)(2)(D), the Second Revised Settlement Agreement treats class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2)(D). Many provisions apply to the class as a whole; and, those provisions that treat class members differently – *e.g.*, where some categories of prisoners are entitled to greater relief than others – are equitable and objectively reasonable because they

---

[17] Defendants report that they have designated an employee at NMCD's central office who will be responsible for monitoring Defendants' compliance with the Second Revised Settlement Agreement and who will report directly to Secretary Tafoya Lucero in this regard. This measure is likely to improve the efficient distribution of relief to the Plaintiff class but the Second Revised Settlement Agreement does not require it. (*See generally* Doc. 3200-1.)

account for particular circumstances at specific facilities and avoid adverse impacts on public safety in accordance with the PLRA.[18]   18 U.S.C. § 3626(a)(1), (c)(1).

o)   For these reasons, the terms of the Second Revised Settlement Agreement are fair, reasonable, adequate, and in the best interests of the Plaintiff class.  Fed. R. Civ. P. 23(e)(2).

p)   The Second Revised Settlement Agreement provides for "prospective relief," *i.e.*, "relief other than compensatory monetary damages," in a "civil action with respect to prison conditions."   18 U.S.C. § 3626(a)(1), (g)(7).  Thus, and because the agreement falls within the statute's definition of a "consent decree," it must comply with the PLRA's requirements for prospective relief.  18 U.S.C. § 3626(c)(1) ("consent decree" must comply with PLRA's requirements for prospective relief); 18 U.S.C. § 3626(g)(1) ("consent decree" is "any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties").

q)   In compliance with the PLRA, the prospective relief provided for in the Second Revised Settlement Agreement is "narrowly drawn."  18 U.S.C. § 3626(a)(1); *see also Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1192 (10th Cir. 2018) (federal consent decrees must be "designed as nearly as possible to restore the victims of illegal conduct to the position they would have occupied in the absence of such conduct") (brackets omitted).  The prospective relief is specific, concrete, and carefully composed to directly address conditions flowing from and related to

---

[18] For example, the Second Revised Settlement Agreement excludes sex offenders, serious violent offenders, and offenders serving sentences for a DWI sixth or higher from the benefits of Paragraph 16, which requires NMCD to recommend reduced parole time for parolees who are class members at the time of completion of their sentence and who serve half of their parole without a major violation.  (Doc. 3200-1 at 10-11 ¶ 16.)  This exclusion prevents the early termination of parole for categories of offenders likely to pose a significant risk to public safety.

overcrowding in the prison facilities in which class members are incarcerated, which conditions are sufficient to constitute violations of the Eighth and Fourteenth Amendments.[19]

r)  In compliance with the PLRA, the prospective relief provided for in the Second Revised Settlement Agreement "extends no further than necessary to correct the violation of" the federal constitutional rights of the Plaintiff class.  18 U.S.C. § 3626(a)(1); *see also Jackson*, 880 F.3d at 1192 (federal consent decrees must be "tailored to cure the condition that offends federal law") (internal quotation marks omitted).  The prospective relief is limited in scope and tailored to cure conditions flowing from and related to overcrowding in the prison facilities in which class members are incarcerated, which conditions are sufficient to constitute violations of the Eighth and Fourteenth Amendments.  The Second Revised Settlement Agreement also includes mechanisms to ensure that the prospective relief is kept in place only as long as necessary to cure the unconstitutional conditions.  *Jackson*, 880 F.3d at 1192.

s)  In compliance with the PLRA, the prospective relief provided for in the Second Revised Settlement Agreement "is the least intrusive means necessary to correct the violation of" the federal constitutional rights of the Plaintiff class.  18 U.S.C. § 3626(a)(1); *see also Jackson*, 880 F.3d at 1192 (federal consent decrees "must take into account the interests of state and local authorities in managing their own affairs, consistent with the demands of federal law") (quotation marks omitted).  In this regard, the Court notes that Defendants actively participated in crafting the

---

[19] On a tour of SCC with counsel from both sides, the undersigned personally observed and heard from inmates and staff about some of these conditions.

prospective relief, agreed to it, and determined and stipulated that it is the least intrusive means to correct the unconstitutional conditions at issue.

t)  Further, Defendants have identified, and the Court has discerned, no adverse impact on public safety or the operation of a criminal justice system that the prospective relief would cause. 18 U.S.C. § 3626(a)(1). In particular, the award of "one month's worth of good time" to eligible class members housed at OCPF during the time period specified in Paragraph 17 does not adversely impact public safety, notwithstanding the fact that OCPF primarily houses sex offenders. (Doc. 3200-1 at 11 ¶ 17.) The Court so finds because: (1) each inmate is entitled to receive the award in question only once; (2) inmates' potential eligibility for the award is reasonably limited in time frame, *i.e.*, from October 2016 to Defendants' substantial compliance with Paragraph 1(b)(iv); and, (3) the award must be "consistent with" Section 33-2-34(A) of the New Mexico Statutes Annotated, (*id.*), which limits such awards to "a maximum of four days per month of time served" for serious violent offenders, including most of the eligible class members housed at OCPF. N.M. Stat. Ann. § 33-2-34(A)(1), (L)(4); (Doc. 3200 at 5.)

