Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SUSIE ZAPATA AND MONICA GARCIA,

       Plaintiffs,

v.                  Case No. 1:21-CV-00083-MV-JFR

LEON MARTINEZ, ROBERTA LUCERO-ORTEGA,

       Defendants.

### DEPOSITION OF

### ARTHUR SANCHEZ

January 11, 2022
9:00 a.m.
500 4th Street, NW Suite 105
Albuquerque, New Mexico 87102

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY:        STEVEN ROBERT ALLEN
                   ATTORNEY FOR PLAINTIFF

REPORTED BY:     EDWINA CASTILLO, CCR #407
                   PAUL BACA COURT REPORTERS
                   500 4th Street, NW Suite 105
                   Albuquerque, New Mexico 87102

Exhibit D

Page 6

1   Edwina, will interrupt us, of course.  We
2   may need to backtrack and make sure that we get
3   clear questions and clear answers for the record.
4       Does that make sense?
5   A.  Yes, sir.
6   Q.  From time to time your attorney will
7   likely object to some of my questions.  I expect
8   that.  Unless she specifically directs you not to
9   answer a question, you'll need to go ahead and
10  answer the question for the record after that
11  objection is lodged.
12      Does that make sense?
13  A.  Yes, sir.
14  Q.  Okay.  Let's see, what materials did you
15  look at in preparation for the deposition this
16  morning?
17  A.  Exhibits 1 through 10.
18  Q.  Okay.  Was that the extent of it?
19      Anything else you looked at?
20  A.  No.  Exhibits 1 through 10 and, I'm not
21  sure what this was called.  Something from Summit.
22  Q.  Oh.  What is --
23  A.  "Answer and Questions from Summit."  It's
24  Civil No. 1:21-CV-00083-MV-JFR.
25  Q.  What is that document?  Is that --

Page 7

1   A.  "Defendant Summit Food Service, LLC's,
2   Answers, Responses and Objections to Plaintiff's
3   First Set of Interrogatories and Request for
4   Production."
5   Q.  I see.  Okay.  So you looked at that in
6   the last couple days to prepare for this as well?
7   A.  I looked over it last night.  Yes, sir.
8   Q.  You looked over it last night.  Okay.
9   That sounds good.
10      Tell me, do you have access to those ten
11  exhibits?  Did you print those out?
12  A.  Yes, sir.  I have them in front of me.
13  Q.  Okay.  Perfect.
14      We'll, you know, take breaks periodically.
15  If you need one, just let me know.  If there's a
16  question on the table that's already been asked,
17  you'll be expected to answer it before the break,
18  but, you know, we want to make this as comfortable
19  as possible.
20      So if you need a bathroom break, a break
21  for a drink of water, whatever, just please let me
22  know.  Okay?
23  A.  Yes, sir.
24  Q.  Great.  So, it sounds like from your own
25  answers to discovery that you recently switched

Page 8

1   jobs.
2       Could you tell me about that?
3   A.  I promoted back to security side of
4   corrections, to sergeant.
5   Q.  Okay.  And that was a promotion?
6   A.  Yes, sir.
7   Q.  And when you say, "promoted back," what
8   does that mean?
9   A.  When I left corrections, I was a sergeant,
10  took a break.  When I came back to corrections, went
11  to fire safety, and then promoted to the security
12  side of corrections to a sergeant again.
13  Q.  I see.  Okay.  So let's walk through that
14  sequence.  I think from discovery, you mentioned
15  that you had a job in -- tell me about your job
16  before you got to corrections.
17  A.  I was a firefighter.
18  Q.  That's right.  And you came to corrections
19  in 2017; is that correct?
20  A.  Yes, sir.
21  Q.  Okay.  And what was your position at that
22  time?
23  A.  In 2017, I went to transportation,
24  transporting our residents to appointments, to other
25  facilities.

Page 9

1       And I applied for the fire safety
2   position.  It was going to open up and went through
3   the State Personnel process and got hired as the
4   fire safety.
5   Q.  And was that all at Western?
6   A.  Yes.
7       (Cell phone rings.)
8   Q   (By Mr. Allen) Oops.  Excuse me.  Sorry
9   about that.  That was all at Western you said?
10  A.  Yes.
11  Q.  Okay.  Sorry, I need to maximize this
12  screen again.
13      So you -- tell me about the position of
14  FSSO.  You sought to apply for that.
15      What was your interest in the job?
16  A.  Because it was firefighter-related.  It
17  had a -- the job itself is -- there's a lot of
18  fire -- firefighter -- you get sent to the New
19  Mexico State Fire Academy to get certified.
20  Q.  I see.  And what other -- when did that
21  happen that you got that position?
22  A.  Officially I was given fire safety in
23  early 2018, I believe, January.
24  Q.  In January 2018.  Okay.  And how long did
25  you hold the position?

Page 10

1   A. I held it up until October 13th of this --
2   of 2021 is when I promoted to sergeant.
3   Q. Okay. I thought you mentioned that maybe
4   you had a small break in there from corrections.
5       Did I misunderstand that?
6   A. I started corrections in 1997, and
7   off-and-on, I worked corrections and firefighting.
8   Q. I see. So the break occurred before 2017
9   and then you went back to corrections from there?
10  A. Yes, sir.
11  Q. Is that right? Got it. Okay. So, my
12  understanding is FSSO was related to some of your
13  job skills, and that was your interest in it,
14  because it involved fire safety?
15  A. Yes, sir.
16  Q. Tell me about the other duties of the job.
17  Like what was the -- what was your basic job
18  responsibility?
19  A. To inspect, document, and report those
20  inspections to administration and my supervisor in
21  Santa Fe.
22  Q. And what inspections are those?
23  A. Code enforcement, sanitization of the
24  housing units, hazardous materials, storage.
25      If there's any kind of fire-related

Page 11

1   emergency, I inspect that along with the authority
2   having jurisdiction, which is the local fire
3   department.
4   Q. I see. But my understanding is that your
5   job duties extended beyond fire safety; is that
6   correct?
7   A. Yes, sir. Whatever I was directed by
8   administration to do, I did.
9   Q. I see. Okay. And what did a typical day
10  look like on-the-job? Like how did that look?
11  A. As fire safety officer?
12  Q. As FSSO?
13  A. Field caustics. "Caustics" I mean
14  cleaning agents, germicide, all purpose cleaner, and
15  window cleaner to all the housing units daily.
16      Conduct spot inspections on housing
17  units for sanitation violations or fire -- what do I
18  call it? Like excessive fire, stuff on the walls,
19  cardboard boxes, things like that. Stuff that can
20  lead to making a fire bigger, I guess, like a fire
21  load.
22      Assisting on the floor if they needed
23  escorts with inmates because I was security.
24  Q. Okay.
25  A. And if I was needed to do security jobs

Page 12

1   per the administration or the lieutenants, I would
2   do that; work a housing unit, work towers, work via
3   patrol.
4   Q. And you said if you needed to do security
5   jobs; is that what you said?
6   A. Yes, sir.
7   Q. And so what is that?
8   A. The security jobs are the correctional
9   officers that -- the COs that work inside the
10  housing units.
11  Q. So you would sort of fill in that capacity
12  if necessary?
13  A. Yes, sir. If the shift needed assistance
14  on the floor. We call it pretty much, "working on
15  the line" with the residents, then I work a security
16  post.
17  Q. Okay. Understood.
18      MR. ALLEN: Edwina, can I ask something
19  really quickly?
20      Do you mind pinning Mr. Sanchez's video?
21  I tried doing it from my end and it didn't work.
22      Are you able to do that?
23      THE COURT REPORTER: Yes.
24      MR. ALLEN: It will be a little less
25  distracting. Sorry for the interruption,

Page 13

1   Mr. Sanchez.
2       THE COURT REPORTER: And if there are
3   objections, I just ask for a few seconds so that I
4   can make sure that I record the objection on my end
5   before the witness starts answering, please.
6       Thank you.
7       MR. ALLEN: Perfect.
8   Q. (By Mr. Allen) Did you have -- as FSSO,
9   did you have staff that you supervised?
10  A. No.
11  Q. Okay.
12  A. I had -- I was the department head for my
13  department, which is fire safety department. And
14  the only supervisory that I had were my porters, but
15  then being a department head, I would -- I mean, I
16  was a department head, so if I went into a housing
17  unit, of course I was their supervisor; not their
18  immediate supervisor, but in my role as fire safety,
19  I was a supervisor.
20  Q. I see. So you had inmate porters that you
21  sort of directed to some extent but not NMCD staff
22  necessarily; am I understanding that right?
23  A. No, sir.
24  Q. Okay. And how many porters did you have
25  that you directed; did that vary?

Page 18

1  Did you ever work on weekends?
2  A. No, sir.
3  Q. If something came up regarding sort of the
4  scope of your work, you know, fire, sanitation,
5  safety, like who would deal with it if it happened
6  during the times you weren't there?
7  A. The shift supervisor.
8  Q. I see. Okay. What was your
9  responsibility when it comes to pest control at
10 Western as FSSO?
11 A. My responsibility, I would escort the pest
12 control tech on the facility grounds. They would go
13 to every housing unit that had inmates and spray for
14 pests.
15     And as far as rodent control, I
16 was -- I would place live traps and sticky traps
17 throughout the facility.
18 Q. And is the pest control tech someone from
19 the company PDI?
20 A. Yes, sir.
21 Q. And who the -- did that person change over
22 the years? Who did you work with from that company?
23 A. I worked with three different individuals.
24 Q. And what were their names?
25 A. The first one I don't recall. The second

Page 19

1  one, I'm trying to think of his name. The most
2  current one his last -- his name was Chase Williams.
3      The first two prior to that, I don't
4  recall their names.
5  Q. Okay. And what do you know about the
6  contract, because PDI has been doing pest control at
7  Western for awhile. Like how did that come about,
8  that contract?
9  A. Previous to me, I'm not sure.
10     My process was every six months, I
11 would do a three-bid quote for vendors to come and
12 provide that service. I would submit that quote to
13 my immediate supervisor which was either the Warden,
14 Deputy Warden or Mr. Almanza at the time who was
15 physical plant. He'd submit that to the business
16 office that went to Santa Fe. And I would wait till
17 the business office gave me the approval that a
18 vendor was approved by Santa Fe.
19 Q. I see. And did you say it was a three-bid
20 quote?
21 A. Yes, sir.
22 Q. Did that mean there was always three
23 applicants? How does that work?
24 A. You contact -- pretty much get on the
25 Yellow Pages or on some sort of website, or get with

Page 20

1  business office to see what vendors are approved, I
2  guess, through the State to come on the facility
3  grounds. And I called them, advised them the
4  services I needed, submit that on the three-bid
5  quote and then it left my hands and it went to the
6  business office or to Santa Fe.
7  Q. And in your experience like every six
8  months when you did this three-bid quote, did you
9  actually get three sort of quotes from different
10 companies? Did that happen every time?
11 A. Yes.
12 Q. I see. And did you provide a
13 recommendation at that time for which one you
14 thought should be there or do you just sort of send
15 it off to Santa Fe?
16 A. I don't recommend anything. I don't have
17 that authority. I send off the three-bid quote with
18 the vendors and all the decisions are made with the
19 business office in Santa Fe.
20 Q. Got it. Do you have any sense of why PDI
21 has always been selected?
22 A. No, I don't.
23     MS. MOULTON: Objection to form.
24 A. No, I don't.
25 Q. (By Mr. Allen) Fair enough. Have you had

Page 21

1  any other interactions with people at PDI, other
2  staff there, the owners over the time you've been
3  FSSO?
4  A. No, sir.
5  Q. Okay. Have you had any conversations with
6  other staff, you know, including Wardens, et cetera,
7  about PDI's services when it comes to pest control
8  that you can recall?
9  A. No, sir.
10 Q. And what was your responsibility for food
11 sanitation while you were FSSO at Western?
12 A. Directly, I didn't have a responsibility
13 for food sanitation.
14     Summit is a third, is a contracted
15 company and that's their responsibility is food
16 sanitation.
17 Q. Did you play any role?
18 A. I would do inspections and I would assist
19 EID when they came in for an actual inspection or
20 complaint.
21 Q. So what was the importance of those
22 inspections, like what function did they play, your
23 inspections of food service, your own inspections
24 and the environmental department inspections of food
25 service at Western?

Page 42

1  A. No.
2  Q. Okay. So for when it comes to this policy
3  for sanitation, pest control, housekeeping, waste
4  disposal, et cetera, there was the environment
5  department, Brian Chavez who served the general
6  FSSO, right, for the corrections department?
7  A. Yes.
8  Q. And anyone else?
9  A. State Fire Marshal's Office.
10  Q. And State Fire Marshal, okay.
11     Did the Fire Marshal have -- would you
12  view as a sanitation inspection or was it sort of a
13  different type of assessment, in your opinion?
14  A. It's part sanitation. He does code
15  enforcement, so it all falls under code enforcement.
16  Q. And is that because there could be a fire
17  danger related to poor sanitation practices
18  conceivably?
19  A. Possibly, I don't know. I don't have
20  training as a Fire Marshal, so I would just get the
21  reports, and fix any discrepancies that were listed.
22  Q. Okay. Fair enough. Let's see. So No. 4
23  there's this sort of sentence in the middle, right,
24  that says, "FSSO will submit a monthly report to the
25  Warden."

Page 43

1     That's basically the same as No. 2, isn't
2  it, or is that the separate report?
3  A. The same, same thing.
4  Q. Okay. That's what I thought. Let's see,
5  when we get further down you can see there's
6  numbered paragraphs and policy or not numbered,
7  excuse me, they're lettered, so A, B, C, and then on
8  the third page, you have D, E and F. And F is the
9  one that talks about pest control.
10     Do you see that?
11  A. Yes.
12  **Q. So it says, each facility shall develop a**
13  **plan for control of -- for pest control, basically,**
14  **that conforms with appropriate standards and**
15  **jurisdictional requirements.**
16     **Tell me about that at Western. What did**
17  **that plan look like?**
18  **A. For pests, pests were insects, according**
19  **to the professionals. They would come in, they**
20  **would spray twice a month the facility.**
21     **For rodents, I was given glue traps**
22  **and I purchase live traps and place them throughout**
23  **the facility; kitchen, B dining area, and all**
24  **housing units.**
25  Q. I see. And was there ever sort of a

Page 44

1  written plan that was created to address F, that
2  paragraph, or was it sort of addressed through the
3  contract with PDI?
4  A. It was addressed by the contractors.
5  Q. So there wasn't -- there was never sort of
6  a written plan to deal with pest control at Western?
7  A. Not that I'm aware of, no.
8  Q. Okay. So let's see, you go down here,
9  right, to Paragraph H, and I think this is
10  essentially addressing Brian Chavez's role; is that
11  correct?
12  A. Yes, sir.
13  Q. And tell me what happened with that, like,
14  did he do a written report annually on Western?
15  A. A report that I don't know about, I don't
16  know. I wasn't present when he would do his
17  inspections. He would communicate with
18  administration and he would come in and do his
19  inspection.
20  Q. I see. So you were never there when he --
21  A. No, that's above my pay grade per se. I
22  mean, that was his thing, he would come in with
23  administration, I guess, and do his inspections.
24  Q. What was your relationship with him as
25  FSSO? I mean, how often did you interact with him

Page 45

1  in doing your job?
2  A. If I had questions about anything I would
3  ask him, so either e-mail, phone calls. If he
4  needed documentation, you know, e-mails.
5  Q. Uh-huh. And what kind of things did you
6  connect with him about your time as FSSO?
7  A. Training opportunities, if there was any
8  kind of training, if certifications need to be
9  renewed.
10  Q. Okay. Anything else --
11  A. No.
12  Q. -- that you can think of?
13  A. Not that I can recall.
14  Q. Okay. We'll go back to Mr. Chavez in a
15  little bit. Let's go to Exhibit 2. That's the Food
16  Service Procedures one.
17     Do you have that?
18     (Exhibit marked, 2.)
19  A. Yes, sir.
20  Q  (By Mr. Allen) So on the first page, it
21  describes a purpose. It says, you know, "To meet
22  the nutritional needs of inmates and cadets and
23  prepared in accordance with health and safety
24  codes."
25     When it comes to being prepared in

12 (Pages 42 to 45)

Page 50

1  Q. From your discovery answer, it mentioned
2  that that happened in March 2018; is that correct?
3  A. I don't recall the date but, yes, I
4  attended a class.
5  Q. Tell me about the class. What was taught?
6  A. We were taught by EID, we were taken to a
7  kitchen in Santa Fe that was on a facility. They
8  showed how to take temperatures of food.
9  Q. Uh-huh.
10  A. They showed us temperature logs. It was
11  mostly sanitation, make sure that, you know, there
12  is not standing water on the floors for slip and
13  falls.
14        Dry storage areas, that they were in
15  some sort of sealable bin, preferably plastic bin or
16  totes or something of that kind to store bagged
17  items, I guess.
18        Dented cans, if there was dented
19  cans, to get rid of them.
20        Just general sanitation of things are
21  always being cleaned down. Hygiene. Washing of
22  hands. If inmates are reporting sick that they're
23  giving them a medical evaluation and that prior to,
24  I guess, starting a shift with the residents or
25  whoever was working that day should be asked just a

Page 51

1  simple, "Are you feeling okay? Any open wounds,"
2  things like that so --
3  Q. I see. And it was the environment
4  department that did this training?
5  A. Yes.
6  Q. Was it a training that was just for
7  corrections staff or were there other people being
8  trained at the same time?
9  A. It was training for fire safety and I
10  believe ACA compliance officers were present.
11  Q. So was it just -- was it focused just on
12  food and safety evaluation in a corrections context?
13  A. Yes.
14  Q. Okay. Did you have other trainings in
15  food and safety evaluation during your time as FSSO?
16  A. No.
17  Q. That was the only one?
18  A. Yes.
19  Q. Okay. Did you have any trainings related
20  to pest control specifically while you were FSSO?
21  A. No.
22  Q. Did the food and safety training that you
23  had in March of 2018 cover pest control?
24  A. No.
25  Q. When they mentioned that it would be best

Page 52

1  to do food storage in plastic bins, did they explain
2  why that would be the case during the training?
3  A. Because bags rip and you can't reseal them
4  so you put it in a plastic bin and they can stay
5  somewhat secure, I guess. I mean, I'm -- I guess
6  because most of the dry goods come in some sort of
7  disposable plastic or paper container, so to put
8  them in bins would keep them, I guess, fresh or away
9  from, you know, the air and stuff like that. I'm
10  not sure. It was just recommended plastic bins or
11  some sort of Rubbermaid bin with a lid.
12  Q. In your experience was food stored in
13  plastic bins at Western?
14  A. Yes.
15  Q. Was it always stored in plastic bins from
16  the beginning of your time there?
17  A. Yes.
18  Q. There was never a time at Western that
19  food was just stored in the plastic bags that it
20  came in?
21  A. If they were unopened, the big heavy bags
22  like 50, probably 25, 50-pound bags, yes, they were
23  stored stacked on top of each other in dry storage.
24  Q. I see.
25  A. But --

Page 53

1  Q. And so do you think -- did the bins have
2  any relevance to pest control in your mind?
3      MS. PULLEN: Object to form.
4      MS. MOULTON: Join.
5  A. I don't know why EID wanted them in some
6  sort of bin. I mean, that's what -- I would think
7  it would keep things from getting into open
8  containers, but ultimately I don't know the reasons
9  why EID preferred the food to be stored in bins or
10  anything.
11  Q. Have you ever had mice in your house?
12  A. Yes.
13  Q. Have you ever had mice chew into bags of
14  food in your house?
15  A. Yes.
16  Q. Did you ever see that in your inspections
17  of food storage, that mice had chewed into bags of
18  food?
19  A. Yes.
20  Q. How often did you see that in your
21  experience?
22  A. Reported to me, maybe twice.
23  Q. Twice during your entire time as FSSO?
24  A. Actual physically seeing this, yes.
25  Q. I guess those are two questions, then.

Page 54

1    So how many times did you physically see
2    bags being chewed into by mice while you were at
3    Western?
4        A.  Twice.  Both reported to me by Summit
5    staff.
6        Q.  And how often did you have it reported to
7    you that bags were being chewed into by mice?
8        A.  Zero unless it was reported to me by
9    Summit staff.
10       Q.  So during the entire time you were at
11   Western there was only two instances that you were
12   directly aware of where mice were chewing into bags
13   of food?
14       A.  Twice that I recall.  I mean, there were
15   both complaints so I would go and look to see what
16   was going on.  And that's when, you know, they
17   either -- they destroyed the stuff that was being
18   opened by mice, it was destroyed and then, you know,
19   bins were -- everything was going to bins or
20   whatever.
21           So it was possibly stuff that was
22   left out, I'm not sure, but, I mean, as I recall it
23   was probably like twice.
24       Q.  I see.  Okay.  Tell me about cleaning
25   supplies.  Part of your job, I think you said, was

Page 55

1    to sort make sure the facility was clean, right?  I
2    mean, that's sort of central to your role as FSSO;
3    is that correct?
4        A.  Yes.
5        Q.  And do you believe that the kitchen was
6    kept clean during your time as FSSO?
7            MS. PULLEN:  Objection to form.
8        A.  Yes.
9        Q   (By Mr. Allen) And who was responsible for
10   cleaning the kitchen during your time there?
11           MS. PULLEN:  Objection to form.
12       A.  The porters assigned to work in the
13   kitchen, it was their job duties.
14       Q   (By Mr. Allen) And do you know if they had
15   adequate sort of soap and cleaning supplies to do
16   that?
17       A.  I'm not aware.  They're a contracted
18   company so, they had to purchase that stuff through
19   their vendors.  They didn't purchase it through
20   NMCD.
21       Q.  So are you saying that Summit purchased
22   the cleaning supplies?
23       A.  Yes.
24       Q.  For the kitchen?
25       A.  For the kitchen -- for the kitchen and B

Page 56

1    dining areas, yes.
2        Q.  Okay.  And B dining is the chow hall at
3    Western?
4        A.  Yes, sir.
5        Q.  Okay.  Let's talk a little bit about
6    inspections.  Can you take a look at Exhibit 3 and I
7    guess Exhibit 4 at the same time.  They're kind of
8    related.  If I had been smart about this, I probably
9    would have put them in one exhibit, but I wasn't.
10   But they're both Food Establishment Inspection
11   Reports.
12           Do you see those two exhibits?
13       A.  Yes.
14           (Exhibits marked 3 and 4.)
15       Q   (By Mr. Allen) Are these familiar
16   documents to you?
17       A.  Yes.
18       Q.  And down in the left-hand corner of, I
19   think, all of these, is a signature for the person
20   in charge.
21           Do you see that?
22       A.  Yes.
23       Q.  Is that your signature?
24       A.  Yes.
25       Q.  Okay.  So, you know, these basically are

Page 57

1    for two years, the inspections that happened in
2    January of 2018 and January of 2019.
3            Is that sort of the typical time frame
4    that the environment department comes?  Is it sort
5    of beginning of the year?
6        A.  It's annual.  They would contact me and
7    that's when I was contacted.
8        Q.  So were you the one that arranged for
9    those inspections, you coordinated it with them?
10       A.  No, sir.
11       Q.  Who did that?
12       A.  EID would contact me saying that they were
13   going to come in for an annual inspection and I
14   would just do an entrance memo to allow them to come
15   onto the facility to conduct their inspection.
16       Q.  I see.  I guess the point I'm getting to
17   is that you were the point of contact at Western for
18   the environment department; is that correct?
19       A.  Yes.
20       Q.  Okay.  And what's the name of the
21   inspector or inspectors that did these inspections
22   while you were FSSO?
23       A.  Ramon Orona.
24       Q.  Okay.  And tell me what that looked like.
25   So he would give you a call and say, "It's time for

Page 58

1  an annual inspection"?
2      A. Yes.
3      Q. And then walk me through that. What
4  happened, what steps did you have to take for those
5  inspections to happen?
6      A. He could call me, ask me if this date was
7  good for me, if I was going to be able to escort him
8  on the property, that I wasn't too busy on a certain
9  date.
10          If I wasn't, we would confirm that on
11 so-and-so date he would be here at so-and-so time.
12 In return, my steps were I would go get permission
13 from the Warden to do an entrance memo for EID to
14 come onto the facility. And he would show up that
15 day, and I would escort him to do his inspection.
16     Q. Okay. Was there ever any time that
17 Mr. Orona just showed up to do an inspection?
18     A. No. He would always call me as a point of
19 contact because we had to do an entrance memo. Or
20 if it was during COVID or something like that, to do
21 a rapid COVID test or something like that.
22     Q. Got it. And did you -- how long did it
23 take to turn this around, typically, between the
24 time that Mr. Orona called you and the time the
25 inspection occurred?

Page 59

1      A. Could be that day or it could be a week
2  from the day he called me. Whatever date that he
3  chose to want to come in and do it, and I was
4  available, we would do it on that day so it just, it
5  varied. Could be a day, could be a week.
6      Q. Did you say that there were times when he
7  would call you and then he was able to do the
8  inspection that same day?
9      A. Yes.
10     Q. Do you recall if either of these
11 inspections in 2018 or 2019 occurred the same day he
12 asked to do the inspection?
13     A. I don't recall.
14     Q. Okay. Fair enough. So there's a lot of
15 information on these documents. If you look at the
16 first page, and you go down to the bottom it says,
17 like, Prevention of Food Contamination and there are
18 two boxes checked off there.
19         In 2019, that's the first page of
20 Exhibit 3, and then if you go, flip through a couple
21 pages of Exhibit 3 to the -- we call these Bates
22 stamps on the bottom. In the bottom right-hand
23 corner it says S. ZAPATA 1075.
24         Do you see that one?
25     A. Yes, sir.

Page 60

1      Q. So that's the one for 2018. It's the same
2  box checked off here for insects, rodents and
3  animals not present. There's an X there.
4          And the same on that other page. Can you
5  tell me what you remember about these inspections in
6  2018 and 2019?
7      A. Unless I read the Observations and
8  Corrective Actions on both of them, I don't recall
9  them.
10         I mean, I know Mr. Orona was here,
11 but unless I look at his notes to see what exactly
12 he found wrong and looking at all the checkmarks and
13 stuff.
14     Q. Did he provide you with notes, additional
15 notes or some additional report beyond what you have
16 here?
17     A. No, sir. Just the documents in hand.
18     Q. Okay. So there is some handwritten notes.
19 Let's see, if you go to Exhibit 3 and it's the
20 second page, the one that's Bates stamped S. ZAPATA
21 1073 in the bottom right-hand corner.
22         Do you see that?
23     A. Yes, sir.
24     Q. So this one in the middle, is that his
25 handwriting? He's the one taking these notes,

Page 61

1  right?
2      A. Yes, sir.
3      Q. So in the middle it says Item No. 39.
4  Well, first of all, what do those numbers mean, like
5  Item No. 39, what does that refer to?
6      A. Unless I -- I would say it refers to the
7  first page to Box 39.
8      Q. I see. So it's referencing insects,
9  rodents and animals not present, correct?
10     A. Yes.
11     Q. And so here he's saying there's mouse
12 droppings in dry storage, Room No. 4 and the dry
13 storage, Room No. 2.
14         Do you recall seeing those mouse
15 droppings?
16     A. Yes.
17     Q. Were you with him while he did this
18 inspection?
19     A. Yes.
20     Q. So tell me what you remember.
21     A. So without reading this, I mean I can
22 just -- I don't remember detail for detail, but he
23 would conduct his inspections, if there was any
24 violations or discrepancies, I would get them
25 corrected on-site immediately.

Page 62

1    Q.  And you hadn't been on the job that long
2    when the one in 2018 occurred; is that correct?
3    A.  No, sir.
4    Q.  So let's go to that one again.  You know,
5    it's the Bates stamped 1075 and 1076 in Exhibit 3.
6         MS. MOULTON:  Are you talking Exhibit 4?
7         MR. ALLEN:  No, I think it's Exhibit 3.
8    Q   (By Mr. Allen) I apologize for the
9    confusing way I put these together, but the Bates
10   stamped S. ZAPATA 1075 and 1076.
11        Do you both see those, Mr. Sanchez and
12   Ms. Moulton?
13   A.  I see them, yes.
14   Q.  Okay.  Yeah, so I think you mentioned that
15   you started in January, and you must have been FSSO
16   for just a few days when this inspection happened;
17   is that correct?
18   A.  No.
19   Q.  No?
20   A.  No.
21   Q.  How long were you -- how long had you been
22   FSSO at this point?
23   A.  Unofficially with, I guess, with the badge
24   and the spot, I was TDY, temporary duty status.  So
25   I went from transport so I was OJT trained fire

Page 63

1    safety and I was doing the job already as fire
2    safety, I just hadn't been, I guess, promoted to the
3    spot --
4    Q.  I see.
5    A.  -- officially through SPO.
6    Q.  That's good to know.
7         So how long had you been doing the job at
8    this point even if you weren't --
9    A.  A couple months.  I don't recall when I
10   left transport and when I -- I mean, the whole
11   process of fire safety started or anything like
12   that.
13   Q.  Okay.  So it maybe had been a couple of
14   months because you had -- and remind me when you got
15   to Western again, when you started the job just as a
16   CO?
17   A.  July of 2017.
18   Q.  July of 2017.  Okay.  And so at some point
19   after that you were in the line to get the promotion
20   but you just didn't have the badge yet; is that
21   correct?
22   A.  I wasn't officially -- it hadn't gone
23   through all -- through SPO and through central
24   office and things like that.  But physically here at
25   the facility I was doing the job, it just hadn't

Page 64

1    been approved, I guess.
2         I hadn't been given the promotion
3    officially, but I was doing the job.
4    Q.  So did the job include certain inspections
5    of the entire prison at that point?  You were
6    already doing that part of your job that you were
7    explaining before?
8    A.  Yes.
9    Q.  So on the document marked Bates stamped
10   ZAPATA 1076, it says there's mouse droppings in the
11   tool room and dry storage.
12        Did you recall seeing them at that time,
13   too, when you were doing the inspection with
14   Mr. Orona?
15   A.  I mean, unless reading it here that there
16   was mouse droppings, I don't recall seeing them.
17   Q.  How often did you see mouse droppings at
18   Western, like how often did that come up for you?
19        MS. PULLEN:  Objection to form.
20   A.  We have mice at Western.  But, I mean, it
21   wasn't -- on a daily if you went into a storeroom
22   that hadn't been opened for years or something,
23   you're going to see mouse droppings.
24        But on a daily, I mean, I wasn't --
25   there wasn't mouse droppings unless you're in an

Page 65

1    outside location, a closet, a shed, something not
2    physically inside the perimeter of the facility.
3    Q   (By Mr. Allen) So if it wasn't daily, how
4    often was it that you saw mouse droppings?
5    A.  I don't recall.  Whenever a complaint was
6    made to me, I address it.
7    Q.  Did you ever see mouse droppings just on
8    your own, not with the complaint, but as you're
9    walking around the facility?
10   A.  Yes.
11   Q.  And how often did that happen?
12   A.  I don't recall.  I didn't take notes on
13   every time I saw mouse poop or something like that.
14   I don't, didn't keep track like that.
15   Q.  Do you view that as a sanitation issue if
16   there's mouse feces in the facility?
17   A.  Is it a sanitation issue, yes.
18   Q.  Yeah.  So explain why you didn't take
19   notes when you saw mouse feces around the facility?
20   A.  I would address it immediately and have it
21   cleaned up and sanitized.
22   Q.  Okay.
23   A.  If it was something I had to put on a
24   report, then I would put it on my report.
25   Q.  Did you recall ever putting that sort of

17 (Pages 62 to 65)

Page 66

1  observation in your monthly reports as FSSO?
2      A.  I don't recall unless I went back and
3  looked at the reports.  Usually something like that
4  with mouse droppings or feces was an immediate kind
5  of fix it, so I would have my porters and myself we
6  would go clean it.
7      Q.  Okay.  I want to sort of drill down the
8  frequency because it's important for this
9  conversation.
10         And I get, you know, that we don't have
11 notes in front of us.  You don't have a check box of
12 each time you saw them, but, I mean, would you say
13 that you saw mouse feces just with your own
14 observation more than once a year while you were
15 FSSO?
16     A.  More than once a year?
17         MS. PULLEN:  Objection to form.
18     Q   (By Mr. Allen) Yes.
19     A.  Yes.
20     Q.  Do you think you saw them more than once a
21 month?
22     A.  No.
23     Q.  No?  You didn't?
24     A.  No.
25     Q.  Okay.  And what about actual rodents.  Did

Page 67

1  you ever see rodents at Western?
2      A.  Yes.
3      Q.  The actual animals?  And how often did
4  that happen?
5      A.  Two, three times I have seen rodents,
6  actual mice alive.
7      Q.  Two, three times in your entire time at
8  Western?
9      A.  On the entire facility, yes.
10     Q.  In the entire facility?
11     A.  Yes.
12     Q.  Okay.  And how often did you see them when
13 they're not alive?  Did you see dead rodents ever?
14     A.  Yes.
15     Q.  And how often did you see those?
16     A.  Once a month, maybe twice a month if they
17 were caught in the traps.
18     Q.  So, is that the primary way that you saw
19 the dead rodents when they were caught in one of the
20 traps that you set out?
21     A.  That's the primary, yes.
22     Q.  Okay.  Can you think of other contacts in
23 which you saw dead rodents?
24     A.  In old equipment.
25     Q.  In old equipment?

Page 68

1      A.  Yes.
2      Q.  I see.  Like if it was being cleaned out,
3  you would see -- what would you see in that case?
4      A.  Possibly if it was a piece of old
5  equipment that was being cleaned out or not
6  maintained, you would find a nest with possible dead
7  rodents in it.
8      Q.  Uh-huh.  Okay.  So if you -- when you were
9  doing these inspections, you know, these two years
10 in 2018 and 2019, was it a surprise that you saw
11 mouse droppings when you were doing these
12 inspections with Mr. Orona, accompanying him?
13         MS. PULLEN:  Form.
14     A.  Would it surprise me?
15     Q   (By Mr. Allen) Yes.
16     A.  It would surprise me.
17     Q.  And tell me about that.
18     A.  Because just walking in and we didn't have
19 a lot of complaints, and just walking in and seeing
20 the kitchen operations and stuff, that they were
21 keeping clean.  They were wiping down stuff.  They
22 were doing what they were supposed to be doing, it
23 did surprise me that there was mouse droppings in
24 the kitchen.
25     Q.  Okay.  You did the sort of food safety

Page 69

1  certification a couple months after this 2018
2  inspection happened; is that correct?
3      A.  Yes.
4      Q.  But you don't recall pest control playing
5  any role in that training that you got; is that
6  correct?
7      A.  Yes.
8      Q.  And during your entire time as FSSO, you
9  received no training in pest control; is that
10 correct?
11     A.  That's correct.
12     Q.  Okay.  I just want to make sure I
13 understood that from earlier.
14         MR. ALLEN:  I would like to, you know,
15 we've been going for a little while, Mr. Sanchez,
16 and I appreciate that.
17         I would like to take a five-minute break,
18 if that's okay with you, so we can -- and then maybe
19 we can come back at 10:45 if that's okay.
20         THE WITNESS:  Yes, sir.
21         MR. ALLEN:  Great.  Thank you.
22         MS. MOULTON:  Sounds good.
23         THE COURT REPORTER:  We're off the record.
24         (Recess taken at 10:40 to 10:48.)
25         THE COURT REPORTER:  We're back on the

Page 70

1  record.
2  Q  (By Mr. Allen) I'd like to go back to the
3  environment department inspections with Mr. Orona.
4        What sort of preparations, if any, were
5  done before those inspections occurred?
6  A.  None on my end, no.  No, sir.
7  Q.  How about did anyone else sort of prepare
8  for those, any other staff either corrections
9  department or Summit staff as far as you know for
10 those inspections?
11 A.  No, sir.  They weren't aware that an
12 inspection was going to happen.  It was just
13 information to myself and the Warden if he or she
14 would ask why they were coming in.
15       And it was simply just for an
16 inspection, annual inspection.  But there was no
17 preparation made by anybody to their arrival.
18 Q.  So just to be clear, no one else, no
19 Summit staff and no corrections department staff,
20 other than you and the Warden, knew that these
21 inspections would occur before they happened?
22 A.  Yes, sir.
23 Q.  Okay.  While Mr. Orona was there or the
24 other inspectors, you know, whether it's the ACA
25 coordinator or Mr. Chavez, the general FSSO guy,

Page 71

1  were inmates ever allowed to interact with the
2  inspectors?
3  A.  Yes.
4  Q.  And tell me what that looked like.
5  A.  Usually it was questions like, "Who are
6  you?"
7        And the inspector would, I guess, let
8  them know who they were and probably their purpose.
9  Q.  Uh-huh.
10 A.  I mean, that's pretty much what I recall.
11 It was usually like, "Who are they," or, "Who are
12 you," or something like that.  They would tell, you
13 know, tell them who they were or they would even
14 come to me and ask me, like, tell them that it was
15 so-and-so and they were here for an inspection.
16 Q.  And did the inspectors ever ask the
17 inmates questions?
18 A.  During the -- no, no they would only speak
19 with myself and Summit staff if it was the kitchen
20 inspection.
21 Q.  Okay.  You know, in Exhibit 3 and
22 Exhibit 4, you're listed as the person in charge.
23 Can you explain what that means?  Why were you the
24 one signing the documents?
25 MS. MOULTON:  Objection to form.

Page 72

1  You can answer, Mr. Sanchez.
2  A.  I signed them.  I took it because all my
3  vendors I'd sign the documents because it would -- I
4  would get a copy.  Most of my vendors whenever they
5  come in, I sign it because it showed that they were
6  here.  So I would sign it as the person in charge.
7        On this it was Mr. Orona would hand
8  me the documents and have me sign.  I don't know if
9  it was because I was his point of contact and, I
10 guess, the person in charge of the process of the
11 inspection, which I wasn't necessarily in charge.  I
12 was kind of escorting him as the inspector, so I'm
13 not sure why I was tasked to sign them.
14 Q.  Okay.  Are there other documents that you
15 can think of that you generated or that you read
16 that reference the presence of rodents at Western?
17 MS. MOULTON:  Objection to form.
18 A.  No, unless I was doing an inspection and I
19 saw the presence of rodents either by checking the
20 traps and removing them and then placing them with
21 new traps.  And that's how it was -- can I clarify
22 something on the training part?
23 Q.  Of course, of course.
24 A.  When you asked me about the training on
25 rodents I thought it was like a formal, like,

Page 73

1  certification-type training.
2  Q.  I see.
3  A.  But when I was the process, the OJT
4  process, on-the-job-training, with previous fire
5  safety, I got physical on-hands training on the
6  process of glue traps, where to place, where not to
7  place them, things like that.
8        So it wasn't like a formal
9  certification, but I did receive training from my
10 predecessor, I guess, from the one that I learned
11 from on how to conduct as far as placing glue traps
12 or mousetraps in areas where they should be placed,
13 things like that.
14       So I just want to clarify that.  I
15 don't have formal training or a certification, but I
16 did receive training from a previous fire safety.
17 Q.  Okay.  Yeah, thank you for that
18 clarification.
19       What was the former FSSO's name, can you
20 remind me?
21 A.  Nicolette Garcia.
22 Q.  Okay.  So when you came on board she gave
23 you training about that?
24 A.  Yes.
25 Q.  And do you recall conversations with her

Page 74

1  about why you were getting that training?
2      A.  Because it was part of the fire safety's
3  job, I guess, to provide traps in areas, where we do
4  and we don't put traps, the reasons why we don't put
5  them in certain areas.
6      Q.  You mentioned at some point earlier in our
7  conversation that you have rodents at Western,
8  obviously, that, you know, there's mouse droppings
9  that showed up in those reports.  You saw them
10 occasionally.  But did it rise to the point in your
11 mind of being a problem?
12     A.  No.  We have all kinds of wildlife here at
13 Western, so I thought, you know, it's part of the
14 everyday.  We have elk, coyotes.  We've had badgers
15 within the facility.  So, I mean, if I saw it, like
16 I said, I clean it up, try to take care of it
17 on-site right there and then.
18     Q.  When you said badgers, sorry, now I'm just
19 curious.
20         Did you actually have badgers in a
21 building at the prison or were they just --
22     A.  No, it was in the -- it was prior to my
23 time but it was, you know, we have wildlife here at
24 the Western.  We're at the foot of a mountain.
25     Q.  Yeah.  My question, though, is were they

Page 75

1  in actual buildings or were they just on the --
2      A.  No.  They were on the property.
3      Q.  Okay.  You know, would you agree that
4  that's, you know, in terms of a sanitation safety
5  issue it's of less significance than animals being
6  inside the building?
7      A.  Yeah.  No, never nothing like that.  I've
8  seen mice within the facility.
9      Q.  Sure.  But you didn't view it as rising to
10 the level of a problem?
11     A.  No.  Because it wasn't that often that I
12 encountered any kind of feces or actual live animals
13 roaming around.
14     Q.  What about these reports, though, two
15 years in a row from the environment department?  I
16 mean, why isn't that a problem, those parts of the
17 report?  Can you tell me about that?
18         MS. PULLEN:  Objection to form.
19     A.  The areas where -- on these reports where
20 he was seeing, I guess, feces that's shown on here,
21 it was in areas that it was under either machinery
22 that was -- that can't be moved or behind cabinets,
23 like stuff that's kind of like stationary and
24 doesn't ever get moved.
25     Q   (By Mr. Allen) I see.  So it was -- are

Page 76

1  you saying it was hidden from view, like he moved
2  things around and saw the rodent droppings?
3      A.  I wouldn't say, no, not move things
4  around, it was just in inaccessible areas.  If he
5  happened to search in areas that pretty much were
6  inaccessible and he found evidence of that, he would
7  write it down.  So I mean it's -- I don't know what
8  he saw.  If it was something that I can get to and
9  clean after he documented it as a discrepancy and it
10 was like under shelving and stuff, where product --
11 all kinds of product had to be moved and then we had
12 to get back there and take care of a couple or, you
13 know, whatever mouse droppings were found and
14 sanitize the area but --
15     Q.  Okay.  I guess, you know, the way I look
16 at these two things, they're saying, especially in
17 the 2019 one that mouse droppings was found in dry
18 storage Room No. 2 and No. 4.  Like what's kept in
19 those rooms in your experience?  Like what's in
20 there?
21     A.  Metal cans, spices, dry goods.  I would
22 say like cornflakes, dry cereal, things like that.
23 Styrofoam containers it's all dry stuff.  Stuff that
24 doesn't have to keep, like a frozen or a cooler
25 temperature.

Page 77

1      Q.  I see.  Okay.  Fair enough.  Let's see, in
2  your discovery response you mentioned that the
3  Warden does weekly inspections of the kitchen; is
4  that right?
5      A.  Shift supervisor does inspections of the
6  kitchen.
7      Q.  But not the Warden?
8      A.  I have seen the Wardens with ACA and with
9  the shift supervisors conducting inspections.  And I
10 would assume it's like weekly, but it's just my
11 assumption.  I'm not sure because I don't, you know,
12 I don't attend these inspections with
13 administration, unless I'm asked to.
14     Q.  Okay.
15     A.  But just me seeing that they're with ACA
16 and with the shift supervisors, I would say it's
17 probably weekly.
18     Q.  Okay.  So you wouldn't -- so just to be
19 clear, there isn't sort of a regular weekly
20 inspection by the Warden of the kitchen that you're
21 aware of?
22     A.  Not that I'm aware of, no.
23     Q.  Okay.  You talked about Brian Chavez, the
24 FSSO, doing annual inspections.  We saw that that's
25 in the sanitation policy.  Can you tell me how those

20 (Pages 74 to 77)

Page 78

1  were documented?  Were those written -- did he have
2  written reports?
3      A.  I don't know because I don't have access
4  to those reports.  I don't know if he did a report
5  by phone to administration or if he actually gave
6  them documentation.  I'm not aware of it.
7      Q.  Did you ever have conversations with him
8  about his inspections, about what he saw or found
9  during those inspections?
10     A.  No.  If there were discrepancies that
11 were -- that had to be brought up to me, he may
12 have, but I don't recall any discrepancies that I
13 wasn't already aware of that I was taking care of.
14     Q.  Did he bring up anything involving
15 rodents?
16     A.  No.
17     Q.  Well, let me make sure I understand.  So
18 your discovery answer says you recall discussing the
19 prevention of rodents with a bunch of different
20 people.  And tell me if this rings a bell.
21         You list out a bunch of people, the
22 Warden; the environment department inspector, which,
23 I guess, is Mr. Orona; Deputy Wardens; the ACA
24 compliance officer; and Brian Chavez; is that
25 correct?

Page 79

1          Did you talk about rodent prevention with
2  all of those folks?
3      A.  Yes.  They're all my supervisors.
4      Q.  And so tell me like how that came up.
5  Like, why did you talk about rodent prevention with
6  all of those different people?
7      A.  To see if I could, when it came up for
8  rebid on a company to provide those services, if I
9  can see about getting a service that would fit this
10 facility better is why I would speak to them about
11 rodent prevention or pest control or things like
12 that.  Just to see if I can get another company that
13 maybe provided something that the local company
14 didn't provide us.  So I would discuss it with
15 administration.
16     Q.  And the local company being PDI?
17     A.  Yes.
18     Q.  And what was it about their services that,
19 like what -- tell me about that.  What weren't they
20 offering?
21     A.  Actual rodent control where they would
22 monitor it themselves through the company.  They
23 would come on site, check traps, put bait stations
24 out, possibly poisons around the perimeter of the
25 facility, things like that, that PDI did not offer

Page 80

1  the facility.
2      Q.  And so like how did you feel just in
3  general the services were that PDI offered,
4  specifically when it came to rodent control?
5          MS. MOULTON:  Objection to form,
6  foundation.
7          You can answer, Mr. Sanchez.
8      A.  From the training I received by
9  Ms. Garcia, that's what I knew, so I was comfortable
10 with it.  I felt like I was doing everything within
11 my power at 100 percent to provide that, you know,
12 do the rodent control.
13         Even if it was myself, I would just
14 get the product from them.  I did it.  I felt their
15 services were adequate but, you know, adequate
16 enough to, you know, protect and I guess treat the
17 facility for its problems.  If it be insects or
18 rodents or anything like that, just with the
19 training I received I felt it was adequate that I
20 was doing that service.
21     Q   (By Mr. Allen) So explain to me why you
22 had conversations with these people about having
23 another company do it.  Like why was that of
24 interest to you?
25     A.  Because they're professionals at what they

Page 81

1  do and they said that it should be a professional
2  that's got that kind of training to do these
3  services because they offered other services because
4  mice aren't the only, I would say, rodents that we
5  have to be aware of.
6          We have pigeons and, you know, things
7  like that, that probably carry disease.  I don't
8  know what diseases, but, you know, you just hear
9  about it.  I was seeing if they could provide some
10 sort of service that would take care of the mass of
11 pigeons that are around the facility, things like
12 that, which they did.  But, you know, like I
13 explained before, they didn't win the quote with the
14 State so --
15     Q.  Who did you -- who are you talking about
16 that didn't win the quote with the State, what
17 specific companies?
18     A.  Like Terminex, the companies that offered
19 a little bit more when it came to rodent control.
20 So it was Terminex, I believe SERVPRO, but I mean,
21 like I said, I was happy with PDI.  I was, you know,
22 still doing the same service except I would say they
23 were trying to sell themselves more, more services
24 because they were the professionals, you know, as
25 the established company, things like that.

21 (Pages 78 to 81)

Page 82

1  You know, they just offered more as
2  far as coming in instead of twice a month with PDI,
3  they would come in once a week or whatever the case
4  may be to, you know, service the facility.
5      Q. So is it fair to say that you would have
6  preferred these other companies over PDI?
7      A. Yes.
8      MS. MOULTON: Objection to form.
9      A. Yes.
10     Q  (By Mr. Allen) And so why do you think PDI
11 was selected instead of these other companies?
12     A. I don't know.
13     MS. MOULTON: Objection to form.
14     A. I don't know. I don't have -- I'm not
15 privy to that procedure. I don't know why. I'm not
16 part of that procedure.
17     Q  (By Mr. Allen) Were there any other
18 services that these other companies could have
19 provided in addition to just increased frequency of
20 pest control or what, in your understanding, like
21 what else could they do that PDI didn't do?
22     A. Physically doing pest and rodent control.
23     Q. Uh-huh.
24     A. Just, I mean, how it was explained to me
25 is like pest control you have to have certifications

Page 83

1  to poisons and stuff for the insects. And in rodent
2  control, I guess the equipment they use would, I
3  feel would have been more beneficial for the
4  facility instead of just placing glue traps and live
5  traps everywhere. So I was not sold but it was just
6  I felt it was a better fit for the facility.
7      Q. I see. Okay. Tell me what other topics
8  were discussed in terms of rodent control with these
9  individuals, the Warden, Mr. Orona, Deputy Wardens,
10 the ACA compliance inspector and Brian Chavez in
11 addition to the companies?
12     Were there other topics that came up in
13 those conversations that you can recall?
14     A. None that I recall, just my thoughts on
15 maybe using another company that provided more
16 services. It was kind of just try to see if maybe I
17 can win an approval and somehow maybe get these
18 services even if it was added as another service on
19 top of PDI or something. I guess that's what I was
20 trying to discuss, but, I mean, it was all just pest
21 control and rodent control, see if we can, you know,
22 could do something better than I was already doing
23 for the facility.
24     Q. Okay. That makes sense. But just to
25 confirm, you didn't view Western as having a rodent

Page 84

1  problem?
2      A. No.
3      Q. And so none of the discussions that you
4  had with these people were about needing to address
5  a problem with rodents at Western?
6      A. No, not just -- no. Just that we have
7  rodents. I mean, we do have rodents but not that we
8  have a problem.
9      Q. Okay. Let's go to -- well, actually let
10 me talk to you a little bit about Summit and your
11 relationship with them. Like has Summit always held
12 the contract while you were there for food service
13 at Western?
14     A. Since I've been here since 2017, yes, sir.
15     Q. Okay. And who was your point of contact
16 with Summit?
17     A. Any one of the Summit staff or
18 Ms. Estevan, which we had good communication. I had
19 good communication because she was the director. So
20 if anything was brought up to me, I would get with
21 Ms. Estevan because we had a good communication with
22 each other and we tried to get stuff corrected or
23 fixed.
24     Q. I see. And did she -- she was the
25 director the entire time for Summit at Western that

Page 85

1  you were FSSO; is that correct?
2      A. Yes.
3      Q. Okay. How many staff did she have under
4  her, like Summit staff?
5      A. I don't recall. I mean, she had between
6  two and three under her who were supervisors,
7  because they supervised the workers, the population,
8  or the residents that worked for them. So it was
9  between two and three on any shift.
10     Q. Okay. And what sort of problems came up
11 or what sort of not problems, but like what did
12 you -- what was sort of your daily or professional
13 communication with Ms. Estevan? Like, what did you
14 communicate with her about just as part of your job
15 as FSSO?
16     A. She was having inmates refuse to work,
17 things like that. If, say, she got in a shipment of
18 produce or something like that and it was
19 questionable which, you know, there was some sort of
20 bug or something, she would address that to me so
21 that we can look at it, do a report on it, send it
22 back or not allow it into the kitchen.
23     Any type of, sometimes maintenances
24 if she had a leaky faucet or something because I
25 worked in the maintenance area, I can possibly get

Page 86

1  that taken care of quicker than going through a work
2  order.
3         Anything if she needed chemicals
4  because she didn't have cleaning supplies, I would
5  give her cleaning supplies from my department. So a
6  good relationship.
7     Q. Okay. Did you ever talk with Ms. Estevan
8  about rodent control?
9     A. Yeah, she would bring it up to me and I
10 would provide her with sticky traps because she knew
11 her department and she knew the problem areas. If
12 there were any problem areas or where she maybe saw
13 a mouse frequent, she can place those or I would
14 place them myself.
15         If it was during times that I was not
16 on site, I gave her sticky traps so that she can
17 take care of it. And then once, twice a week we
18 would check the traps in the kitchen to replace them
19 fresh ones once.
20    Q. How often did you find rodents in the
21 sticky traps in the kitchen?
22    A. Not often. I think I went -- I just
23 recently left fire safety and prior to me leaving,
24 it had probably been like six, seven months since I
25 had a mouse on a sticky trap or a live trap in the

Page 87

1  kitchen.
2     Q. So that would have been in 2021?
3     A. Yes, sir.
4     Q. Six or seven months.
5         Was there ever a point where you found
6  them more frequently in the kitchen?
7     A. No.
8     Q. No? So once every six or seven months you
9  would find a sticky trap with a mouse on it in the
10 kitchen?
11    A. And maybe sometimes never during that
12 entire year that I was in fire safety.
13    Q. Okay. How often did Ms. Estevan bring the
14 presence of rodents in the kitchen with you in your
15 recollection?
16    A. She didn't unless there was a complaint,
17 like say, breakfast was served and it was reported
18 if there was mouse droppings on a tray or something
19 like that. It was brought up to me so I can go and
20 look at it.
21         But as far as, I mean, mice problems
22 it was more inmates not wanting to work or maybe a
23 leaky faucet or something like that. I mean, were
24 there mice here, yes, but, I mean, it was very
25 seldom that we spoke of mice. She would have glue

Page 88

1  traps out. I would have glue traps out when she
2  needed them.
3         The only time we spoke of mice is
4  when she needed glue traps and I would provide those
5  to her.
6     Q. Okay. Tell me about the instance when
7  mouse droppings were reported on a food tray. Like
8  did that happen more than once?
9     A. Yes. This was during meals that were
10 served, but when it was reported to me and I would
11 go look into it, it was already destroyed or there
12 was no evidence there for me to actually physically
13 see this.
14         So it was rumor, I took as rumor
15 because I couldn't see it for myself to substantiate
16 the complaint while on site, so, I mean, there's not
17 much if I could do if there was mousetraps.
18         I would in turn do a little spot
19 inspection of, say, the B dining area where most of
20 these complaints came from and found no evidence of
21 mice in the kitchen with, you know, without seeing
22 mouse droppings, that's how I would see if there was
23 any type of mouse activity.
24    Q. So Ms. Estevan would call you regarding
25 mouse droppings on a tray and ask you to come and

Page 89

1  see it, but by the time you got there, there wasn't
2  mouse droppings?
3         Am I understanding that correctly?
4         MS. PULLEN: Objection to form.
5         MS. MOULTON: Join.
6         THE WITNESS: Do I answer?
7         MS. MOULTON: Yes.
8     A. So what would happen was I would get told
9  by -- when I would come in that there was an
10 incident, say, in the B dining where they serve chow
11 that a mouse dropping was found on the tray. And
12 we're talking about a tray that already had food or
13 something on it or the resident was in the process
14 of eating.
15         So by the time I got to the dining
16 hall or whatever, all this, it was already all taken
17 care of as far as there was no saved tray, there was
18 no evidence there for me to look at to substantiate
19 that there was a mouse dropping on the tray. And
20 that happened a couple of times so --
21    Q  (By Mr. Allen) But it was Ms. Estevan
22 that --
23    A. No, not always Ms. Estevan. Sometimes it
24 was a shift supervisor or even a correctional
25 officer that would advise me that there was

Page 94

1  before this deposition?
2     A. Yes.
3     Q. Tell me, just tell me broadly like what's
4  going on here. What are these documents about?
5     MS. PULLEN: Objection to form.
6     MS. MOULTON: Same objection.
7     A. From what I see, the first one, that
8  Exhibit 5, it's correspondence, I guess an e-mail, I
9  don't know to, let's see, she's referring to
10 Mr. Orona's inspection, which is Block 39, and then
11 he puts on there, I think, that's New Mexico food
12 code for that discrepancy.
13    Q. Uh-huh.
14    A. Mice droppings present in tool storage
15 area. Corrective action request was asked the same
16 day which we took care of it that day. Mr. Orona
17 asked me, we took care of it on site.
18        ==And then it goes on to where I==
19 ==refused to clean it and that wasn't the case.==
20 ==Inside the kitchen area working at the time was a==
21 ==biohazard certified worker and I stated that it==
22 ==could be taken care of in-house because she was bio==
23 ==certified, that's why she took the bio==
24 ==certification.==
25        ==And then it goes on that Beavers==

Page 95

1  ==couldn't do it because she was working with food.==
2  ==I wasn't aware she was working with food. I simply==
3  ==said that Beavers was biohazard certified and I==
4  ==believe in the long run, I ended up cleaning it. My==
5  ==porters did take care of the instant after it was==
6  ==addressed to me that Ms. Beavers was working with==
7  ==food as a cross-contamination with her, but I==
8  ==believe from what I recall we ended up taking care==
9  ==of it ourselves with my porters.==
10        And then the job order, I mean, I
11 don't know. I don't see these. These go to
12 maintenance, so the first time I saw this was last
13 night.
14    Q. Okay. Was this communication between
15 Ms. Estevan and the Warden at the time, had you seen
16 this before?
17    A. Which one, the Exhibit 5?
18    Q. Yes, Exhibit 5.
19    A. I hadn't seen it until last night. When I
20 printed it last night was the first time seeing
21 this.
22    Q. Did you recall, and I recognize this is
23 quite a long time ago at this point, but did you
24 recall having a conversation either with Ms. Estevan
25 or the Warden at the time about this, the

Page 96

1  information on Exhibit 5?
2     A. No. I remember the incident itself about
3  Ms. Beavers because I remember certifying her and
4  her requesting to get certified or whatever, and I
5  remembered the actual conversation we had that I
6  can -- you can have Ms. Beavers clean it because she
7  was bio certified.
8        And then, you know, I wasn't aware of
9  the whole food preparation, cross- -- I know what
10 cross-contamination is, but from what I understood
11 Ms. Beavers was one of the cleaners in the kitchen,
12 so she was responsible for kind of cleanliness of
13 the kitchen area, that's why I had asked her to do
14 it.
15    Q. I see. Why does someone need to be
16 biohazard certified to address this?
17    A. They don't. They feel more comfortable
18 because I'm not biohazard certified. It's just --
19 you don't have to be biohazard certified to clean
20 mouse feces as long as you're wearing PPE, gloves,
21 face mask, probably eye protection because they're
22 using chemical. You don't have to be bio certified,
23 it's just population preferred to get bio certified
24 because it paid if they were doing biohazard, it
25 paid more than any job on the facility.

Page 97

1        So it was kind of like an incentive
2  plus it goes into their files as a certification.
3  And it's, I guess, like a job skill.
4     Q. I see.
5     A. It benefits the population.
6     Q. Okay. Am I understanding from earlier in
7  our conversations is at least on a couple of
8  occasions, you cleaned up mouse droppings yourself;
9  is that correct?
10    A. Yes, sir.
11    Q. And so you mention protective equipment to
12 do that. Did you use protective equipment yourself
13 when you cleaned it up?
14    A. Rubber latex gloves, face mask, and eye
15 protection, yes, sir.
16    Q. And was that true every time that you
17 cleaned up mouse droppings you used that protective
18 equipment?
19    A. Yes.
20    Q. And do you know, was that equipment
21 provided to inmates when they were cleaning up mouse
22 droppings?
23    A. Yes.
24    Q. It was?
25    A. Yes.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Page 110

1  immediate person that needed to be notified, I would
2  say yes. But in corrections there's a chain of
3  command so not everything is always reported to the
4  fire safety when it comes to anything.
5      So it's reported to different people.
6  It could be a duty officer, it could be the Warden,
7  it could be the Deputy Warden, it could be a shift
8  supervisor or lieutenant. So, I mean, it's done by
9  chain of command.
10     **Q. You know, I recognize that you said before**
11  **that you don't believe there's a rodent infestation**
12  **at Western, correct?**
13     **A. Yes, there's not a rodent infestation.**
14     Q. If there were a rodent infestation, what
15  would be your job as FSSO? In that role, like what
16  responsibility would you have if there were an
17  infestation?
18     MS. PULLEN: Objection to form.
19     A. I wouldn't know. I don't have an
20  infestation. I never come across an infestation
21  here at the prison. So I would have to get advice
22  from my superiors and probably from professionals
23  that are familiar with the rodent infestation.
24     But my time in corrections or as fire
25  safety, I haven't come across an infestation. So I

Page 111

1  would have to, you know, get advice and guidance
2  from superiors and probably professionals if we did
3  have an infestation.
4     Q. Okay.
5     MR. ALLEN: Mr. Sanchez, I'd like to take
6  another break if that's all right with everyone.
7  Maybe we could come back at 11:55. I do think we'll
8  probably need a lunch break. You know, I don't have
9  a huge amount more but it's probably not enough -- I
10 might need a little bit of time after a lunch break.
11    So if we could come back at 11:55, maybe.
12 I'd go another half hour and then we could take a
13 break for lunch.
14    Does that work for folks?
15    MS. MOULTON: Why don't we just take a
16 lunch break now.
17    MR. ALLEN: Okay. That works for me, too.
18    MS. MOULTON: Is that okay with everybody?
19    MS. PULLEN: Yes.
20    MS. HICKMAN: Yes.
21    MS. MOULTON: What time do you want us
22 back, Mr. Allen?
23    MR. ALLEN: Why don't we do 12:45. Does
24 that work for folks?
25    MS. MOULTON: Yes.

Page 112

1      Does that work for you, Mr. Sanchez?
2      THE WITNESS: Yes, ma'am.
3      MR. ALLEN: Thanks everyone.
4      (Recess taken at 11:50 to 12:54.)
5      THE COURT REPORTER: We're on the record.
6    Q  (By Mr. Allen) Okay. Mr. Sanchez, have
7  you any awareness of cats being on the grounds at
8  Western?
9     A. Yes.
10    Q. And how did they get there?
11    A. I would presume they're feral.
12    Q. They're feral?
13    A. Yeah. I mean, there's housing
14 developments kind of close to the prison itself, so
15 either they were dropped off on the side of the road
16 or they, what is it called, walked out this way.
17    Q. Uh-huh.
18    A. Commuted this way and found the prison and
19 kind of stayed here.
20    Q. Do they ever come into the buildings at
21 the prison?
22    A. Yes.
23    Q. In what circumstances?
24    A. From what I've noticed is they're friendly
25 with the population. The population kind of like

Page 113

1  befriends them or whatever. They feed them and
2  everything like that, so it resulted in me going to
3  administration and posting written directives to
4  leave the wildlife alone, including the cats or
5  disciplinary action would come about with a writeup
6  if I found them inside the housing units.
7     Q. Have you ever found them inside the
8  housing units yourself?
9     A. No.
10    Q. No. Have you ever had to do any
11 disciplinary action in relation to the cats?
12    A. Feeding them, yes. I've done them as
13 conduct report to witnessing the population feeding
14 them after the directives were put out, they're not
15 to feed them and leave them alone. So I did do a
16 misconduct report.
17    Q. In what circumstances did you see the
18 inmates feeding the cats?
19    A. They place food and water bowls outside of
20 the units and were physically there feeding the
21 cats.
22    Q. So you only saw that outside the units,
23 not inside?
24    A. Just outside, yes, sir.
25    Q. Got it. Okay. To your knowledge no one