Case 1:21-cv-00083-MV-JFR   Document 107-5   Filed 06/29/22   Page 1 of 3

ZAPATA vs. MARTINEZ, et al.                                   Susie Zapata
1:21-cv-00083-MV-JFR                                       March 30, 2022

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW MEXICO


SUSIE ZAPATA AND MONICA GARCIA,

        Plaintiffs,

v.                                 Case 1:21-cv-00083-MV-JFR


LEON MARTINEZ, ROBERTA LUCERO-ORTEGA,
ARTHUR SANCHEZ, BERLEEN ESTEVAN,
and SUMMER FOOD SERVICE, LLC,

        Defendants.



                 DEPOSITION OF SUSIE ZAPATA

                      March 30, 2022
                        9:30 a.m.

   All Participants Appeared Through Zoon Videoconference

                The Deponent Was Located at:
        The Law Offices of NM Prison & Jail Project
               3800 Osuna Road, NE, Suite 2
                   Albuquerque, New Mexico




         PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE,
   this deposition was:

   TAKEN BY:     LISA ENTRESS PULLEN, ESQ.
                 ATTORNEY FOR DEFENDANTS BERLEEN ESTEVAN
                 AND SUMMIT FOOD SERVICE




   REPORTED BY:  TANYA M. NIMS, RPR, NM CCR #168
                 WILLIAMS & ASSOCIATES COURT REPORTING, LLC
                 317 Commercial Street, Northeast
                 Suite G-101
                 Albuquerque, New Mexico  87102
```

Exhibit E

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

Case 1:21-cv-00083-MV-JFR   Document 107-5   Filed 06/29/22   Page 2 of 3

Page 19 (Pages 70-73)

ZAPATA vs. MARTINEZ, et al.
1:21-cv-00083-MV-JFR

Susie Zapata
March 30, 2022

Page 70

1  metal tables. Yeah.
2     Q.  When you identified that there was mouse feces
3  there, did you take any action?
4     A.  Yeah. We had to clean it. So, yeah. We would
5  have to clean it.
6     Q.  So if you're -- if you as a floater your duties
7  are changing, did you interact with food trays regardless
8  of what your assigned duties were for that day?
9     A.  Yes, ma'am.
10    Q.  Did you have any training on cleaning at any
11 point?
12    A.  No, ma'am. Training?
13    Q.  Yes.
14    A.  No, ma'am.
15    Q.  I understand there's a -- some kind of
16 certification for hazardous waste as part of your cleaning
17 duties as pod porter and the other duties that you had at
18 Western. Did you have any training about cleaning
19 materials like that, hazardous materials?
20    A.  Not that I can remember. I mean, the only thing
21 that I remember was the orientation I spoke to you
22 previously about with the packet. But not that I can
23 recall, no. No training for specific cleaning, no.
24    Q.  So even though you're sweeping and mopping and
25 cleaning toilets, there wasn't any kind of training about

Page 71

1  sanitary methods?
2     A.  Not that I can recall, ma'am, no.
3     Q.  Okay. And the orientation packet was the one we
4  talked about when you started your work in the kitchen at
5  Western?
6     A.  Yes, ma'am. And I didn't do the orientation
7  right away. It took a couple months for us to go to do
8  the orientation.
9     Q.  Did you need instruction on cleaning before the
10 orientation?
11    A.  Yes, ma'am.
12    Q.  So despite your experience at CCA and as a pod
13 porter, you believe you needed further instruction on
14 cleaning?
15    A.  I don't believe I needed further instruction. I
16 know how to clean. But, you know, the thing is the staff
17 have authority over us. If they tell us to do something,
18 we're supposed to do it.
19       And if we don't, there's consequences to suffer
20 from that. So if she says clean it or kill it, that's
21 something that we have to do.
22    Q.  Did you ever talk with any officer assigned to
23 oversee inmates working in the kitchen about cleaning?
24    A.  About cleaning?
25    Q.  Yes.

Page 72

1     A.  Cleaning in general or cleaning the rodent feces?
2     Q.  Well, let's break it down. Talked with an
3  officer in general about cleaning?
4     A.  Not an officer or -- no. I mean, cleaning was
5  part of our duties. So I didn't speak to anybody about
6  it, you know. I didn't speak to anybody about cleaning.
7     Q.  Did you talk with any officer about -- assigned
8  to oversee inmates in the kitchen about cleaning after the
9  mice?
10    A.  Officer.... Not cleaning up after the mice. I
11 did speak to Mr. Sanchez about, you know, if they were
12 going to fix the problem so we could stop having to clean
13 after them, yes.
14    Q.  When was this conversation? Was this Art
15 Sanchez?
16    A.  Yes.
17    Q.  And when was the conversation with Art Sanchez,
18 the officer, about fixing the problem to stop cleaning up
19 after mice?
20    A.  I don't have a direct day or time. Mr. Sanchez
21 went in and out of there quite a lot. I do remember
22 bringing up the subject of, you know, what are you guys
23 doing about the rodent problem?
24       You know, like this is ridiculous. You know, we
25 are tired of having to kill them and clean them. And, you

Page 73

1  know, he kind of said, "Well, we are taking care of it.
2  There's the mouse traps." And that was that.
3     Q.  So one time that you recall speaking with Art
4  Sanchez, the officer, about the subject?
5     A.  Yes, ma'am.
6     Q.  Any other officer that you spoke with about
7  cleaning or cleaning after mice?
8     A.  I know Sergeant Gonzales. I have spoken to him
9  about, you know, it being gross in there. You know, why
10 can't, you know, anybody do something about the problem.
11 Like, you know, we're tired of cleaning up after it.
12       And it's -- it's constantly in our food, in our
13 food trays. And, you know, it's -- you know. He
14 basically said like, you know, that nobody hasn't done
15 anything in a while there, so. He basically left it at
16 that.
17       You know, when you -- when you're upset about the
18 situation and you're bringing it to a staff member and
19 they basically shrug it off and you're taking it as like,
20 okay, well, they are not taking it seriously. I'm talking
21 to the wrong person. You know, I'm not going to bring it
22 up again for them to do the same thing to my face, you
23 know.
24       It's irritating and very rude. So I didn't bring
25 it up to anybody else.

Case 1:21-cv-00083-MV-JFR   Document 107-5   Filed 06/29/22   Page 3 of 3

ZAPATA vs. MARTINEZ, et al.
1:21-cv-00083-MV-JFR

Page 31 (Pages 118-121)

Susie Zapata
March 30, 2022

Page 118

1  time, and I know Ms. Moulton has questions. I may have a
2  few more for you, Ms. Zapata, but I'd like to turn you to
3  Ms. Moulton right now. And like I said, I may have a few
4  other questions at the end. Thank you very much.
5          THE DEPONENT: Thank you.
6                  EXAMINATION
7  BY MS. MOULTON:
8    Q. Good afternoon. I have lots of questions. But
9  one of the first things I want to do, Ms. Zapata, is to
10 talk to you about when you arrived at Springer and when
11 you arrived at Western.
12         My records indicate that according to dates of
13 receipt that are in your inmate file, that you arrived at
14 Springer on February 14th of 2017. Does that sound
15 correct to you?
16   A. Yes, ma'am.
17   Q. Okay. And then that you arrived at Western on
18 May 25th of 2017. Does that sound correct?
19   A. Yes, it sounds -- it sounds correct.
20   Q. Okay. And then, finally, the medical records --
21 or the records from Healthcare for the Homeless indicate
22 that you checked back in with them after having been
23 incarcerated at Western on 12 of 2019, specifically on
24 December 19th, 2019.
25         You had originally said that you were

Page 119

1  incarcerated until 2020. But that's not correct; is it?
2    A. No. No.
3    Q. You got out in December of 2019?
4    A. Yeah.
5    Q. Is that right?
6    A. Yeah.
7    Q. Yeah. Okay. And you started -- I don't know
8  exactly when you got out. But it looks like you checked
9  back in with Healthcare for the Homeless, like I said, on
10 December 19th of 2019.
11   A. Yes, ma'am.
12   Q. And shortly after that you started seeing
13 Mr. Porter again.
14   A. Yes, ma'am.
15   Q. And it indicates, seems to suggest in looking at
16 your records that the last date you saw Mr. Porter was in
17 August of '21. Is that correct? Have you seen -- have
18 you been seeing someone other than Mr. Porter since that
19 time or?
20   A. No. I've only seen Mr. Porter. So that might be
21 accurate.
22   Q. Okay. And where did Mr. Porter go?
23   A. I don't know the name of the organization. I
24 just know he left to a different organization.
25   Q. Okay. All right. Who resides with you currently

Page 120

1  other than Monica?
2    A. My children.
3    Q. All three of your children?
4    A. No. Just my -- my boys. That would be Eduardo
5  Junior Contreras and Elias Contreras.
6    Q. And how long have they actually lived with you?
7    A. Eduardo has been with me for over a year now.
8  And Elias just moved back with me I want to say the end of
9  February.
10   Q. And where -- had they been with your step-sister
11 before that?
12   A. No. They were with my aunt in Washington at the
13 time.
14         MS. MOULTON: Okay. All right. I want to go to
15 your answers to NMCD's discovery, so we can make it
16 worthwhile for Mr. Allen having printed those out for us
17 to look at. Thank you, Mr. Allen.
18         MR. ALLEN: You're welcome.
19   Q. (By Ms. Moulton) If you could please go to
20 page 4, bottom of page 4. I asked you about other
21 lawsuits that you've had. And you talked in the top of
22 page 5 about a landlord-tenant dispute. What was that
23 about?
24   A. I was out on probation. And I believe this was
25 like around 2015, '16. I was renting an apartment. And I

Page 121

1  ended up violating, and they sent me back to prison. So I
2  wasn't there to explain to them that I went back to jail
3  or anything.
4          So I lost the apartment. And I know I had owed
5  them I think the month's rent. So I think that's why they
6  were trying to dispute with me that in court. But I was
7  incarcerated, so they couldn't.
8    Q. Okay. All right. The thing that's confusing
9  about what you just said is that this is listed as 2008.
10   A. Oh, wow. Okay.
11   Q. So was there some other landlord-tenant dispute
12 in 2008?
13   A. Yes, there was.
14   Q. What was that?
15   A. I lost my apartment. Unfortunately, the person
16 that I was with at the time, I was giving them the money
17 to pay the rent. And instead of paying the rent, they
18 were getting -- they were abusing drugs.
19         So I came home from work to find an eviction
20 notice on my door. And I had to move out. So what they
21 wanted was the money that I owed them for rent. That's
22 why I left there.
23   Q. And then in continuing down there, in 2016, drug
24 trafficking, criminal charges were dismissed but there was
25 an accompanying parole violation. Tell me about that drug