Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

SUSIE ZAPATA and MONICA GARCIA,

    Plaintiffs,

V.                              1:21-cv-00083-MV-JFR

LEON MARTINEZ, ROBERTA LUCERO-ORTEGA,
ARTHUR SANCHEZ, BERLEEN ESTEVAN,
and SUMMIT FOOD SERVICE,

    Defendants.

==DEPOSITION OF LEON MARTINEZ==
==MONDAY, FEBRUARY 7, 2022==
10:00 A.M.
VIA ZOOM VIDEOCONFERENCING PLATFORM

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, THIS DEPOSITION was taken by:

    STEVEN ROBERT ALLEN, ESQ.
    Attorney for Plaintiffs

REPORTED BY:  Mary Therese Macfarlane, CCR
               PAUL BACA PROFESSIONAL COURT REPORTERS
               500 4th Street, Suite 105
               Albuquerque, NM 87102
               (505) 843-9241

Exhibit D

Page 6

1  have looked at to prepare for this deposition.
2      A. Outside of the exhibits, none.
3      Q. Okay. Let's see here.
4          So tell me a little bit -- where are you
5  working currently?
6      A. I'm retired.
7      Q. You're retired. Okay. I was wondering. And
8  what was your job right before you retired?
9      A. I was the warden at the penitentiary in Santa
10 Fe.
11     Q. That's what I thought. Congratulations. You're
12 living the dream.
13         When did you retire?
14     A. December 1st was my retirement date of last
15 year.
16     Q. I see. Okay. Congratulations. That's
17 fantastic.
18         How long were you at PNM?
19     A. Overall probably like 21 years. Uh --
20     Q. All with --
21     A. I've done the majority of my tenure there.
22     Q. Okay. And you have been in corrections for a
23 while, right?
24        (Note: Reporter interruption.)
25        THE WITNESS: Okay. So I should pause like for

Page 7

1  a second or two?
2      A. I've been in corrections for 25 years.
3      Q. And have you been in corrections that entire
4  time here in New Mexico?
5      A. Yes.
6      Q. Are you from New Mexico?
7      A. I am.
8      Q. Where did you grow up?
9      A. I grew up in Las Vegas, New Mexico.
10     Q. Las Vegas. Okay. Great.
11         What was your first job in corrections?
12     A. I was a correctional officer.
13     Q. And why did you have an interest in pursuing a
14 jot or a profession in corrections?
15     A. I wanted a job, something in law enforcement,
16 and at the time it wasn't locked in better than
17 corrections, you know without a degree. I was going to
18 school at the time. And so that's kind of where it is,
19 and I just ended up staying, promoting, and ended up
20 making it a career, turned it from my job to career, and
21 here we are.
22     Q. That makes sense.
23         You have been in several different
24 positions, like leadership positions at different
25 facilities; is that correct?

Page 8

1      A. I have held every job from correction officer,
2  correction officer sergeant, and then everything on the
3  administrative side you can imagine, from classification
4  to warden and everything in between.
5      Q. Right. That's great.
6          Tell me, what was the first facility that
7  you worked at as a corrections officer?
8      A. PNM.
9      Q. Oh, at PNM?
10     A. At the old main facility.
11        (Note: Reporter interruption.)
12     Q. Understood. I'll try to compensate for that, as
13 well, and slow down a little bit on my end.
14         So when did you first get a position at
15 Western?
16     A. June of 2018.
17     Q. And is it correct that you came on board as
18 deputy warden at that time?
19     A. That's true.
20     Q. Okay. And who was the warden at that time?
21     A. Roberta Ortega. And I think it's hyphenated
22 Ortega-Lucero or something like that.
23     Q. Correct. It's Lucero-Ortega, correct.
24         Tell me who was serving as fire sanitation
25 safety officer when you came on board as deputy warden?

Page 9

1      A. Art Sanchez.
2      Q. Did he serve as FSSO the entire time you were at
3  Western?
4      A. Yes.
5      Q. And who was the person directing food service
6  for Summit while you worked at Western?
7      A. Berleen Estevan.
8      Q. And was she -- was she serving in that role the
9  entire time you worked at Western?
10     A. Yes.
11     Q. Okay. When you came on board in June of 2018 as
12 deputy warden, tell me what your job duties were.
13     A. I oversaw certain aspects of the facility:
14 Programming, Chaplaincy, the business office, various
15 other ones that the warden would have me oversee.
16     Q. Okay. I believe that Ms. Lucero-Ortega was
17 serving as deputy warden at some point before you came on
18 board and before she was warden, and in her answers on
19 discovery she gave a little detail about the job duties
20 she had as deputy warden, and I'm going to go through
21 those and ask you if they remained the same while you were
22 deputy warden.
23     A. If I could say something on that real quick.
24     Q. Yes, please.
25     A. I do not believe that Roberta was every a deputy

Page 10

1  warden at Western. She was a deputy warden at Central.
2  And --
3      Q. And so --
4      (Note: Reporter inquiry. Record read.)
5      A. Correct. I don't believe she was ever deputy
6  warden at Western. She went from Central deputy warden to
7  warden at Western, I believe.
8      Q. Okay. I appreciate that correction.
9          Let me see if her description of when she
10 was deputy warden at Central matches what your duties were
11 at Western while you were deputy warden.
12         Okay. She said -- I'm just going to
13 mention a few things that are relevant for our
14 conversation.
15         The first is she said was food service.
16 Did you play any role in food service when you were the
17 deputy warden?
18     A. I don't ever remember being specifically
19 assigned to food service. When we sat down -- and I used
20 to have notes, you know, like from like my first day
21 there, hey, you know, this, this, this and this. I don't
22 remember if it was on there or not. I don't remember.
23     Q. Okay. Do you recall performing any duties
24 related to overseeing food service while you were deputy
25 warden.

Page 11

1      A. Yeah. I mean, as the deputy warden I oversaw
2  the entire facility to some degree, right?
3      Q. Yeah. So tell me more about that. What do you
4  recall was the intersection between your role as deputy
5  warden and food service?
6      A. I couldn't tell you specifically on that. I
7  just know that when I would do my rounds I would do rounds
8  in the kitchen. But I would do rounds everywhere. So
9  from segregation to general population to the food
10 service, whatever the area is, I just -- I oversaw -- I
11 walked throughout the entire facility.
12     Q. That makes sense.
13         Another thing that she mentioned was
14 physical plant maintenance was one of her roles as deputy
15 warden at the other facility. Do you recall that being
16 part of your job responsibility?
17     A. Not as a deputy warden. I oversaw Chris Almanza
18 when I was the warden.
19     Q. And who was that?
20     A. He's the PPS Director, for lack of a better
21 term.
22     Q. And tell me what PPS stands for.
23     A. Physical -- sorry, I'll delay.
24         Physical Plant Services. Basically
25 maintenance.

Page 12

1      Q. Okay. Got it. And so you were supervising that
2  person while you were warden --
3      A. Right.
4      Q. -- if I heard you correctly.
5      A. Correct.
6      Q. Okay. And could you tell me how to spell that
7  person's last name, Mr. ...
8      A. Almanza, A-l-m-a-n-z-a.
9      Q. And the first names is Chris, C-h-r-i-s?
10     A. Chris.
11     Q. Did Mr. Almanza stay in that role when you
12 became warden?
13     A. Yes.
14     Q. That makes sense.
15         One of the things Ms. Lucero-Ortega
16 mentioned was her duty as deputy warden was recommending
17 procedures to ensure the security, safety and efficient
18 operation of the prison. I'm just lifting that directly
19 from her written response.
20         Does that sound like part of your job
21 responsibility, as well?
22     A. I'd word it similar to that, yeah.
23     Q. Okay. And then I think this is the last thing I
24 wanted to run by you was she mentioned that another job
25 duty she had as deputy warden was ensuring compliance with

Page 13

1  NMCD Policies and Procedures.
2      A. Yeah. That's just standard. But I mean that
3  would be anybody's role in Corrections. That's like being
4  a soldier. You're just a soldier. No matter what your
5  job is, that's just Corrections.
6      Q. Sure. It's probably -- the importance of that
7  responsibility is probably higher for someone who is
8  serving as deputy warden and warden. Would you agree with
9  that?
10         MS. MOULTON: Objection to form.
11     A. Yes.
12     ==Q. Okay. Let me see. And so you served as deputy==
13 ==warden from June, 2018 through April, 2019; is that==
14 ==correct?==
15     ==A. Correct.==
16     ==Q. Okay. And then you took over for Ms.==
17 ==Lucero-Ortega as warden at that point; is that correct?==
18     ==A. Correct.==
19     Q. Okay. Tell me -- describe, to the extent you
20 recall, what your job duties were as a warden, especially
21 to the extent that they varied from your job duties as
22 deputy warden.
23     A. They wouldn't vary, because anything that my
24 deputy warden oversaw, I oversaw, right? I mean, you have
25 complete oversight as the warden.

Page 54

1  institution?
2      A.  I guess.  I try to be as approachable as
3  possible in any job that I do.  It's just -- it's just
4  different.  I can't even -- I can't -- I can't tell you
5  why it happens that way, it just does.
6      Q.  Right.  Okay.  If there were problems with
7  rodents at Western, you would expect Mr. Sanchez to know
8  about it, correct?
9      A.  Yes.
10     Q.  And you would also expect, given what we talked
11 about earlier, that he would communicate those problems to
12 you, his direct supervisor.  Correct?
13     A.  Correct.  So let's -- let's be clear about what
14 an "issue" is with rodents.
15         Seeing one mice scurrying across the
16 floor -- I had a mouse in my office one time.  I probably
17 called Art, "Hey man, I got a mouse in my pocket" -- not
18 pocket -- "in my office."
19         He brought me a trap and I caught him a
20 couple of days later.  And that was the time I -- so,
21 yeah.
22     Q.  Sure.
23     A.  So mice crawling on top of mice and falling out
24 of the ceilings and the walls, that's different.
25         So as far as a mouse scurrying across the

Page 55

1  floor, yeah, sure.  But I don't need to be told about
2  that.  I don't care about that.  It was in my office.
3  "Hey, come and get this damn mouse. "
4          If it's a huge issue, yeah, of course I
5  would expect it be communicated to me.  That's a big
6  problem.
7      Q.  That's right.  Okay.  That makes sense.
8          And you did expect Mr. Sanchez, given his
9  role inspecting the facility specifically for issues
10 regarding pests, and in particular rodents, to know about
11 a problem if it exists and communicate it to his direct
12 supervisor, which would be you.
13     A.  Correct.
14         MS. MOULTON:  Objection to form.
15     Q.  Okay.
16     A.  Correct.  If it was reported to him.  Sometimes
17 inmates don't want to report it.  They might be mad at Art
18 for whatever reason and they're going to go tell CO
19 Somebody Else.
20     Q.  So just to be clear, you never recall Mr.
21 Sanchez reporting to you that there was an issue with
22 rodents at Western that needed to be addressed.
23     A.  No, not that I recall.
24     Q.  Okay.  He never talked about there being an
25 infestation of rodents at Western that you recall.

Page 56

1      A.  Not that I recall.  I know they had some issues
2  where inmates claimed they saw feces in food, and it ended
3  up being something else.  I've had stuff of that nature.
4  We had issues with glue traps because they would use them
5  for other purposes.  Stuff of that nature, yeah.
6          But like a mass problem like I said, like
7  they are falling out of the walls and ceilings, no.
8      Q.  Do you have --
9      A.  Anything that's considered like an emergency
10 that I need to get Central Office involved and say, "Hey,
11 we got to tear this place down and rebuild it"?  Short of
12 that, no.
13     Q.  Same with Ms. Estevan.  She never communicated
14 to you a problem on with rodents at Western.
15     A.  No.
16         MS. PULLEN:  Objection to form, foundation.
17         MS. MOULTON:  Join.
18     Q.  And she certainly never communicated to you that
19 there was a rodent infestation at Western.
20         MS. PULLEN:  Objection to form.
21     A.  As previously defined, like infestation falling
22 out of the ceilings and walls and walking over rodents all
23 the time, no.
24     Q.  Let's contextualize that a little bit, because,
25 yeah, I've had mice in my house, too, and it's not fun,

Page 57

1  but that's different from infestation.
2          I think one way to define it, maybe just
3  for our purposes, is they are breeding in the walls and
4  they're, you know, large quantities.  They've moved in, so
5  to speak.
6      A.  Using that definition, no one has ever reported
7  that type of infestation to me.
8      Q.  Okay.  Let me -- let's look at a couple of other
9  exhibits here.  And these are just -- you know, I'm
10 sharing these with you by way of example.
11         The first one here is Exhibit 3.  You know,
12 it's difficult to read, you know, as these Informal
13 Complaints often are.  Probably has --
14     A.  Yeah.
15     Q.  -- this to some extent.
16         This is from an inmate, Anne Apodaca.  Do
17 you know this inmate?
18     A.  No.
19     Q.  She says -- she's asking here to please have
20 staff stop removing rodent barriers.  And my understanding
21 from talking with dozens of inmates and other folks is --
22 and she's sort of describing this here, is they are
23 putting barriers on the bottom of their cell doors to
24 prevent rodents from getting into their cells.
25         Are you familiar with this practice at

Page 58

1  Western?
2      A. I always thought it was based on heating and
3  cooling is what I thought it was about. I had no idea it
4  was about mice. They'll put like a towel or whatever they
5  can get underneath the doors. And any time I've ever
6  asked it's because it was cold in the cell or hot in the
7  cell and that added air, right?
8      Q. I see.
9      A. I will say, too, that these forms are
10 incomplete, like extremely incomplete. No one has ever
11 reviewed them that I see, which is odd. But just for your
12 own information.
13     Q. Yeah. I appreciate that, because I got these --
14 it was very difficult to get these inmate grievances to
15 begin with. And, you know, I eventually did after months
16 of putting pressure on the Corrections Department, and got
17 like a small stack.
18         I know from talking with inmates there's is
19 quite a few more, but I don't know why it's incomplete.
20 That's a really good question. But I got these directly
21 from the Corrections Department as part of an IPRA lawsuit
22 that's related to this one. So that's where these came
23 from.
24         MS. MOULTON: Objection to form.
25     A. I only --

Page 59

1          MS. MOULTON: Is there a question, Mr. Allen?
2          MR. ALLEN: No. I'm just explaining to the
3  in- -- sorry, to Mr. Martinez where I got these, and so I
4  don't know why they are incomplete, just so you know.
5          THE WITNESS: I only state that because I
6  couldn't affirm whether this is authentic or not. I mean,
7  I could write that right now in front of you and submit it
8  to you as evidence is the only thing. It doesn't seem
9  affirmed in any way, shape or form.
10         MR. ALLEN: Uh-huh.
11         THE WITNESS: That's all.
12     Q. Given that I got these directly from counsel for
13 the Corrections Department, do you think it would be
14 surprising if someone manufactured these?
15     A. I've seen inmates do worse.
16         MS. MOULTON: Objection. Sorry. Go ahead and
17 say it again.
18     A. I've seen inmates do worse.
19     Q. But given that they came from the Corrections
20 Department would it be surprising that it was
21 manufactured?
22     A. Yeah, I'd say that. If you got it from the
23 grievance officer or whatever. It's just that I don't
24 know why they wouldn't add the entirety of it. Weird.
25     Q. It is weird. Yeah, I agree with that.

Page 60

1          So, you know, it's difficult to read, but
2  Ms. Apodaca here is saying that there's been a rodent
3  problem here that they are dealing with with these
4  barriers, and I just want to make it clear that you have
5  never heard of inmates having issues with rodents crawling
6  into their cells at night, and suing these barriers to
7  protect against that.
8      A. No.
9      Q. Okay. On the next page we have an incident -- I
10 realize this is after your tenure here, but just so -- you
11 know, you have these complaints going back before you got
12 there, while you were there, and afterwards, and, you
13 know, this is an example of one of them.
14         She says that she -- this woman Erica Duran
15 says that she found rodent feces in her cereal. Is that
16 something that you've heard inmates complaining about
17 before?
18         MS. PULLEN: I will object to the form and
19 foundation, and that this line of the questioning about a
20 July, 2020, report is out of the scope of this case, given
21 the Plaintiffs' time they were at the facility.
22         MS. MOULTON: Object -- join. I join that
23 objection.
24         You can answer, Mr. Martinez, if you can.
25     A. Like I said, and I even mentioned that earlier,

Page 61

1  I don't know if there was a specific case or not, but
2  inmates would say, "Hey, we found this," or we found flies
3  or whatever, and they would produce something to somebody.
4  And 99 percent of the time that I recall I never heard,
5  yeah it is rat poop, or whatever the case is.
6          But, yeah. Oh, yeah, they play games like
7  that, I'm sure.
8      Q. Do you specifically recall inmates complaining
9  about rodent feces in food that they were served?
10     A. Not to me.
11     Q. Okay. Do you recall Mr. Sanchez or Ms. Estevan
12 telling you that they'd heard from inmates that they had
13 been served food with rodent feces in it?
14     A. Maybe. For some reason it sticks out in my mind
15 that an inmate made a claim, and they went and checked it
16 out and it ended up being like a burnt piece of something
17 else. That sticks out in my mind, and I couldn't have
18 just made that up out of my brain, so at some point an
19 inmate made this allegation, somebody was sent to go check
20 it out. Whether I sent him out or the major sent him to
21 go look into it, to do a little investigation to see if it
22 was substantiated or not. That makes sense.
23     Q. I see. In this same Informal Complaint it
24 mentions "to staff" here. Do you know who Lt. Gifford is?
25     A. Yes.

Page 66

1  reason, but I mean that was -- that's separate.
2  **Q. Did you ever have to do mediations between Ms.**
3  **Estevan and Mr. Sanchez?**
4  A. Maybe. Maybe. And what comes to mind is there
5  was an issue with the chemical pulls (phonetic), where in
6  the contract the Food Service contractors are supposed to
7  provide their own chemicals, but she was -- she's a
8  company woman, she was trying to save some money, so we
9  would provide some of the chemicals. And that ended up
10 being kind of a thing between her and Mr. Sanchez about
11 who's going to buy the chemicals. Well, you've been
12 providing them, and then all of a sudden, you know, you're
13 "supposed to provide them" type of thing. That sounds
14 familiar.
15         Just personality conflicts, too. I mean,
16 you don't get along with everybody.
17         But I know that was an issue with
18 chemicals, who was going to buy them and who was supposed
19 to. And at the end of the day we pulled the contract out,
20 and you're supposed to provide them. So...
21         If something got broke she was very, like,
22 "Hey, I need it this second," and maintenance might say,
23 "I can get you it this afternoon," and that wasn't good
24 enough. Stuff of that nature.
25         But, I mean, that's her purpose there. She

Page 67

1  needed to get food prepared and she needed this stuff
2  done, repaired in a timely manner. And, like, I see it.
3  I see both sides.
4  **Q. That's fair.**
5  **I'm specifically interested in the**
6  **professional relationship between Mr. Sanchez and Ms.**
7  **Estevan. Did anything come up, any conflicts come up**
8  **between the two of them regarding food safety or the**
9  **sanitation or cleanliness of the kitchen?**
10 A. Not that I recall specifically, but I know that
11 Art's come and told me, "Hey, Boss, the kitchen's a mess."
12 And I told Berleen, hey, she needS to get it cleaned or
13 whatever the case is. And whether it got done or not --
14 of course it eventually got done.
15         But stuff of that nature. I'm sure. I'm
16 sure. There was always conflicts. Art's job is fire
17 safety, sanitation and berleen's is cooking, so their
18 prioritis don't always intersect, and times -- I don't
19 know. It's hard to -- your emergency is not necessarily
20 mine type of thing.
21         So, yeah, I'm sure. I'm sure there was
22 conflict there. I mean, he's the guy that's going to say,
23 "Hey, your kitchen's a mess." "Hey, EID came through and
24 said this, so you got to get that fixed."
25         So he ended up being kind of like the

Page 68

1  hammer. So of course they probably had some kind of -- it
2  wasn't a great relationship, I'm sure.
3         But I couldn't talk about how they got
4  along. They could have been best friends for all I know
5  of at work.
6  **Q. Right. But you recall some professional**
7  **conflicts around cleanliness in the kitchen?**
8  A. Chemicals is what I recall. And I know the
9  kitchen's been a mess before, because at some point I
10 required an extra cleaning crew nightly to be into the
11 kitchen.
12         But you're seeing a kitchen that's 20-some,
13 30-some years old. It's just old. And so we had extra
14 crews that would go out, and we'd pay these inmates to go
15 in there and do a deep cleaning, and there for a while it
16 was nightly.
17         I don't recall when that practice stopped,
18 or if it stopped, or maybe to this day it still happens.
19 I'm not sure. But we would have special crews go in there
20 and do deep cleaning in the kitchen all the time. All the
21 time.
22         And that was usually prompted because of
23 something where Art would come in and say, "Hey, the
24 kitchen's a mess."
25 **Q. How often did he complain to you that the**

Page 69

1  **kitchen was a mess during your tenure at Western?**
2  A. I don't know. At times --
3         MS. MOULTON: Object to form. Go ahead and
4  answer.
5  A. I can't recall. I don't know. I'm sure it
6  could be a time or two. I'm not sure.
7  **Q. I'm sorry, I missed that. Could you repeat**
8  **that?**
9  A. I'm sure it was a time or two. I mean, it
10 sticks out in my mind, so it was more than one isolated
11 incident. I'm sure a time or two.
12 **Q. So more than once, but was it half a dozen**
13 **times?**
14 A. I'd be lying if I told you. It could have been
15 three times. I have no idea. But it was enough for us to
16 put another measure into it.
17 **Q. And in those instances where he came to say that**
18 **the kitchen was a mess, did you go down to look to see**
19 **whether it was a mess or not?**
20 A. Depending on what I had going on. I mean, not
21 necessarily. I could have sent a captain. Art's word's
22 gold to me, anyway.
23 **Q. Yeah.**
24 A. It could have been a manager or the deputy
25 warden, or if I happened to be doing rounds that week I

Page 86

1  the same -- yeah, basically the same date. This is coming
2  from Summit staff, and there's a Work Order here, and
3  under Custom Tasks it says: Need exterminator to address
4  the rodent infestation inside the wall that is shared
5  with -- and then it cuts off.
6      Do you, uhm -- do you recall having
7  conversations with other Summit staff, other than Ms.
8  Estevan, about this type of problem associated with the
9  building in the kitchen?
10      So again, you know, this is sort of an
11  infestation inside the wall that seems to be referenced
12  here.
13      MS. MOULTON: Objection: form, foundation.
14      MS. PULLEN: Objection to form --
15      A. That was before my time, so I would have never
16  had that conversation.
17      Q. Sure. That makes sense.
18      I was looking at Ms. Lucero-Ortega's
19  discovery responses regarding her interactions with Ms.
20  Estevan over time, and she says she recalled having
21  ongoing conversations with her about controlling rodents
22  and maintaining cleanliness in and around the kitchen.
23      Am I correct in saying you did not have
24  similar conversations with Ms. Estevan about these issues?
25      MS. MOULTON: Objection to form and foundation.

Page 87

1      MS. PULLEN: Form, foundation.
2      A. That's correct.
3      Q. You do not.
4      A. Not ongoing, no.
5      Q. And here's an interesting point. Ms.
6  Lucero-Ortega mentions purchasing ultrasonic mice
7  repellers.
8      A. Hmm.
9      Q. Do you recall anything about that?
10     A. No. I wish we had them when we were there.
11  They might have broke or something.
12     I remember having a conversation with
13  somebody, I think it was Art, can't remember, but they
14  wanted to use -- the smash traps? I don't know what you'd
15  call them, but traditional traps. And we couldn't use
16  them in the kitchen, couldn't use poison obviously,
17  because there's food there. And the best option was at
18  the time, the sticky traps. Even that became an issue
19  because the inmates used them for other things. They
20  wanted to do body wax, and other kinds of different things
21  out of the wax on there. But that's neither here nor
22  there.
23     But then at some point they went to a live
24  trap. And I don't know, I think that was right at the end
25  of my tenure, so I don't know remember whatever happened

Page 88

1  to those. But those ended up being from what I recall
2  hearing, through the grapevine basically, that those were
3  the most effective, was the live traps.
4      Q. Okay. And so she also mentions, Ms.
5  Lucero-Ortega, I'm just sort of going through her
6  responses here, that she did weekly rounds specifically to
7  check for cleanliness in kitchen and dry food storage area
8  while she was there as warden.
9      Did you continue that practice while you
10 were there?
11     A. Yeah. Like I said, I'd go through and do my
12 weekly rounds. I was required to rounds once a week,
13 required. But if there was something where I was just
14 bored, I'd go walk around. Those are areas you tend to
15 look at. You know, make sure that the dead-man trays are
16 there, that they're are dated correctly, and stuff of that
17 nature. Make sure temperatures are correct, make sure
18 that tools are accounted for.
19     Those are the type of stuff that I would
20 inspect for.
21     Q. Okay. Ms. Lucero-Ortega also mentions that she
22 had multiple conversations with you while you were the
23 deputy warden about the presence and prevention of rodents
24 at Western. What do you recall about those conversations?
25     A. Like I said, if it was something about sticky

Page 89

1  traps, possibly. That sounds familiar. I don't know if
2  it was with Roberta, but whoever that was, those are the
3  type of conversations that I remember having.
4      Some inmate claiming there was feces in the
5  food or stuff like that, I don't know if she was there or
6  not during that time, but those are the type of
7  conversations we would have had.
8      Q. Okay. I want to ask about the company that did
9  pest control at Western -- and still does, I believe --
10 PDI. Have you heard of that company?
11     A. No.
12     Q. I asked Mr. Sanchez about this, because we have
13 a bunch of invoices showing they're some kind of pest
14 control: for spiders, providing those glue traps that you
15 discussed.
16     Do you remember discussing with Mr. Sanchez
17 the services provided by a pest control company at
18 Western?
19     A. Unless they came up to the point where it was
20 needed to be renewed, I wouldn't have.
21     Q. What Mr. Sanchez said when we were having his
22 deposition a couple of weeks ago was every six months
23 there would be a three-company bid for new pest control
24 services.
25     Tell me what you recall about that process.

23 (Pages 86 to 89)

Page 122

1  Q. Fair point.
2     We turn to Exhibit 5, and we have numerous
3  reports from the New Mexico Environment Department citing
4  mouse droppings and the presence of rodents at Western,
5  correct?
6     MS. PULLEN: Objection to form, foundation.
7  A. Yes, sir.
8  Q. And then in Exhibit No. 9 we have Mr. Sanchez
9  acknowledging very clearly that there is a problem with
10 mice at Western. Correct?
11    MS. MOULTON: Objection: form, foundation.
12    MS. PULLEN: Same.
13 A. That's what his statement said.
14 Q. And then in that same report we have Corrections
15 Department staff documenting rodent feces served in food
16 to inmates. Correct?
17    MS. PULLEN: Objection: form, foundation.
18    MS. MOULTON: Same.
19 A. Yes, sir.
20 Q. So what I just want to -- you know, we are
21 coming near to the end here, Mr. Martinez. I just want to
22 verify that when you take all these things together you
23 still don't believe there was a problem with rodents at
24 Western?
25 A. I believe there's mice at Western, but your

Page 123

1  definition and my definition are two different things. So
2  there were mice there. Guarantee it. There's going to be
3  mouse droppings there. Guarantee it. But there is a big
4  difference between an infestation and a few mice. And so
5  I can't state by any of those documentations that you read
6  that there is 10,000 mice inside the walls at Western.
7  You'd see them coming out the walls.
8     I had one mouse in my office in 20 months.
9  Q. Uh-huh.
10 A. I had food in my closet -- like, they would have
11 chips and stuff from like food sales, and I had a little
12 closet in my office where all that stuff was stored, and
13 one mouse in 20 months. That's pretty good.
14    And my office was adjacent to the kitchen.
15 So outside the back of my office was like a pond, and then
16 a walk thoroughfare to between two units, and then beyond
17 that was the kitchen and the Sally Port.
18    So for me to say there was one mouse in 20
19 months that I killed in my office that I saw, that's not
20 abnormal. That's not inordinate.
21    In the kitchen where there's food, and mice
22 know there's food, you're probably going to have a few
23 more. You're probably going to have a few more.
24    I cannot state one way or the other whether
25 there was, I'm not a professional, but that's a big

Page 124

1  difference.
2  Q. Fair enough. So just regarding the presence of
3  rodents at Western, during your tenure there as department
4  warden and warden, knowing, you know, the discussion we've
5  had here today, is there anything that you would have done
6  differently?
7     MS. PULLEN: Object to the form.
8  A. Okay. If I had $100 million I would have blown
9  that place to the ground and rebuilt it brand new, because
10 there was problems from all levels just because it's an
11 old, inundated facility. It's been retrofitted so many
12 times, and duct tape and bubble gum can only go so far.
13    That facility is one of oldest in the
14 state. It's old, it's falling apart. But I mean we only
15 have so much money. We do the best we can. We are
16 humans, we are not monsters. We are not intentionally
17 putting these inmates in threat of harm or trying to get
18 them to catch Hantavirus. If there is an issue, we fix
19 it.
20    For some inmates, and I understand, and I
21 mean I understand your position and I understand inmates'
22 position, but I have been in this business long enough
23 where 99 percent of these filings, these lawsuits are all
24 about the deal we are going to pay you out this money just
25 to make this thing go away.

Page 125

1     And I understand that. But even when that
2  happens, where's the real change? Where's the real
3  change? We are going to get sued $50,000, $100,000
4  whatever the case is. That doesn't help the facilities.
5  It helps that one individual, that one inmate that was
6  smart enough to say, "Hey, let's organize this thing and
7  let's sue the department."
8  Q. I appreciate you bringing up that point, Mr.
9  Martinez, because I think it helps me formulate another
10 question, actually.
11    You know, with our Plaintiffs, right, Susie
12 Zapata and Monica Garcia, you know they might get some
13 monetary damage out of this, right, with their lawsuit.
14    I wonder what you would think about what
15 motivation Evangeline Chavez-Quintana might have in
16 Exhibit No. 4 for filing this Declaration. Like, why
17 would she do this?
18    MS. PULLEN: Objection to form.
19 A. Do I answer that? Is that the ex-inmate?
20 Q. Yeah, the ex-inmate. She's is not part of the
21 lawsuit. She's just putting out her story here.
22    Why would she do this?
23 A. Is she connected to the other inmates in any
24 way, shape or form? Do they communicate?
25 Q. They worked in the kitchen. I don't know if

Page 126

1  they knew each other or not. Some of the dozens of
2  inmates who filed these sworn statements knew other
3  Plaintiffs, some of them didn't, but I'm just wondering
4  what in your mind the motivation might be from someone
5  like that to make these allegations about Western when it
6  comes to the rodent issue.
7       MS. PULLEN: Objection to form.
8       MS. MOULTON: Foundation, form.
9     A. In my opinion it corroborates their story.
10    Q. It corroborates the story of the Plaintiffs?
11    A. (Note: No audible response.)
12       MR. ALLEN: Fair enough. I think I'm done, Mr.
13  Martinez.
14       (Note: Reporter inquiry.)
15       MS. MOULTON: It was a statement. And the
16  recording went off.
17       MR. ALLEN: Could you read the end of the
18  transcript, court reporter? I just want to make sure.
19       (Note: The record was read.)
20       MR. ALLEN: Yeah, that was a question. I wanted
21  to confirm that. And then you can answer, Mr. Martinez.
22    A. In my opinion it does. I mean, you can't just
23  have one person making an allegation, right? You have to
24  have a weight or evidence to corroborate it. That's my
25  opinion. And, like I said, if they want true change, I

Page 127

1  mean I guess this is first step to it, right? I don't
2  begrudge anybody that. We all want to have safer
3  facilities, we all want to have better facilities. I
4  understand that 100 percent.
5       MR. ALLEN: Fair enough. Thank you, Mr.
6  Martinez. I really appreciate your time today. I will
7  pass the witness.
8       MS. MOULTON: Lisa, do you have any questions?
9       MS. PULLEN: No, we don't have any questions at
10  this time.
11       MS. MOULTON: Okay. Actually, I have a couple
12  of follow-up, Mr. Martinez.
13              EAMINATION
14  BY MS. MOULTON:
15    Q. We talked -- you talked with Mr. Allen about
16  weekly inspections. Do you recall that?
17    A. Yes, ma'am.
18    Q. Do you recall if Food Service did weekly
19  inspections?
20    A. I don't specifically recall, uhm, but I'm
21  assuming they did. Something in the back of my mind tells
22  me they did some kind of daily inspection of their areas.
23  It might have been daily that they had to come in and
24  inspect all their areas and see if there was any broken
25  equipment or any issues that needed to be fixed. I think

Page 128

1  it was a form that they kept in their own records. I'm
2  not 100 percent sure.
3       But I know that I required my staff, just
4  out of directive: Hey, I need you guys to go check the
5  kitchen daily.
6       We had a lot of issues in the kitchen with
7  fights, items being stolen, stuff of that nature. So
8  there was always something going in the kitchen. The
9  kitchen was definitely a hotspot, so I required my staff,
10  my lieutenants and above, to do rounds in there daily
11  anyway. And not necessarily documented. Those that are
12  documented are by Art Sanchez, Anne Marie Perez, EID, and
13  all those different individuals, entities. But, uhm, so
14  just off of verbal directive I want you guys checking the
15  kitchen daily --
16    Q. Okay.
17    A. -- is kind of the way it went.
18    Q. Okay. All right.
19       You said that -- you talked about the
20  inmate Informal Complaint, which was S. Zapata 1230. That
21  was the one about putting barriers on the bottom of cell
22  doors.
23       When does something like that to get to
24  your level?
25    A. So --

Page 129

1    Q. If at all.
2    A. Yeah. It might not, necessarily. But I would
3  tell you that if I was doing rounds and I saw that, I
4  mean, to me coming from a male facility that means
5  something different. So when I tell the inmate, "Hey, I
6  need you to either remove that or take down your window
7  cover from the back," it becomes a security issue for me.
8  And then the explanation that I had was, "Well, it's cold
9  in here" or "it's hot in here," and this keep the air in
10  or out.
11       Generally when it's a male facility when
12  they start barricading the bottom of the door, that means
13  they are going to flood the tier, and there's something
14  coming, something -- a negative reaction is coming, so we
15  got to react to that.
16       So when I was doing rounds is normally when
17  I was going to say, "Hey, what's that mess? You guys need
18  to take that out."
19    Q. Okay. But talking about the Inmate Informal
20  Complaint, what happens if they aren't able to deal with
21  it informally, resolve it informally?
22    A. It turns into a grievance. Step 2 of that form
23  is a grievance, a Formal Grievance that goes to the
24  grievance officers. The grievance officers conduct an
25  investigation, the investigation is documented and it's

Page 130

```
1   taken to -- it's either the deputy warden or warden to
2   sign off on those Formal Grievances. If not that,
3   there's -- if that's not satisfactory, which a lot of
4   times -- I mean, most of time it is, but if it's not they
5   can complain to Constituent Services, they can write to
6   the leadership at Central Office. There's always another
7   step of: I need to get this fixed.
8       Q. Okay. And you don't recall -- do you recall
9   seeing that particular Informal Grievance from Ann
10  Apodaca?
11      A. Those ones, no. Again, grievances in general
12  I've seen thousands of them, so what was the context of
13  them, I couldn't tell you.
14          So maybe, but not something off the top of
15  my head I can recollect.
16      Q. And would a grievance get to you if it were
17  resolved at some point?
18      A. No, not necessarily. A lot of times it would,
19  but not necessarily. If it was resolved at the informal
20  level I'd never see it. If it became a grievance I'd sign
21  off on it. But again 99 percent of those are already
22  resolved, as well.
23          The only time I really got involved in the
24  grievance process was if it was a PREA, Prison Rape
25  Elimination Act incident elevation. Emergency medical
```

Page 131

```
1   services, they are considered emergency grievances, and
2   those you pay attention to a lot more.
3       Q. Okay. We've talked about the mouse droppings in
4   the cereal. To your knowledge did that happen more than
5   the one time that we've talked about?
6       A. Not that I recall.
7           Sorry, there was feedback.
8       MS. MOULTON: That's all the questions I have.
9       A. Not that I recall. I mean, if there was,
10  general practice, hey, if it came to my attention if the
11  inmates were cooking in the kitchen. And, like I said,
12  they were required to report a change in menu to the
13  warden's office. But just playing devil's advocate here,
14  if they had found something and they threw it away and did
15  a change of menu, I couldn't say. Maybe they did, and
16  maybe they found something and they discarded it and had
17  to substitute it. Maybe.
18      Q. Okay. All right. And what would be the
19  situation if an inmate did report seeing something in
20  their food? What would be the situation that you would
21  expect your staff about how they would handle it?
22      A. I would expect my staff to go down there and try
23  to verify it. Of course you err on the side of caution.
24  Even if I can't say that's burnt rice or that's a bean
25  sprout or a burnt corn flake, or whatever it is, I would
```

Page 132

```
1   take the added step and said: Toss all that food and
2   re-serve the food. We can do sack lunches for that day or
3   that meal.
4           And I would always err on the side of
5   caution and say, okay. We might verify, or we might say
6   it's not, but just err on the side of caution. Trash
7   everything and give them sack lunches for now and we'll
8   make it up for them on the next meal.
9       MS. MOULTON: All right. I don't have any
10  further questions.
11      THE WITNESS: That's just good business.
12      MS. MOULTON: We will read and sign.
13      MS. PULLEN: No questions.
14      (Note: Deposition concluded at 1:16 p.m.)
```

Page 133

```
1           IN THE UNITED STATES DISTRICT COURT.
2             DISTRICT OF NEW MEXICO
3   SUSIE ZAPATA and MONICA GARCIA,
4           Plaintiffs,
5   V.                        1:21-cv-00083-MV-JFR
6   LEON MARTINEZ, ROBERTA LUCERO-ORTEGA,
    ARTHUR SANCHEZ, BERLEEN ESTEVAN.
7   and SUMMIT FOOD SERVICE,
8           Defendants.
9          CERTIFICATE OF COMPLETION OF DEPOSITION
10      I, MARY THERESE MACFARLANE, CCR NO. 122, DO
11  HEREBY CERTIFY that on Monday, February 22, 2022, the
12  deposition of LEON MARTINEZ was taken and original
13  deposition retained by:
14      Steven Robert Allen, Esq.
        (505)515-0939
15      steve@nmpip.org
16      I FURTHER CERTIFY that copies of this
17  certificate have been mailed or delivered to the
18  following Counsel of Record and parties not represented by
19  Counsel:
20      Deborah J. Moulton, Esq.
        (505) 884-7787
21      dmoulton@kmwpc.com
22      Lisa Entress Pullen, Esq.
        (505) 842-8255
23      pullen@civerolo.com
24      Harriet Hickman, Esq.
        (505) 652-1339
25      hhickman@rlattorneys.com
```