Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**EXHIBIT 3**

SUSIE ZAPATA and MONICA GARCIA,

        Plaintiffs,

vs.                    1:21-cv-00083-MV-JFR

LEON MARTINEZ, ROBERTA LUCERO-ORTEGA, ARTHUR SANCHEZ, BERLEEN ESTEVAN, and SUMMIT FOOD SERVICE, LLC,

        Defendants.
_____/

VIDEOTAPED ZOOM DEPOSITION OF SARAH JOHNSON

Monday, June 6, 2022

Albuquerque, New Mexico

    PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY:    STEVEN ROBERT ALLEN, ESQ.
              ATTORNEY FOR PLAINTIFFS

REPORTED BY:  TERI WARD, RPR, CCR #549
              PAUL BACA COURT REPORTERS
              500 4th Street, Suite 105
              Albuquerque, New Mexico 87102

Page 6

1  space maybe and then give an answer and then go back
2  and forth without that sort of overlap that's
3  typical of a more casual conversation. Make sense?
4      A.   Yes.
5      Q.   And same with yes-or-no questions. In
6  an ordinary conversation, we may go uh-huh or I
7  might shake my head or something like that. In this
8  context, we need a clear yes, clear no to a
9  yes-or-no question. Make sense?
10     A.   Yes.
11     Q.   Okay. Let's see, what else? I think
12 the questions I have will be pretty short, but, you
13 know, we have up to four hours to do the deposition
14 as a -- because you're a non-party witness.
15         If you need a break at any point, just
16 let us know, and we can do that. If there's a
17 question on the table, if I or one of the other
18 attorneys has asked a question, you'll need to
19 answer that question and then we'll take the break.
20 Make sense?
21     A.   Yes.
22     Q.   Okay. Did you review any materials in
23 preparation for the deposition this morning?
24     A.   No.
25     Q.   Okay. I'm just going to jump in, then.

Page 7

1  My understanding is that you worked at the women's
2  prison in Grants for some time. Can you tell me
3  what -- when that was?
4      A.   My first day at Western New Mexico
5  Correctional Facility, the -- now called The North.
6  At the time, that was the only state facility in
7  town, now the state runs both.
8          So the women's facility on Lobo Canyon
9  Road, I started on December 3, 2017. My last day
10 was June 30, 2021.
11     Q.   Okay. Great. And tell me what -- what
12 position or positions did you hold while you worked
13 there.
14     A.   Initially, I was hired as the reentry
15 specialist and college facilitator on and off. For
16 two thirds of that time, I was also the acting
17 supervisor, head of department, GED instructor,
18 cognitive instructor, and registrar.
19     Q.   And let me make sure I understand. You
20 were acting supervisor of which department?
21     A.   The education department. All
22 education.
23     Q.   All education. Okay. And approximately
24 when did you fulfill that role? You said it was on
25 and off. Do you remember the time periods?

Page 8

1      A.   So during the -- during the year of
2  2018, it was literally on and off because my then
3  supervisor Cabrerro was preparing to retire, so he
4  would be gone for a week or two here or there.
5          From -- from mid June 2019 through the
6  time that I left, June 30, 2021, I was almost always
7  acting supervisor. There were two or three months
8  where we -- they had hired a supervisor, and she was
9  there, but she became very ill very quickly, so was
10 really only there for a few of those months.
11     Q.   Okay. That makes sense. Was that sort
12 of the highest position that you held while you were
13 at the women's prison?
14     A.   Yes.
15     Q.   Okay. And that's a leadership position,
16 correct?
17     A.   Yes. Department head of the education
18 department.
19     Q.   Okay. Sounds good. Let me see. I want
20 to ask you -- as you know, this litigation is about
21 an alleged rodent infestation at the women's prison.
22 I want to just ask you generally what you may know
23 about that.
24     A.   Well, I mean, it was apparent from day
25 one that there were mice and other kinds of rodents

Page 9

1  around the facility. Throughout my time there, it
2  started as when I was a reentry specialist doing
3  reentry classes, students would come in with
4  complaints about what was going on in the kitchen
5  and in the dining hall.
6          I brought in ACA Annmarie Perez to talk
7  to the class on how to properly put in a grievance,
8  and over the next year and a half, two years that
9  was done. They documented when they made a
10 complaint, who they made a complaint to, where it
11 was on the facility, would bring it to my class, and
12 I would place it in her mailbox. And this happened
13 sporadically for probably almost two years.
14     Q.   Can I ask, so it sounds like the inmates
15 were giving you the grievances, and then you were
16 passing them along to the ACA for --
17     A.   Oftentimes, yes. There are grievance
18 boxes that they could put them in, but she gave
19 permission to at least the one class that she spoke
20 with that she would give -- that I could take them
21 and put them in her mailbox, and I did that often.
22     Q.   Can I ask, why did she do this -- the
23 training? Did the inmates not understand --
24     A.   I actually asked her to.
25         MS. PULLEN: Objection.

Page 10

1  THE WITNESS: The --
2  THE COURT REPORTER: Sorry, I didn't get
3  the objection. And, I'm sorry, if you could wait
4  until he finishes the question. Thank you so much.
5  MS. MOULTON: Objection to form.
6  Foundation.
7  THE COURT REPORTER: All right. Thank
8  you.
9  BY MR. ALLEN:
10  Q. That reminds me, Ms. Johnson. I should
11  insert that now. It's my fault more than yours.
12  Occasionally, the other attorneys -- or
13  maybe not occasionally, they can do it as often as
14  they'd like -- may object to one of my questions.
15  That's the most likely time when people will be
16  speaking over each other because you'll be giving
17  your answer, and they'll be trying to insert the
18  objection.
19  So if you hear them do that, just give a
20  little pause so they have the opportunity to
21  register that objection so the court reporter can
22  get it in the transcript, and then go ahead and
23  answer the question. We just need that objection
24  for the record. It won't prevent you from going
25  ahead and answering.

Page 11

1  Does that make sense?
2  A. Okay. So still answer?
3  Q. Yeah. Yeah, my fault.
4  A. Okay. I thought it was a big enough
5  issue with the students coming into education that I
6  personally asked ACA Perez to come and speak with
7  the class on what the proper grievance process was.
8  Q. Okay. And did you -- why did you think
9  it was such a problem that required that sort of
10  extra work on your part?
11  MS. MOULTON: Objection to form.
12  THE WITNESS: Because there were
13  complaints around the kitchen, the dining food,
14  cleanliness often. I don't know if you want me to
15  say -- I can't -- you know, I don't want to say the
16  word daily, but often.
17  BY MR. ALLEN:
18  Q. Okay. And I also -- I didn't mean to
19  put words in your mouth. Did you personally feel it
20  was a significant problem at the prison, the --
21  A. Yes.
22  Q. -- presence of rodents?
23  A. Yes.
24  Q. Okay. And so you weren't getting these
25  complaints daily. Were you getting them every week?

Page 12

1  MS. MOULTON: Objection to foundation.
2  Form.
3  MS. PULLEN: Join.
4  BY MR. ALLEN:
5  Q. Or every month or every year?
6  A. More than every month. I won't say
7  weekly either, but more than every month.
8  Q. Okay. And what were the inmates saying
9  roughly, or what do you recall their story was to
10  you?
11  A. Okay. Well --
12  THE COURT REPORTER: Was that an
13  objection, Ms. Moulton?
14  MS. MOULTON: Yes, sorry. Objection to
15  form.
16  THE COURT REPORTER: Thank you.
17  THE WITNESS: Often it was rodent
18  excrement in food, in the -- rodents in the kitchen,
19  rodents in B Dining. We also had bird issues. Now,
20  the dining hall is an open room. There's a door in
21  the front and a door in the back, so birds would fly
22  through. There were numerous issues that upset the
23  inmates over the years.
24  BY MR. ALLEN:
25  Q. Can you estimate the number of inmates

Page 13

1  that brought these concerns to you over the years?
2  MS. MOULTON: Objection. Foundation.
3  Form.
4  MS. PULLEN: Same objections.
5  THE WITNESS: Less than 20, but again,
6  those are the students that were in my classes.
7  BY MR. ALLEN:
8  Q. Okay. At what point did you start
9  thinking that maybe they were onto something in
10  terms of the validity to their concern?
11  MS. MOULTON: Objection to form.
12  Foundation.
13  MS. PULLEN: Join.
14  THE WITNESS: Well, a timeframe on that
15  is difficult to answer. What I can say is the
16  particular class that I invited Ms. Perez to is one
17  of the first that I started probably in March of
18  2019, and it probably went -- these classes, you
19  know, completely rotate and you get a new set of
20  students, and they run for maybe three months. So
21  it had to be sometime between March and May of 2019.
22  BY MR. ALLEN:
23  Q. Okay. And how about your own -- what
24  you saw with your own eyes and ears. Like, what --
25  did you see evidence yourself of rodents at the

Page 14

1  prison?
2  A.  Yeah.  We had mice in the education
3  building, too.  There were not -- it was not an
4  infestation, but they were certainly there.
5  Q.  Okay.  And the -- go ahead.  Sorry.
6  A.  The education building is in what I
7  would call the same corridor as the dining hall, the
8  same piece of building.
9  Q.  Okay.  And did you ever go into the
10  kitchen or the dining hall yourself?
11  A.  Yes.
12  Q.  And how often did you enter those two
13  places?
14  A.  The kitchen, not more than a couple
15  times a month.  B Dining, sometimes to see if our
16  people were being called for chow any time soon and
17  sometimes just to see who was in the chow hall.  So
18  I could say a weekly basis easily.
19  Q.  Did you ever see rodents or evidence of
20  rodents in those two places yourself?
21  A.  Yes.
22  Q.  Describe those times.
23  A.  In the kitchen I can't say that I
24  actually saw rodents, but I had been in there a few
25  times when the workers were either looking for them

Page 15

1  or seemed to be looking for a problem.  With the B
2  Dining, I mean, you just -- you saw them.  They were
3  just around.  I --
4  Q.  What were they -- what were they -- what
5  did you see them doing?
6  A.  Running.
7  Q.  Uh-huh.  Were they --
8  A.  Mice don't want to be around you when
9  they see you coming.
10  Q.  Were they on the floor?  Were they on
11  the tables?
12  A.  Yes.
13  Q.  On the floor?
14  A.  No, on the floor.
15  Q.  Okay.
16  A.  They were around outside in the
17  walkways.
18  Q.  Okay.  And did you see traps of any kind
19  while -- while you worked at the prison?
20  A.  Yes.
21  Q.  What kind, do you remember?  What did
22  they look like?
23  A.  We -- yeah, we had -- unfortunately, we
24  had some live traps in the education building.  We
25  never trapped anything.  They weren't what I wanted

Page 16

1  there.  I think they had in B Dining the traps where
2  they go in a box and can't get back out again.
3  Q.  Um-h'm.  I see.
4  Can you tell me -- you know, you
5  mentioned at one point that some of the inmates
6  talked about actually finding rodent feces in their
7  food.  Did you ever see or have evidence of that
8  yourself?
9  A.  Yes.  On a few occasions, inmates
10  brought food into the education building that they
11  claimed came from B Dining hall that they were
12  served that clearly had feces in it.
13  Q.  How do you know?  Like, what did it look
14  like?
15  A.  Tiny little black dots.
16  Q.  And so how did you know those tiny black
17  dots were rodent feces and not, I don't know --
18  A.  I didn't.  That's why I said what they
19  claimed was that it was rodent feces.
20  Q.  Okay.  Have you seen rodent feces before
21  like outside of the prison?
22  A.  Yes.  Well -- oh, yeah, sure.
23  Q.  Did it look similar in any way or
24  different?
25  MS. MOULTON:  Objection to form.

Page 17

1  MS. PULLEN:  Same objection.
2  THE WITNESS:  Similar.
3  BY MR. ALLEN:
4  Q.  Um-h'm.  Okay.  How many inmates brought
5  food to you with what they alleged was rodent feces
6  on it?
7  A.  Three, perhaps four.
8  Q.  Okay.  And at what -- what timeframe did
9  this happen where the inmates brought you this food
10  with what they alleged was rodent feces on it?
11  A.  That's hard to say.  I can't give a time
12  of year.  Sometime during the 2018 -- probably
13  summer to fall.
14  Q.  Okay.  Let's see.  So you mentioned that
15  while you were acting supervisor of education, you
16  were in a leadership position, right?  You were --
17  that was a department head position?
18  A.  Yes.
19  Q.  Is that correct?
20  A.  Yes.
21  Q.  Okay.  And my understanding is there
22  were somewhat regular meetings with department heads
23  at the prison; is that correct?
24  A.  At that time there were.
25  Q.  And how frequent were those meetings?

Page 18

1  A. They could be as frequent as weekly. I
2  would say three times a month at least.
3  Q. Okay. And who attended those meetings?
4  A. Warden, deputy -- well, warden, deputy
5  warden, if there was one, department heads, high
6  level security people, probably one person from
7  STIU. I don't know all the ranks. They called it
8  the department head meeting.
9  Q. Okay.
10  A. You know, the major was there,
11  generally.
12  Q. Okay. And who was -- who served as
13  warden while you were in that position, department
14  head position?
15  A. For the most part, it would be Warden
16  Martinez and then acting Deputy Warden Vigil.
17  Q. Was -- one of the defendants in this
18  litigation was Roberta Lucero-Ortega. Was she
19  warden while you were serving in that position?
20  A. I think there was one, at most two
21  meetings that I went to as acting head when she was
22  still warden.
23  Q. Okay. I want to ask about two other
24  defendants in this litigation, whether they attended
25  those meetings. The first is Arthur Sanchez, who

Page 19

1  served as FSSO. Did he attend those --
2  A. He -- I can't say he attended every
3  meeting, but he was a person who generally was at
4  those meetings.
5  Q. Okay. Another defendant is the Summit
6  Food Service director, I think was her official
7  position. Her name was Berleen Estevan.
8  A. Yes, that is correct. Again, I couldn't
9  say she was at every meeting, but she was the head
10  of the department and in most of them that I can
11  remember.
12  Q. Okay. And now what I want to ask you is
13  whether the presence of rodents at the prison was
14  discussed at those meetings ever?
15  A. Sometimes, yes.
16  Q. And how -- how often do you think it was
17  discussed?
18  MS. MOULTON: Objection to form.
19  MS. PULLEN: Same objection.
20  BY MR. ALLEN:
21  Q. More than once?
22  A. Yes.
23  Q. Okay. Was it more than a dozen times?
24  A. I'll say no, because I can't -- I can't
25  give a number like that, but it was in that realm.

Page 20

1  Q. Approximately, around a dozen, maybe
2  less?
3  A. Ten, yeah.
4  Q. Ten to 12 is an estimate?
5  A. Okay. Yes.
6  Q. You would agree with that estimate?
7  MS. PULLEN: Objection to form.
8  THE WITNESS: Yes.
9  BY MR. ALLEN:
10  Q. Okay. And I understand, yeah, these
11  things happened a long time ago. No one's going to
12  get these metrics precisely. I'm just trying to
13  gauge your memory of how often it came up.
14  Who brought up the issues in these
15  meetings, in your recollection?
16  A. That I cannot give a good answer to. I
17  -- I can remember the discussions happening. Was it
18  on the warden's agenda and he came to that bullet
19  item? I can't really say that I have that good of a
20  recollection.
21  Q. Do you remember who participated in the
22  discussions?
23  A. Yes. I -- I can remember a couple of
24  meetings in particular. Do you want to -- okay.
25  Q. Yes.

Page 21

1  A. Then Major Tom Trujillo and Ms. Estevan
2  were actually trying very hard to press for
3  solutions to the issue, and the warden participated
4  in the discussion. I mean, it -- it was -- it was a
5  large discussion at the table.
6  I was usually in the background. But
7  there was a period of a couple of meetings where the
8  major and Ms. Estevan were really trying to get
9  something done.
10  Q. And what did they want done?
11  A. Better storage containers is the one
12  thing I remembered the most being discussed. You
13  know, how -- how -- what traps they were using I
14  remember being discussed. But again, I -- I can't
15  -- I remember some of those little boxes, but I
16  can't remember what else they did, whether or not
17  they -- they put out any chemicals or anything. A
18  lot of it was storage of food.
19  Q. Did they talk about what type of pest
20  control company might -- they might hire to address
21  the issue?
22  MS. MOULTON: Objection to form.
23  MS. PULLEN: Join.
24  THE WITNESS: I don't remember any
25  outside company being discussed, which doesn't mean

Page 50

1  Q. Okay. And what was her response to
2  that?
3  A. She would get them and process them as
4  they should be.
5  Q. Any -- anyone ever bring any grievances
6  back to you and ask you to -- and ask for assistance
7  in appealing the grievances?
8  A. No.
9  Q. Did you ever hear any inmates discuss
10 the grievance -- the appeal process?
11 A. Yes.
12 Q. And what did you hear?
13 A. I really can't recall the particulars.
14 I know that there is a process for appeal, there's a
15 timeframe on it. You know, there's a timeframe
16 they're supposed to get the grievance back, a
17 timeframe that they can write to Santa Fe. I
18 honestly don't know the details of how that's
19 supposed to work.
20 Q. Okay. And did you -- did you ever talk
21 to Annmarie Perez about -- about the appeal process
22 or --
23 A. No.
24 Q. Okay.
25 A. Nope.

Page 51

1  Q. Did you talk to anyone about the appeal
2  process of a grievance?
3  A. When you say talk to anyone, you know, I
4  worked in the education department, so as staff we
5  certainly heard inmates talking about it and
6  discussed it ourselves that -- that at least there
7  was one, but I can't tell you how it's supposed to
8  work. I know there's timeframes on it.
9  Q. Okay. All right. I'm sorry, I'm just
10 going through my notes.
11 A. No, take your time.
12 Q. Okay. You said -- Mr. Allen asked you a
13 question about the number of inmates or how many
14 inmates complained, and I think you said less than
15 20 of the inmates complained to you.
16 A. Yes.
17 Q. Is that -- is that for the entire two
18 years?
19 A. For -- for two years I could honestly
20 and logically bump that to about 30, but you need to
21 remember that education is only a certain percentage
22 of the population, and it's small right there. And
23 then to be trusted to even receive a complaint from
24 an inmate takes some time.
25      So the good fortune of my job is that

Page 52

1  the college program was long-term as well as the
2  environmental literacy programs. So I had groups of
3  students for longer periods of time than let's say
4  the cognitive instructors or even some of the ABE
5  instructors.
6  Q. Okay. All right. So -- so just to be
7  clear, then, over the years, over the two years that
8  we talked about, which would be 2018 to the time you
9  left, maybe 30 inmates complained to you about --
10 about rodents; is that correct?
11 A. Yes.
12 Q. What other things did they complain
13 about?
14 A. The -- the birds going in and out of B
15 Dining, the cleanliness process of the trays, either
16 not being cleaned or having cleaning products left
17 on it, the grievance process, not getting answers to
18 grievances. The disciplinary process, the -- you
19 know, the -- the inconsistency sometimes of how
20 things were handled.
21 Q. Okay. Anything else?
22 A. Boy, issues with commissary, writing
23 debit memos and not having the right commissary, and
24 the process to get that rectified, changing
25 commissary vendors, and issues with MP3 players and

Page 53

1  kiosks. I mean, that -- yeah. It's like --
2  Q. Every aspect of --
3  A. If I thought for a long time, I could
4  come up with others, yeah.
5  Q. Well, let's talk about the birds, the
6  birds in B Dining. Did you ever talk to anyone
7  about the problem -- that -- that problem?
8  A. Well, when you say talked to anyone, did
9  I report it to anyone, no. But there were
10 conversations. And -- and to be, you know, factual,
11 the conversations were B Dining is open. There's an
12 open door in the front and an open door in the back,
13 and birds are going to fly through. That -- that
14 was the gist of the conversation.
15 Q. Okay. So then under that context, who
16 did you report it to?
17 A. I didn't report it. That's what I'm
18 saying. It was really -- you know, we -- people
19 talked about it on the facility.
20 Q. Okay. All right. And then you talked
21 about the cleanliness process, and did -- did you
22 report any cleanliness issues to -- to anyone?
23 A. No.
24 Q. Okay. Did you talk to -- to Major
25 Trujillo about inmate concerns about the cleanliness

14 (Pages 50 to 53)

Page 66

1  before, that's why someone like Ms. Zapata would
2  have spent so much time in a reentry class because
3  we would excuse -- give an excused absence if they
4  had to be on a kitchen shift because that's not a
5  piece of curriculum that you're going to miss.
6  You're just going to do it the next time you come to
7  class.
8      Q.   Gotcha.  So it's sort of a -- a floating
9  class that you can --
10     A.   Yes.
11     Q.   -- proceed through at your own -- at a
12 pace that allows you to continue to work?
13     A.   Yes.
14     Q.   Okay.  And I take it you never saw
15 actual dead rodents?
16     A.   No.  No, we luckily never got any
17 trapped in our traps in education.
18     Q.   All right.  So let me talk to you about
19 that.  You said -- you said that you had snap traps
20 in education?
21     A.   Yes.  I found one in my office, and I
22 can't say how many months into the job, but it was
23 -- so it was probably early to mid 2018, and I just
24 popped it and threw it away.  I don't know who set
25 it there.  It was clearly there before I got there.

Page 67

1  No one ever came to check on it, and I didn't ask
2  about it.
3         There were a couple in the library as
4  well, and I'm not sure whatever became of them.
5      Q.   And did they have mice in them?
6      A.   No.  Nor -- nor any food, so --
7      Q.   Okay.  And so you don't know who set the
8  trap?
9      A.   No.
10     Q.   Did you ever see anyone set the traps in
11 -- in education?
12     A.   No.  I -- my assumption was they were
13 set at some point, and no one ever came back to
14 check on them.
15     Q.   And did you ever see actual mice in --
16 in the education --
17     A.   Yes.  Oh, yeah.
18     Q.   Okay.  And did you ever -- did you ever
19 trap one?
20     A.   No.
21     Q.   Did you ever trap one?
22     A.   No.
23     Q.   And where did you see the mice in
24 education?
25     A.   In my hallway, in my office, in the

Page 68

1  front office, in the library, the back corridors.  I
2  can't -- I can't say that there wasn't a room that
3  we didn't see one or more in at some point in time.
4      Q.   Okay.  And how many times,
5  approximately?
6      A.   I can't give you a count.  I would say
7  that we were seeing them randomly right up until
8  right before I left.
9      Q.   And did you -- did you have any sense
10 over time that you got less complaints about mice?
11     A.   Yes.  Well, at -- over time there were
12 less grievances given to me overall, so whether that
13 was mice or everything else --
14     Q.   Did -- do you recall if you had less
15 discussion with inmates about mice over time?  And
16 by that I mean between 2018 and when you left.
17     A.   Yes.
18         MS. MOULTON:  Pass the witness.
19              EXAMINATION
20 BY MS. PULLEN:
21     Q.   Ms. Johnson, my name is Lisa Pullen.
22 Can you her me okay?
23     A.   I can.
24     Q.   Okay.  Thanks.  I represent Summit Food
25 and Ms. Estevan in this case.  And this is going to

Page 69

1  just skip around a little bit because I'm going
2  third, but basically, wanted to find out if you had
3  any other conversations with anyone else who worked
4  for Summit Food other than Ms. Estevan?
5      A.   No.
6      Q.   And for the entire time that you were
7  with the Western New Mexico Correctional Facility,
8  was Ms. Estevan the food service director?
9      A.   Yes.  She -- she was still there when I
10 left I'm -- I'm pretty sure.  I -- I know she's not
11 there now, but -- but I'm pretty sure she was still
12 there when I left.
13     Q.   And when you started, she was the food
14 service director?
15     A.   She's the only one that I can remember,
16 so I'll say yes, but -- but I -- I can't be
17 positive.
18     Q.   While you worked at the facility, the
19 prison, was it always just women inmates?
20     A.   Yes, yes.
21     Q.   What -- what would you describe your
22 interaction with Ms. Zapata as?  Was she
23 particularly friendly with you as far as
24 interaction?
25     A.   Yes.  I -- we had almost no incidents