Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**EXHIBIT 7**

SUSIE ZAPATA AND MONICA GARCIA,

      Plaintiffs,

v.                Case No. 1:21-CV-00083-MV-JFR

LEON MARTINEZ, ROBERTA LUCERO-ORTEGA,

      Defendants.

DEPOSITION OF

ARTHUR SANCHEZ

January 11, 2022
9:00 a.m.
500 4th Street, NW Suite 105
Albuquerque, New Mexico 87102

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY:      STEVEN ROBERT ALLEN
                  ATTORNEY FOR PLAINTIFF

REPORTED BY:   EDWINA CASTILLO, CCR #407
                  PAUL BACA COURT REPORTERS
                  500 4th Street, NW Suite 105
                  Albuquerque, New Mexico 87102

Page 78

1  were documented? Were those written -- did he have
2  written reports?
3     A. I don't know because I don't have access
4  to those reports. I don't know if he did a report
5  by phone to administration or if he actually gave
6  them documentation. I'm not aware of it.
7     Q. Did you ever have conversations with him
8  about his inspections, about what he saw or found
9  during those inspections?
10    A. No. If there were discrepancies that
11 were -- that had to be brought up to me, he may
12 have, but I don't recall any discrepancies that I
13 wasn't already aware of that I was taking care of.
14    Q. Did he bring up anything involving
15 rodents?
16    A. No.
17    Q. Well, let me make sure I understand. So
18 your discovery answer says you recall discussing the
19 prevention of rodents with a bunch of different
20 people. And tell me if this rings a bell.
21    You list out a bunch of people, the
22 Warden; the environment department inspector, which,
23 I guess, is Mr. Orona; Deputy Wardens; the ACA
24 compliance officer; and Brian Chavez; is that
25 correct?

Page 79

1     Did you talk about rodent prevention with
2  all of those folks?
3     A. Yes. They're all my supervisors.
4     Q. And so tell me like how that came up.
5  Like, why did you talk about rodent prevention with
6  all of those different people?
7     A. To see if I could, when it came up for
8  rebid on a company to provide those services, if I
9  can see about getting a service that would fit this
10 facility better is why I would speak to them about
11 rodent prevention or pest control or things like
12 that. Just to see if I can get another company that
13 maybe provided something that the local company
14 didn't provide us. So I would discuss it with
15 administration.
16    Q. And the local company being PDI?
17    A. Yes.
18    Q. And what was it about their services that,
19 like what -- tell me about that. What weren't they
20 offering?
21    A. Actual rodent control where they would
22 monitor it themselves through the company. They
23 would come on site, check traps, put bait stations
24 out, possibly poisons around the perimeter of the
25 facility, things like that, that PDI did not offer

Page 80

1  the facility.
2     Q. And so like how did you feel just in
3  general the services were that PDI offered,
4  specifically when it came to rodent control?
5     MS. MOULTON: Objection to form,
6  foundation.
7     You can answer, Mr. Sanchez.
8     A. From the training I received by
9  Ms. Garcia, that's what I knew, so I was comfortable
10 with it. I felt like I was doing everything within
11 my power at 100 percent to provide that, you know,
12 do the rodent control.
13    Even if it was myself, I would just
14 get the product from them. I did it. I felt their
15 services were adequate but, you know, adequate
16 enough to, you know, protect and I guess treat the
17 facility for its problems. If it be insects or
18 rodents or anything like that, just with the
19 training I received I felt it was adequate that I
20 was doing that service.
21    Q. (By Mr. Allen) So explain to me why you
22 had conversations with these people about having
23 another company do it. Like why was that of
24 interest to you?
25    A. Because they're professionals at what they

Page 81

1  do and they said that it should be a professional
2  that's got that kind of training to do these
3  services because they offered other services because
4  mice aren't the only, I would say, rodents that we
5  have to be aware of.
6     We have pigeons and, you know, things
7  like that, that probably carry disease. I don't
8  know what diseases, but, you know, you just hear
9  about it. I was seeing if they could provide some
10 sort of service that would take care of the mass of
11 pigeons that are around the facility, things like
12 that, which they did. But, you know, like I
13 explained before, they didn't win the quote with the
14 State so --
15    Q. Who did you -- who are you talking about
16 that didn't win the quote with the State, what
17 specific companies?
18    A. Like Terminex, the companies that offered
19 a little bit more when it came to rodent control.
20 So it was Terminex, I believe SERVPRO, but I mean,
21 like I said, I was happy with PDI. I was, you know,
22 still doing the same service except I would say they
23 were trying to sell themselves more, more services
24 because they were the professionals, you know, as
25 the established company, things like that.

Page 82

1  You know, they just offered more as
2  far as coming in instead of twice a month with PDI,
3  they would come in once a week or whatever the case
4  may be to, you know, service the facility.
5      Q. So is it fair to say that you would have
6  preferred these other companies over PDI?
7      A. Yes.
8         MS. MOULTON: Objection to form.
9      A. Yes.
10     Q  (By Mr. Allen) And so why do you think PDI
11 was selected instead of these other companies?
12     A. I don't know.
13        MS. MOULTON: Objection to form.
14     A. I don't know. I don't have -- I'm not
15 privy to that procedure. I don't know why. I'm not
16 part of that procedure.
17     Q  (By Mr. Allen) Were there any other
18 services that these other companies could have
19 provided in addition to just increased frequency of
20 pest control or what, in your understanding, like
21 what else could they do that PDI didn't do?
22     A. Physically doing pest and rodent control.
23     Q. Uh-huh.
24     A. Just, I mean, how it was explained to me
25 is like pest control you have to have certifications

Page 83

1  to poisons and stuff for the insects. And in rodent
2  control, I guess the equipment they use would, I
3  feel would have been more beneficial for the
4  facility instead of just placing glue traps and live
5  traps everywhere. So I was not sold but it was just
6  I felt it was a better fit for the facility.
7      Q. I see. Okay. Tell me what other topics
8  were discussed in terms of rodent control with these
9  individuals, the Warden, Mr. Orona, Deputy Wardens,
10 the ACA compliance inspector and Brian Chavez in
11 addition to the companies?
12        Were there other topics that came up in
13 those conversations that you can recall?
14     A. None that I recall, just my thoughts on
15 maybe using another company that provided more
16 services. It was kind of just try to see if maybe I
17 can win an approval and somehow maybe get these
18 services even if it was added as another service on
19 top of PDI or something. I guess that's what I was
20 trying to discuss, but, I mean, it was all just pest
21 control and rodent control, see if we can, you know,
22 could do something better than I was already doing
23 for the facility.
24     Q. Okay. That makes sense. But just to
25 confirm, you didn't view Western as having a rodent

Page 84

1  problem?
2      A. No.
3      Q. And so none of the discussions that you
4  had with these people were about needing to address
5  a problem with rodents at Western?
6      A. No, not just -- no. Just that we have
7  rodents. I mean, we do have rodents but not that we
8  have a problem.
9      Q. Okay. Let's go to -- well, actually let
10 me talk to you a little bit about Summit and your
11 relationship with them. Like has Summit always held
12 the contract while you were there for food service
13 at Western?
14     A. Since I've been here since 2017, yes, sir.
15     Q. Okay. And who was your point of contact
16 with Summit?
17     A. Any one of the Summit staff or
18 Ms. Estevan, which we had good communication. I had
19 good communication because she was the director. So
20 if anything was brought up to me, I would get with
21 Ms. Estevan because we had a good communication with
22 each other and we tried to get stuff corrected or
23 fixed.
24     Q. I see. And did she -- she was the
25 director the entire time for Summit at Western that

Page 85

1  you were FSSO; is that correct?
2      A. Yes.
3      Q. Okay. How many staff did she have under
4  her, like Summit staff?
5      A. I don't recall. I mean, she had between
6  two and three under her who were supervisors,
7  because they supervised the workers, the population,
8  or the residents that worked for them. So it was
9  between two and three on any shift.
10     Q. Okay. And what sort of problems came up
11 or what sort of not problems, but like what did
12 you -- what was sort of your daily or professional
13 communication with Ms. Estevan? Like, what did you
14 communicate with her about just as part of your job
15 as FSSO?
16     A. She was having inmates refuse to work,
17 things like that. If, say, she got in a shipment of
18 produce or something like that and it was
19 questionable which, you know, there was some sort of
20 bug or something, she would address that to me so
21 that we can look at it, do a report on it, send it
22 back or not allow it into the kitchen.
23        Any type of, sometimes maintenances
24 if she had a leaky faucet or something because I
25 worked in the maintenance area, I can possibly get

22 (Pages 82 to 85)

Page 106

1  is saying that she had learned or heard that food
2  had been served last week, the week before she filed
3  this that had rodent feces in it.
4        During your time as FSSO, have you ever
5  heard a complaint of that nature that rodent feces
6  had been found in food?
7        MS. PULLEN: Objection to form and
8  foundation.
9     A. I've heard of complaints, but along with
10 poop on trays and stuff like that, I've never seen
11 it, like actually witnessed and seen it there with
12 my eyes. Haven't been able to confirm that was
13 going on.
14    Q (By Mr. Allen) Okay. So you've never
15 seen -- have you seen a lot of feces elsewhere in
16 the kitchen during your inspections? Have you seen
17 it on surfaces, on the floor, any open, have you
18 seen it on the surfaces where food is prepared,
19 anything like that during your time as FSSO?
20       MS. MOULTON: Objection to form.
21       MS. PULLEN: Form.
22    A. No.
23    Q (By Mr. Allen) So I believe you told me
24 earlier that you have seen rodent feces but it was
25 very infrequent during your time there.

Page 107

1        Just to make sure that I understand, could
2  you tell me once more what the context was in which
3  you have personally seen rodent feces at Western?
4        MS. MOULTON: Other than what he already
5  testified to?
6        MR. ALLEN: Yes, please.
7        MS. MOULTON: Okay.
8        Go ahead, Mr. Sanchez.
9     A. Just during the inspection if I see it in
10 a corner, or a complaint from either inmate or
11 staff, I, of course, see it if it was mouse poop.
12 We're talking about the kitchen still, right?
13    Q (By Mr. Allen) Actually anywhere in the
14 facility I'd be interested.
15    A. Like I said before, in areas inaccessible
16 to inmates, like a storage closet or something like
17 that where it wasn't frequented a lot that mice can
18 get into. I'd see it, you know, along the walls in
19 corners. Never on surfaces or anything like that.
20 It would always be in inaccessible areas.
21    Q. Okay. So you don't recall this complaint
22 from Ms. Ramirez, correct?
23    A. Correct.
24    Q. My understanding of complaints filed with
25 OPS, and tell me if I'm wrong, is that there's

Page 108

1  typically an investigation done after a complaint is
2  filed.
3        Is that your understanding?
4     A. I don't know the process. I've never
5  spoken to an OPS investigator.
6     Q. Are you saying you never spoke to an OPS
7  investigator about this incident with Ms. Ramirez?
8     A. About any incidents, sir.
9     Q. You've never spoken to an OPS investigator
10 about any incident including this one? Sorry, I
11 just want to make sure.
12    A. Yes.
13    Q. Okay. So no OPS investigator ever
14 followed up with you about this report from
15 Ms. Ramirez?
16       MS. MOULTON: Objection to form.
17    A. No.
18       MS. MOULTON: You can answer.
19    A. No.
20    Q (By Mr. Allen) If you are reading through
21 here, just what's your opinion? Would this rise to
22 the level of a problem for you if this is true?
23       MS. PULLEN: Objection, form and
24 foundation.
25       MS. MOULTON: Agreed. Join.

Page 109

1     A. If it was brought to my attention, I mean,
2  just reading it and if I can visually see this and
3  confirm it, that it was actually true, it would be
4  addressed. Of course, it would be a problem because
5  I mean, who wants to find poop in their food. But,
6  I mean, like I explained before, I have never seen
7  stuff like this with my own eyes. I've only heard
8  of it and wasn't ever able to, I guess, conduct my
9  own little investigation to see if it was true or
10 not. It was always just word of mouth or just
11 getting the complaint verbally and being told but
12 I've never seen it.
13    Q (By Mr. Allen) Okay. Can you explain, you
14 know, given the nature of this complaint and given
15 your role as FSSO, you know, your job was safety and
16 sanitation in that role. You inspected every
17 instance, every inch of the facility as you've said,
18 like, isn't this the type of thing that should be
19 brought to your attention as FSSO?
20       MS. MOULTON: Objection to form,
21 foundation.
22    A. No.
23    Q (By Mr. Allen) Why is that? Why shouldn't
24 this be brought to your attention?
25    A. There's a chain of command. If I was the

28 (Pages 106 to 109)

Page 110

1  immediate person that needed to be notified, I would
2  say yes. But in corrections there's a chain of
3  command so not everything is always reported to the
4  fire safety when it comes to anything.
5      So it's reported to different people.
6  It could be a duty officer, it could be the Warden,
7  it could be the Deputy Warden, it could be a shift
8  supervisor or lieutenant. So, I mean, it's done by
9  chain of command.
10     Q.  You know, I recognize that you said before
11  that you don't believe there's a rodent infestation
12  at Western, correct?
13     A.  Yes, there's not a rodent infestation.
14     Q.  If there were a rodent infestation, what
15  would be your job as FSSO? In that role, like what
16  responsibility would you have if there were an
17  infestation?
18         MS. PULLEN: Objection to form.
19     A.  I wouldn't know. I don't have an
20  infestation. I never come across an infestation
21  here at the prison. So I would have to get advice
22  from my superiors and probably from professionals
23  that are familiar with the rodent infestation.
24         But my time in corrections or as fire
25  safety, I haven't come across an infestation. So I

Page 111

1  would have to, you know, get advice and guidance
2  from superiors and probably professionals if we did
3  have an infestation.
4      Q.  Okay.
5         MR. ALLEN: Mr. Sanchez, I'd like to take
6  another break if that's all right with everyone.
7  Maybe we could come back at 11:55. I do think we'll
8  probably need a lunch break. You know, I don't have
9  a huge amount more but it's probably not enough -- I
10 might need a little bit of time after a lunch break.
11        So if we could come back at 11:55, maybe.
12 I'd go another half hour and then we could take a
13 break for lunch.
14        Does that work for folks?
15        MS. MOULTON: Why don't we just take a
16 lunch break now.
17        MR. ALLEN: Okay. That works for me, too.
18        MS. MOULTON: Is that okay with everybody?
19        MS. PULLEN: Yes.
20        MS. HICKMAN: Yes.
21        MS. MOULTON: What time do you want us
22 back, Mr. Allen?
23        MR. ALLEN: Why don't we do 12:45. Does
24 that work for folks?
25        MS. MOULTON: Yes.

Page 112

1      Does that work for you, Mr. Sanchez?
2      THE WITNESS: Yes, ma'am.
3      MR. ALLEN: Thanks everyone.
4      (Recess taken at 11:50 to 12:54.)
5      THE COURT REPORTER: We're on the record.
6   Q   (By Mr. Allen) Okay. Mr. Sanchez, have
7  you any awareness of cats being on the grounds at
8  Western?
9      A.  Yes.
10     Q.  And how did they get there?
11     A.  I would presume they're feral.
12     Q.  They're feral?
13     A.  Yeah. I mean, there's housing
14 developments kind of close to the prison itself, so
15 either they were dropped off on the side of the road
16 or they, what is it called, walked out this way.
17     Q.  Uh-huh.
18     A.  Commuted this way and found the prison and
19 kind of stayed here.
20     Q.  Do they ever come into the buildings at
21 the prison?
22     A.  Yes.
23     Q.  In what circumstances?
24     A.  From what I've noticed is they're friendly
25 with the population. The population kind of like

Page 113

1  befriends them or whatever. They feed them and
2  everything like that, so it resulted in me going to
3  administration and posting written directives to
4  leave the wildlife alone, including the cats or
5  disciplinary action would come about with a writeup
6  if I found them inside the housing units.
7      Q.  Have you ever found them inside the
8  housing units yourself?
9      A.  No.
10     Q.  No. Have you ever had to do any
11 disciplinary action in relation to the cats?
12     A.  Feeding them, yes. I've done them as
13 conduct report to witnessing the population feeding
14 them after the directives were put out, they're not
15 to feed them and leave them alone. So I did do a
16 misconduct report.
17     Q.  In what circumstances did you see the
18 inmates feeding the cats?
19     A.  They place food and water bowls outside of
20 the units and were physically there feeding the
21 cats.
22     Q.  So you only saw that outside the units,
23 not inside?
24     A.  Just outside, yes, sir.
25     Q.  Got it. Okay. To your knowledge no one