Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

**EXHIBIT 8**

SUSIE ZAPATA and MONICA GARCIA,

        Plaintiffs,

V.                                    1:21-cv-00083-MV-JFR

LEON MARTINEZ, ROBERTA LUCERO-ORTEGA,
ARTHUR SANCHEZ, BERLEEN ESTEVAN,
and SUMMIT FOOD SERVICE,

        Defendants.


DEPOSITION OF LEON MARTINEZ
MONDAY, FEBRUARY 7, 2022
10:00 A.M.
VIA ZOOM VIDEOCONFERENCING PLATFORM


PURSUANT TO THE NEW MEXICO RULES OF CIVIL

PROCEDURE, THIS DEPOSITION was taken by:

STEVEN ROBERT ALLEN, ESQ.
Attorney for Plaintiffs


REPORTED BY:  Mary Therese Macfarlane, CCR
PAUL BACA PROFESSIONAL COURT REPORTERS
500 4th Street, Suite 105
Albuquerque, NM 87102
(505) 843-9241

Page 18

1  communicating when problems arise. Can you say a little
2  more about that your expectations of the people you are
3  supervising to communicate?
4      A. It's just what is right. I mean, just let me
5  know. I had a boss a long time ago tell me, "Let me know
6  before my boss knows what's going on." Because if I get a
7  phone call from my boss saying "Hey, what's going on
8  here," I obviously don't have a handle on my facility.
9      So that's something I teach my staff. "Hey
10 come and talk to me. I have an open-door policy 24-7. I
11 have a state-issued telephone. Call me. It doesn't
12 matter."
13     I always want to be in the know. I might
14 not be able to have the answers right then and there, fix
15 it right then and there, but at least I know.
16     Q. Okay. You want to be in the communication loop.
17     A. Yes, sir.
18     Q. That makes sense.
19     So again, Ms. Lucero-Ortega mentioned a
20 couple of things about her job duties as warden in her
21 written discovery, and I just want to run these by you and
22 make sure I wrote them down here.
23     She said ensuring the facility's safety.
24 Maybe a no-brainer but I wanted to run that by you anyway.
25     A. That's everybody's responsibility, yeah.

Page 19

1      Q. And again it's a heightened responsibility for
2  people in those leadership positions, correct?
3      A. It should be, depending on the person. I mean,
4  you have some people that just don't care in leadership
5  roles for whatever reason. I mean, that's their choice.
6  I mean those are usually weeded out pretty quickly.
7      So I can't say that's for everybody, I
8  can't say that's systemic. It's just how I operate.
9      Q. At least in your mind, though, it would be
10 inappropriate for someone in a warden or deputy warden
11 role to not have that as part of their explicit job
12 responsibility.
13     A. In my opinion, I absolutely agree.
14     Q. Right. Can you tell me, what was your interest
15 in serving in those roles? Because you have had these
16 leadership roles at different facilities for a while.
17 What appealed to you about serving as deputy warden and/or
18 warden in these different facilities in your career?
19     A. It's the natural career path. I mean, you get
20 to a point where you believe that if I was in this role I
21 could make a difference. You know, it's that whole thing
22 that, if I was in charge I could do this or I could do
23 that. Or, "Hey, I can do a better job than this guy. I
24 know I can do a better job than that guy," and, "I
25 definitely don't want to work for that guy. I might as

Page 20

1  well get promoted and be his boss instead of vice versa."
2  That's the reality of the situation. I have a lot of
3  knowledge.
4      I don't have any degrees in college, but I
5  always tell people I have a PhD in criminal justice and in
6  prison -- you know, within the prison walls. It's jut the
7  natural progression, I was just ready for them. And
8  actually it took me a lot longer than most, because I did
9  spend so much time on the security side first. I mean, we
10 went through the whole Johnson Administration where we
11 weren't getting promoted, we weren't getting, you know,
12 stuff of that nature, and then eventually things opened
13 up, doors opened up. Leadership roles change, people
14 retire and there's your opportunity. Take it or not.
15     I was also willing to move, too, and that's
16 one thing that's unique about me is I've made it known
17 years ago that I'll work anywhere between where I live now
18 and then out -- Central is not too far for me, Western's
19 kind of far but it was feasible. PNM's, you know, kind of
20 all in that little triangle area that I would work for
21 that I would work at. And I've worked all three
22 facilities there.
23     I've worked at Roswell, as well. And that
24 was far for my family, but as long as it was in that
25 triangle I was willing to move, and that helped the

Page 21

1  department locate me where they wanted me, basically.
2      Q. How long did you work in Roswell? That is a
3  little ways away from the triangle you're describing.
4      A. About six months in 2015 I was the acting warden
5  out there.
6      Q. I see. And I guess from what you're saying is
7  you wanted to get back into the triangle somewhat quickly,
8  because your family didn't move with you, did they?
9      A. No, sir. They stayed at home and that was a
10 tough time.
11     Q. Yeah. I could see that.
12     Okay. You know, you gave a long list of
13 the trainings you've had over the years, which was really
14 impressive. Was most of that provided through the
15 Corrections Department itself?
16     A. Or its affiliates. National Corrections
17 Institute is another one. Uhm, I think that's probably
18 the majority of it, though, yes.
19     Q. Okay. And were you professionally satisfied
20 with the trainings you've gotten over the years from the
21 NCI or the Corrections Department itself?
22     A. Yeah, I mean -- you know, with Corrections I
23 mean -- kind of a tangent, and I don't know if we have
24 time for it or not, but you don't learn Corrections from
25 going to school and getting a Master's degree. As warden

6 (Pages 18 to 21)

## Page 54

1  institution?
2  A.  I guess.  I try to be as approachable as
3  possible in any job that I do.  It's just -- it's just
4  different.  I can't even -- I can't -- I can't tell you
5  why it happens that way, it just does.
6  Q.  Right.  Okay.  If there were problems with
7  rodents at Western, you would expect Mr. Sanchez to know
8  about it, correct?
9  A.  Yes.
10  Q.  And you would also expect, given what we talked
11  about earlier, that he would communicate those problems to
12  you, his direct supervisor.  Correct?
13  A.  Correct.  So let's -- let's be clear about what
14  an "issue" is with rodents.
15  Seeing one mice scurrying across the
16  floor -- I had a mouse in my office one time.  I probably
17  called Art, "Hey, man, I got a mouse in my pocket" -- not
18  pocket -- "in my office."
19  He brought me a trap and I caught him a
20  couple of days later.  And that was the time I -- so,
21  yeah.
22  Q.  Sure.
23  A.  So mice crawling on top of mice and falling out
24  of the ceilings and the walls, that's different.
25  So as far as a mouse scurrying across the

## Page 55

1  floor, yeah, sure.  But I don't need to be told about
2  that.  I don't care about that.  It was in my office.
3  "Hey, come and get this damn mouse. "
4  If it's a huge issue, yeah, of course I
5  would expect it communicated to me.  That's a big
6  problem.
7  Q.  That's right.  Okay.  That makes sense.
8  And you did expect Mr. Sanchez, given his
9  role inspecting the facility specifically for issues
10  regarding pests, and in particular rodents, to know about
11  a problem if it exists and communicate it to his direct
12  supervisor, which would be you.
13  A.  Correct.
14  MS. MOULTON:  Objection to form.
15  Q.  Okay.
16  A.  Correct.  If it was reported to him.  Sometimes
17  inmates don't want to report it.  They might be mad at Art
18  for whatever reason and they're going to go tell CO
19  Somebody Else.
20  Q.  So just to be clear, you never recall Mr.
21  Sanchez reporting to you that there was an issue with
22  rodents at Western that needed to be addressed.
23  A.  No, not that I recall.
24  Q.  Okay.  He never talked about there being an
25  infestation of rodents at Western that you recall.

## Page 56

1  A.  Not that I recall.  I know they had some issues
2  where inmates claimed they saw feces in food, and it ended
3  up being something else.  I've had stuff of that nature.
4  We had issues with glue traps because they would use them
5  for other purposes.  Stuff of that nature, yeah.
6  But like a mass problem like I said, like
7  they are falling out of the walls and ceilings, no.
8  Q.  Do you have --
9  A.  Anything that's considered like an emergency
10  that I need to get Central Office involved and say, "Hey,
11  we got to tear this place down and rebuild it"?  Short of
12  that, no.
13  Q.  Same with Ms. Estevan.  She never communicated
14  to you a problem on with rodents at Western.
15  A.  No.
16  MS. PULLEN:  Objection to form, foundation.
17  MS. MOULTON:  Join.
18  Q.  And she certainly never communicated to you that
19  there was a rodent infestation at Western.
20  MS. PULLEN:  Objection to form.
21  A.  As previously defined, like infestation falling
22  out of the ceilings and walls and walking over rodents all
23  the time, no.
24  Q.  Let's contextualize that a little bit, because,
25  yeah, I've had mice in my house, too, and it's not fun,

## Page 57

1  but that's different from infestation.
2  I think one way to define it, maybe just
3  for our purposes, is they are breeding in the walls and
4  they're, you know, large quantities.  They've moved in, so
5  to speak.
6  A.  Using that definition, no one has ever reported
7  that type of infestation to me.
8  Q.  Okay.  Let me -- let's look at a couple of other
9  exhibits here.  These are just -- you know, I'm
10  sharing these with you by way of example.
11  The first one here is Exhibit 3.  You know,
12  it's difficult to read, but I know, as these Informal
13  Complaints often are.  Probably has --
14  A.  Yeah.
15  Q.  -- this to some extent.
16  This is from an inmate, Anne Apodaca.  Do
17  you know this inmate?
18  A.  No.
19  Q.  She says -- she's asking here to please have
20  staff stop removing rodent barriers.  And my understanding
21  from talking with dozens of inmates and other folks is --
22  and she's sort of describing this here, is they are
23  putting barriers on the bottom of their cell doors to
24  prevent rodents from getting into their cells.
25  Are you familiar with this practice at

## Page 58

1    Western?

2       A.  I always thought it was based on heating and

3  cooling is what I thought it was about.  I had no idea it

4  was about mice.  They'll put like a towel or whatever they

5  can get underneath the doors.  And any time I've ever

6  asked it's because it was cold in the cell or hot in the

7  cell and that added air, right?

8       Q.  I see.

9       A.  I will say, too, that these forms are

10  incomplete, like extremely incomplete.  No one has ever

11  reviewed them that I see, which is odd.  But just for your

12  own information.

13       Q.  Yeah.  I appreciate that, because I got these --

14  it was very difficult to get these inmate grievances to

15  begin with.  And, you know, I eventually did after months

16  of putting pressure on the Corrections Department, and got

17  like a small stack.

18       I know from talking with inmates there's is

19  quite a few more, but I don't know why it's incomplete.

20  That's a really good question.  But I got these directly

21  from the Corrections Department as part of an IPRA lawsuit

22  that's related to this one.  So that's where these came

23  from.

24       MS. MOULTON:  Objection to form.

25       A.  I only --

## Page 59

1       MS. MOULTON:  Is there a question, Mr. Allen?

2       MR. ALLEN:  No.  I'm just explaining to the

3  in-- sorry, to Mr. Martinez where I got these, and so I

4  don't know why they are incomplete, just so you know.

5       THE WITNESS:  I only state that because I

6  couldn't affirm whether this is authentic or not.  I mean,

7  I could write that right now in front of you and submit it

8  to you as evidence is the only thing.  It doesn't seem

9  affirmed in any way, shape or form.

10       MR. ALLEN:  Uh-huh.

11       THE WITNESS:  That's all.

12       Q.  Given that I got these directly from counsel for

13  the Corrections Department, do you think it would be

14  surprising if someone manufactured these?

15       A.  I've seen inmates do worse.

16       MS. MOULTON:  Objection.  Sorry.  Go ahead and

17  say it again.

18       A.  I've seen inmates do worse.

19       Q.  But given that they came from the Corrections

20  Department would it be surprising that it was

21  manufactured?

22       A.  Yeah, I'd say that.  If you got it from the

23  grievance officer or whatever.  It's just that I don't

24  know why they wouldn't add the entirety of it.  Weird.

25       Q.  It is weird.  Yeah, I agree with that.

## Page 60

1       So, you know, it's difficult to read, but

2  Ms. Apodaca is saying that there's been a rodent

3  problem here that they are dealing with with these

4  barriers, and I just want to make it clear that you have

5  never heard of inmates having issues with rodents crawling

6  into their cells at night, and suing these barriers to

7  protect against that.

8       A.  No.

9       Q.  Okay.  On the next page we have an incident -- I

10  realize this is after your tenure here, but just so -- you

11  know, you have these complaints going back before you got

12  there, while you were there, and afterwards, and, you

13  know, this is an example of one of them.

14       She says that she -- this woman Erica Duran

15  says that she found rodent feces in her cereal.  Is that

16  something that you've heard inmates complaining about

17  before?

18       MS. PULLEN:  I will object to the form and

19  foundation, and that this line of the questioning about a

20  July, 2020, report is out of the scope of this case, given

21  the Plaintiffs' time they were at the facility.

22       MS. MOULTON:  Object -- join.  I join that

23  objection.

24       You can answer, Mr. Martinez, if you can.

25       A.  Like I said, and I even mentioned that earlier,

## Page 61

1  I don't know if there was a specific case or not, but

2  inmates would say, "Hey, we found this," or we found flies

3  or whatever, and they would produce something to somebody.

4  And 99 percent of the time that I recall I never heard,

5  yeah it is rat poop, or whatever the case is.

6       But, yeah.  Oh, yeah, they play games like

7  that, I'm sure.

8       Q.  Do you specifically recall inmates complaining

9  about rodent feces in food that they were served?

10       A.  Not to me.

11       Q.  Okay.  Do you recall Mr. Sanchez or Ms. Estevan

12  telling you that they'd heard from inmates that they had

13  been served food with rodent feces in it?

14       A.  Maybe.  For some reason it sticks out in my mind

15  that an inmate made a claim, and they went and checked it

16  out and it ended up being like a burnt piece of something

17  else.  That sticks out in my mind, and I couldn't have

18  just made that up out of my brain, so at some point an

19  inmate made this allegation, somebody was sent to go check

20  it out.  Whether I sent him out or the major sent him to

21  go look into it, to do a little investigation to see if it

22  was substantiated or not.  That makes sense.

23       Q.  I see.  In this same Informal Complaint it

24  mentions "to staff" here.  Do you know who Lt. Gifford is?

25       A.  Yes.

Page 90

1    A.  If that process occurred it would have went
2  through, like he said, the three-price quote, and we would
3  have went with the most -- not necessarily the cheapest
4  one, the one that met our needs.  And that would go signed
5  off on by the business office and whoever else.  I don't
6  even think the facility has -- I think that has to go to
7  Central Office, maybe, I'm not 100 percent sure, for final
8  approval.  But generally a vendor would be picked based on
9  or needs and based on cost, of course, and they would
10  perform their function.
11    Q.  And what role did the warden or deputy warden
12  play in selecting a vendor?
13    A.  I don't recall it ever being -- like, if it was
14  my decision or not, I wish, because I would have just
15  got -- you know, hey, if it's not my money I would have
16  probably got the most expensive place I could get.  That's
17  just not the reality situation, not the way it works.  And
18  that goes with any kind of vendor, from UA cups to what
19  laptops we get, to whatever else, I would go with the
20  expensive best technology.  It's just not the reality.
21    Q.  Uh-huh.  Mr. Sanchez said in his deposition that
22  he wanted to -- there was three companies that came in
23  every time is my understanding.  PDI was always one of
24  them.  That's the one that actually provided the service.
25  And that one's based in Grants.

Page 91

1          And there was two others based in
2  Albuquerque, and I believe he said that he wanted -- if it
3  were up to him, along the lines of just what you said, he
4  would have hired those other companies over PDI, because
5  he thought they would provide better services.
6          MS. MOULTON:  Is there a question there?
7    Q.  Do you recall discussing Mr. Sanchez' preference
8  to hire a different pest control company other than PDI?
9    A.  No.  And it would have definitely been
10  something, being a new warden, I would have definitely
11  looked into, saying, "How do we get this done?"
12          I don't even know who made that decision.
13  I don't know if it was, like I said, Central Office level,
14  if it was the business office, but obviously somebody had
15  signed off on it.
16    Q.  Given that Mr. Sanchez was reporting directly to
17  you, would you have expected that to be the kind of
18  information that he communicated to you?
19          MS. MOULTON:  Objection to normal.
20    A.  Sure.
21    Q.  And just to make sure we are clear:  If he was
22  concerned about the quality of the pest control services
23  provided by the existing vendor and he believed that other
24  vendors could do a better job, he should have communicated
25  that to you.  Correct?

Page 92

1          MS. MOULTON:  Objection to form.  You can
2  answer.
3    A.  Sure.  Yeah, I would hope that he would have.
4  And maybe he did.  "Hey, Boss, I wanted to pull these
5  guys, but they're going to select this guy because he's
6  local and he's cheap."  I have no idea.
7    Q.  Okay.  Fair enough.
8          Let me turn now, then, to Exhibit No. 8,
9  which is this OPS Complaint from a woman named Nicole
10  Ramirez.  Do you see that document?
11    A.  Yes.
12    Q.  Is this form familiar to you?  Did you see this
13  a lot while you were doing your OPS work?
14    A.  Yes.
15    Q.  Okay.  And so what's -- who -- what types of
16  people file this type of form, like in your experience?
17  Where do these forms come from?
18    A.  It's subjective.  It's whoever the warden wants
19  to.  When I was the warden, either I would have my deputy
20  warden submit it or the major, possibly.  But that's me.
21          Anybody can make an allegation, and then it
22  goes, I would require that to come up to the proper level,
23  or whatever, and then they would do the OPS investigation
24  That way we can track it appropriately.
25          For me, when I was running the facility,

Page 93

1  Santa Fe or Western, it was also a major, a unit manager,
2  or above.
3    Q.  Okay.  I ask because I should, for
4  transparency's sake mention that Ms. Ramirez is our client
5  in a separate lawsuit involving a whistleblower case.  She
6  worked for Centurion, uhm, right as you were leaving, I
7  think.
8          Let's see.  You left in February, 2020; is
9  that correct?
10    A.  Yes.  I wasn't here during this time.
11    Q.  Okay.  So she came on board in December of 2019,
12  I believe.  You don't remember her, do you?
13    A.  No.
14    Q.  Okay.  Just for full transparency's sake, Ms.
15  Ramirez has alleged that she was fired for filing this
16  complaint about what she viewed as a rodent infestation at
17  Western.
18          Did you ever talk to anyone about this
19  complaint?
20    A.  I didn't even know this complaint existed until
21  you sent it, or I got it in my email.
22    Q.  Okay.  Fair enough.
23          This particular -- you know, she's talking
24  about one specific allegation here.  If you turn to
25  page 2, it's the third paragraph.  She's talking about

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Page 106

1  the timeline, Mr. Sanchez, I believe, started as FSSO in
2  January of 2018, and you started as deputy warden in June
3  of 2018.  Correct?
4      A.  Correct.
5      Q.  So what, to your knowledge, is the time frame in
6  which these food practice changes took place?
7      A.  Well, if you want to give me a second, I'll find
8  it and I'll tell you exactly when it happened, but I
9  know -- I want to say January sometime, maybe?  Of '18
10  maybe?
11          Where's it at?  Boo-boo-boo-boo.  (Note:
12  Clucking sound.)
13          Actually, you know what?  I'm wrong.  It
14  was after I left.  So the time frame shrinks a lot.
15          So the date of it is 4-19 of 2019 where she
16  claims she bought $70 of plastic bins for mice (inaudible)
17  anywhere; mouse traps those aren't working.
18          So that's in April of '19.  I stand
19  corrected.  And that was to Ian Tollitson.
20      Q.  I see.  Can you tell me which document you're
21  looking at?
22      A.  This is an email.  The Bates number is on the bottom,
23      MS. MOULTON:  The Bates number is on the bottom,
24  Mr. Martinez.
25      THE WITNESS:  Let's see.  Summit-Gen00020.

Page 107

1      Q.  I see it.  So I don't believe that's in one of
2  our exhibits.  That's in another document that you were
3  looking at?
4      A.  Yeah.
5      Q.  And what is that document?
6      MS. MOULTON:  He just identified it.
7      A.  Yeah, that's the only way I can identify it.  It
8  doesn't have any other marker on it.
9      Q.  I thought at the beginning of the deposition you
10  mentioned that the only documents you looked at were these
11  exhibits.  Am I misremembering that?
12      A.  Yeah.  All I'm seeing is what I've been sent.  I
13  guess I should have clarified it that way.  Whatever was
14  sent me is what I opened up.
15      Q.  Could you tell me what documents you were sent
16  that weren't in these -- that weren't marked as
17  Plaintiffs' Exhibits in these yellow boxes with a number?
18      MS. MOULTON:  I'm going object that is
19  attorney-client work product -- attorney-client
20  privilege/attorney work product.  What documents I sent
21  him is privileged information.
22      Q.  Are you -- go ahead and respond, Mr. Martinez.
23      A.  So I have my answers to my response.  My
24  answers.  I have my stuff here.  (Note: Pause.)  And
25  wherever else was attached, that's what I have.  On

Page 108

1  emails.
2      Q.  Can you give me have a sense of what documents
3  you were provided that aren't stamped with these yellow
4  boxes that say Plaintiffs' Exhibit and then a number?
5      A.  Like I said, the only thing I have on here,
6  because I put them in a folder, was Martinez
7  answers.response.
8      Q.  And how many documents are in there?
9      A.  It says page 1 of 17.
10      Q.  Okay.
11      A.  These are my interrogatories, blah, blah, blah;
12  my history of being sued; my trainings; all this jazz.
13      Q.  Okay.  Okay.  Let's go back to Mr. Sanchez'
14  response, then.
15          Are you saying that these changes happened
16  in April of 2019, is your sense?
17      A.  I misspoke.  It is April of 2019.  But there is
18  documentation somewhere that has Roberta's name on it that
19  they are discussing it.  I don't know where I saw it.
20          But I was incorrect.  It's April of '19.
21  So that would have been something that I would have
22  implemented either as deputy warden or as a warden,
23  because I was there until February of '20.
24      Q.  And so Mr. Sanchez says, you know going back to
25  the OPS report, that same page we were looking at, and

Page 109

1  this one is marked in the middle bottom of the page:
2  SZapata 1357.  At the top he mentions that this change in
3  food practices that happened in April of 2019 cut down on
4  mice in the kitchen, and before that you would see them
5  "on the daily," he says.
6      MS. PULLEN:  Objection:  Form, foundation, if
7  that's a question.
8      MS. MOULTON:  Join.
9      MR. ALLEN:  I just want to make sure you see
10  that before I ask the question.
11      THE WITNESS:  I'm reading through it -- you're
12  talking about the big set of text at top, right?
13      Q.  Yeah.
14      A.  (Reading)  This cut down on mice in kitchen.
15  Before you would see them on the daily.  I haven't seen a
16  mouse in there in a few month.  Uhm, --
17      Q.  Okay.
18      A.  -- yeah.
19      Q.  And so seeing mice in the kitchen on a daily
20  basis seems fairly frequent.  Did Mr. Sanchez mention this
21  to you?
22      A.  That they would see mice daily?  No.
23      Q.  That never happened.
24      A.  No.
25      Q.  And to be clear, he never mentioned that mice

28 (Pages 106 to 109)

Page 110

1  were a problem to you, that he viewed mice as a problem at
2  Western.
3       A.  So what I would say:  If an issue arose, like I
4  said when the sticky traps were implemented and all that
5  stuff, I was made aware of it.  So, yeah, he did report
6  some incidences of me, but not to this magnitude of daily.
7       Q.  Okay.  Towards the middle of that paragraph he's
8  going into the past.  He's talking about what happened in
9  the past when it came to pest control at Western, and
10  that's why this document's relevant to your time while you
11  were a deputy warden and warden at Western.
12           It's a sentence that reads, "I mean, in the
13  past we had issues, but according to my last EID
14  inspection it's 100 percent better.  There's no sign of
15  feces in that area."
16           You know, this is kind of garbled here.
17  (Reading) That used to be so the mice population mice.
18           What he's saying, I think, is that the last
19  EID inspection was much better than the ones in the past.
20  Is that the way you read that sentence, as well?
21           MS. MOULTON:  Objection to form, foundation.
22           MS. PULLEN:  Join.
23       A.  If I had to be a mind reader, yeah, that's what
24  it sounds like he's saying.
25           MR. ALLEN:  Okay.  Let's see here.

Page 111

1           I would like to do another quick break, and
2  then I think the next one will probably be -- well, no.
3  Let me ask you a couple of quick questions first, and then
4  we will take a break.  And I think we would just need one
5  little section and then we should be done here,
6  Mr. Martinez.
7           Serving food with rodent feces in it to
8  inmates would be a problem, correct?
9       A.  I'd say so.  I don't want to eat rat feces.
10      Q.  And if you look towards -- if you go -- stay in
11  the OPS report and do you see the Bates stamp SZapata
12  1372?
13      A.  Yes, sir.
14      Q.  There's a Lt. Joey Gonzales who is being
15  interviewed here.  Do you know this individual?
16      A.  I do.
17      Q.  Okay.  Is he a trustworthy person?
18      A.  I don't know him at that level.  I mean, I
19  promoted him from sergeant to lieutenant, so he must have
20  had -- at least in my opinion he must be trustworthy.
21      Q.  You have some faith in his professional
22  abilities.
23      A.  Yes, sir.  We didn't hang out outside of work or
24  nothing like that, I just don't do that, but okay.
25      Q.  Sounds good.  So he's saying at the end -- and

Page 112

1  go down to the very last paragraph.  The OPS investigator
2  is slipping in another question here about a reported
3  incident of mouse droppings in cereal.  Do you see that
4  paragraph?
5       A.  Yes, sir.
6       Q.  And he's saying a Sgt. Tachine -- is that how
7  you say that name?  Do you know her?
8       A.  Ta-cheen.
9       Q.  Ta-chin-ee (phonetic); is that right?
10      A.  Yes, sir.
11      Q.  What is Sgt. Tachine's first name?
12      A.  I do not know.  Sergeant?
13      Q.  Okay.  Just curious.  She's saying that mouse
14  droppings have been found in the cereal, in the corn
15  flakes, and Mr. Gonzales is saying it was verified that
16  there were mouse droppings in the cereal.  Do you see
17  that?
18      A.  Yes, sir.
19           MS. PULLEN:  I will object to this line of
20  questioning allegedly involving an incident of 4-28-20,
21  which is beyond the scope of this lawsuit.  And also form
22  and foundation.
23           MS. MOULTON:  Join.
24      Q.  I ask this question because our Plaintiffs and
25  numerous other inmates and former inmates have said this

Page 113

1  is something that occurred regularly at Western.  If this
2  is something that occurred regularly at Western, inmates
3  being served food with rodent feces in it, that would be a
4  serious issue that would need to be rectified, correct?
5           MS. PULLEN:  Objection:  form, foundation.
6           MS. MOULTON:  Same.
7       A.  I'll state that in this particular incident he
8  goes on to state that the whole batch of cereal was thrown
9  away.  So yeah.
10      Q.  That's right.
11           Have you heard of Hantavirus, Mr. Martinez?
12      A.  Yes, sir.
13      Q.  What do you know about it?  Tell me your
14  knowledge of that.
15      A.  I actually had Hantavirus like five years ago.
16  It's something you don't want to have.
17      Q.  Oh, my God.  That's pretty serious.  You're
18  lucky, right?  The mortality rate is fairly high from that
19  illness.
20           MS. MOULTON:  Hold on.  Object to form,
21  foundation.
22           MS. PULLEN:  Same.
23      A.  It's the sickest I've ever been in my life, let
24  me tell you that.
25      Q.  And how did you -- when did you contract

29 (Pages 110 to 113)