u)  Finally, no part of the Second Revised Settlement Agreement, if adopted by this Court, would constitute a "prisoner release order" within the meaning of the PLRA. 18 U.S.C. § 3626(a)(3), (g)(4). Specifically, the agreement does not have "the purpose or effect of reducing or limiting the prison population," nor does it "direct[] the release from or nonadmission of prisoners to a prison." 18 U.S.C. § 3626(g)(4). At the February 3, 2020 hearing, Defendants confirmed that they will be able to provide class members with the required 50 square feet of combined living and

sleeping space per inmate by means other than reducing or limiting the prison population or releasing prisoners before they are due to be released, including by transferring prisoners from overcrowded facilities to underutilized ones. The modifications to certain good-time award policies bring such awards into compliance with Section 33-2-34 of the New Mexico Statutes Annotated and are designed to increase participation in the RDAP, which benefits not only the class but also the communities to which class members will return when they are released. Provisions regarding the retraining of records staff, the early submission of forms to the Parole Board, and medical and geriatric parole are designed to ensure that class members receive the good-time awards and parole to which they are entitled and that their parole planning is timely accomplished. Finally, the good-time awards provided for in Paragraph 17 are expressly remedial in nature and designed to compensate class members for the unconstitutional conditions in which they have been housed.[20]

    v) Thus, the Second Revised Settlement Agreement is fully compliant with the requirements of the PLRA. 18 U.S.C. § 3626.

30. The Court has scrupulously considered all of the objections to the proposed settlement filed in this case and finds that none of them are sufficient to undermine the settlement's fairness, adequacy, and reasonableness. The Court has already addressed: (a) the loss of the provision providing that certain overcrowding restrictions in the 1991 Consent Decree would remain in place in perpetuity; (b) the reduction of the required dimensions for dormitories and multiple

---

[20] Other provisions, such as those addressing staff recruitment and bathroom facilities, obviously do not have the purpose or effect of reducing or limiting the prison population, nor do they direct the release from or nonadmission of prisoners to a prison.

occupancy cells from 60 to 50 square feet per inmate; and, (c) the reduction in total good time awarded for completion of the RDAP.  For the reasons discussed above, these terms do not vitiate the fairness, reasonableness, or adequacy of the proposed settlement.  The bulk of the objections regarding the adequacy of the proposed settlement's remedial relief concern the exclusion of class members housed at OCPF from being eligible to receive a remedial good time award.  However, as modified in the Second Revised Settlement Agreement, Paragraph 17 strikes a proper balance between preserving public safety and providing reasonable remedial relief.  The proposed settlement is a compromise, as are all settlements.  The relief class counsel successfully negotiated is fully adequate to protect the legitimate interests of class members and inures to the benefit of the greatest number of class members impacted by the unconstitutional conditions at issue without compromising public safety or imposing impracticable or impossible burdens on NMCD.  And, the Court specifically finds that class counsel in no way colluded with Defendants or defense counsel in reaching the proposed settlement and that challenges to the adequacy of their representation are entirely without merit.  None of the objections warrant disapproval of the proposed settlement and the Court will therefore overrule them.

31. The Court has determined that it is in the parties' best interests and furthers the ends of justice for this Court to approve the Second Revised Settlement Agreement.

For these reasons, IT IS HEREBY ORDERED as follows:

A. The Court APPROVES the Second Revised Settlement Agreement (Doc. 3200-1) as fair, adequate, reasonable, and meeting all of the requirements of Rule 23(e) and the PLRA;

B. The objections to the proposed settlement filed by members of the Plaintiff class are not well taken and are hereby OVERRULED;

C.  The Second Revised Settlement Agreement is ADOPTED as an Order of this Court and SUPERSEDES all consent decrees previously entered in this case, (*see* Doc. 3200-1 at 14 ¶ 29);

D.  The parties' Joint Motion for Final Approval of the Second Revised Settlement Agreement (Doc. 3200) is GRANTED;

E.  The Parties' Joint Motion for Final Approval of Revised Settlement Agreement (Doc. 3184) and Joint Motion and Memorandum of Law for Approval of a Modification to Paragraph 12 of the Revised Settlement Agreement (Doc. 3186) are DENIED AS MOOT;

F.  In light of the fact that the Second Revised Settlement Agreement "constitutes the entire set of obligations and duties necessary for Defendants' full release from this litigation and all attendant Court orders in both the *Duran* and *Klatt* lawsuits," (Doc. 3200-1 at 14 ¶ 29), the following motions are also DENIED AS MOOT: (1) Plaintiffs' Motion for Declaratory, Injunctive, and Remedial Relief Regarding Violations of the Court's Stipulated Orders (Doc. 2837); (2) Plaintiffs' Motion for Declaratory, Injunctive and Remedial Relief at Northwestern New Mexico Correctional Facility (Doc. 2928); and, (3) Plaintiffs' Motion for Declaratory, Injunctive, and Remedial Relief Regarding Violations of the 1991 Settlement Agreement at Western New Mexico Correctional Facility (Doc. 2929);

G.  Counsel are to confer with one another regarding the most expeditious and effective way to provide objectors with the Second Revised Settlement Agreement and this Order.  **Within ten (10) days of entry of this Order**, class counsel are to file a certificate of service documenting the date(s) and manner of service of the Second Revised Settlement Agreement and this Order on all class members who objected to the proposed settlement; and,

27

H. Counsel are to confer with one another regarding the most expeditious and effective way to provide all other class members with the Second Revised Settlement Agreement.

IT IS SO ORDERED.

_____

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE