**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

SUSIE ZAPATA and MONICA GARCIA,

Plaintiffs,

v. 21-CV-0083 MV/JFR

LEON MARTINEZ, ROBERTA LUCERO-ORTEGA,
ARTHUR SANCHEZ, BERLEEN ESTEVAN,
and Summit Food Service, LLC

Defendants.

# MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Roberta Lucero-Ortega's Motion for Summary Judgment [Doc. 106], Defendant Arthur Sanchez's Motion for Summary Judgment [Doc. 107], Defendant Leon Martinez's Motion for Summary Judgment [Doc. 108], and Defendants Summit Food Service LLC's and Berleen Estevan's Motion for Summary Judgment [Doc. 126]. The Court, having considered the Motions, briefs, and relevant law, and being otherwise fully informed, finds that the Motions are not well-taken and will be denied.

## BACKGROUND

At issue on the instant motions is whether Defendants Roberta Lucero-Ortega, Leon Martinez, Arthur Sanchez, and/or Berleen Estevan and Summit Food Service LLC ("Summit") violated the Eighth Amendment rights of Plaintiffs Susie Zapata and Monica Garcia by failing to adequately address the presence of mice in the kitchen and dining areas of the Western New Mexico Correctional Facility ("Western") while Ms. Zapata and Ms. Garcia were incarcerated there. "The facts supported by evidence, [viewed] in the light most favorable to [Plaintiffs]" as the parties opposing summary judgment, are as follows. *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 662 (10th Cir. 2010).

Ms. Zapata was incarcerated at Western from May 25, 2017 through December 19, 2019. Doc. 106 at 3. Ms. Garcia was incarcerated at Western from August 22, 2017 through October 2, 2017 and from March 15, 2018 through June 2019. *Id.* From January 2016 through October 30, 2018, Ms. Lucero-Ortega was Warden at Western. *Id.* As Warden, she "performe[ed] administrative functions of running a prison facility, including budgeting and managing the development and implementation of appropriate policies and procedures," and "coordinat[ed], plan[ned] and implement[ed] appropriate staffing plans and services to ensure facility safety . . . and maintain a safe working environment." Doc. 119-11. Mr. Martinez was Deputy Warden at Western from June 2018 through April 2019, at which time he was promoted to Warden, a position which he held until February 2020. Doc. 108 at 3. As Warden, he had "complete oversight" of Western. *Id.* From January 2018 through October 13, 2021, Mr. Sanchez was the Fire Safety and Sanitation Officer ("FSSO") at Western. Doc. 107 at 3. As FSSO, Mr. Sanchez was "responsible for pest control" at Western. Doc. 119-11 at 3; Doc. 120-9 at 2. While Ms. Zapata and Ms. Garcia were incarcerated at Western, Summit had a contract with Western to provide food service and Summit employee Berleen Estevan was the Food Service Director ("FSD"). Doc. 126 at 4. Ms. Estevan was "responsible for food service and food sanitation, with oversight from Shift Commanders . . . and inspections by EID." Doc. 119-11 at 3; Doc. 120-9 at 2. A Summit Manual directed that "[t]eam members must take preventive measures to restrict and eliminate pests from the operation," noting that, upon "signs of pests," the location supervisor must "address the issue with the proper client contact or a licensed pest control operator." Doc. 129-2 at 2.

During the period from April 2017 through April 2019, Western's kitchen and dining areas were cited for a series of environmental health violations involving rodents. Specifically,

on April 10, 2017, NMED Environmental Health Bureau conducted an inspection of the kitchen at Western. Doc. 106-10. The inspection report, which was signed by Ms. Estevan as the "person in charge," indicated as follows: "mice droppings present in the facility"; "only 2 traps available"; "Double doors have a gap on the bottom that are possibly allowing mice into the facility"; "repair walk in cooler #4 where mice have chewed through the insulation." *Id*. An EID Corrective Action Plan Form, which was signed by Ms. Lucero-Ortega and Deputy Warden Pete Perez on April 12, 2017, noted both these "non-compliant areas" and the "corrective action taken," namely, "Bio Hazard Crew was called out and cleaned the area and set more traps"; "Replaced weather stripping on the front door to the kitchen"; "Replaced molding on the bottom freezer door. Sealed up all cracks on the bottom." Doc. 106-11.

On July 29, 2017, NMED Environmental Health Bureau conducted another inspection at the kitchen at Western. Doc. 106-12. The inspection report, signed by Ms. Estevan as the "person in charge," again noted "evidence of mouse dropping found in cooler #4 area." *Id.* An EID Corrective Action Plan Form submitted by FSSO Nicole Garcia and Ms. Estevan to Ms. Lucero-Ortega and Mr. Perez indicated that "stainless steel" would be ordered to seal up the holes in cooler #4. Doc. 106-13.

An inspection report reflects that NMED Environmental Health Bureau inspectors again found "mice droppings in tool room and dry storage" on January 10, 2018. Doc. 106-14. A January 12, 2018 memo from Ms. Estevan to Ms. Lucero-Ortega states the following regarding that inspection report:

> Corrective action request was asked same day of EID inspection that FFSO Sanchez send his Bio Hazard team to clean mice droppings. FFSO Sanchez refused and stated that [Inmate] Beavers was Bio Hazard Certified and she can clean it up herself. Inmate Beavers was working with food and it would be considered cross contaminating. Mice droppings were cleaned by inmate that was not working with food.

Doc. 106-15. Mr. Sanchez testified that he "believe[s] from what [he] recall[s]" that he and "his [inmate] porters" "ended up taking [corrective action themselves]." Doc. 106-16 at 2.

A year later, on January 23, 2019, NMED Environmental Health Bureau completed two inspection reports, each of which was signed by Mr. Sanchez as the "person in charge." Doc. 119-10. The report recording the "time in" as 10:02 a.m. indicated that "mouse droppings" were found in dry storage in two rooms, mentioned "glue traps provided to catch mice," and stated that "holes" in the dry storage needed to be "filled with sealant to minimize access for rodents." *Id.* at 2. The report recording the "time in" as 10:50 a.m. indicated that "rodent droppings" were "observed in the kitchen," and noted the "maintenance room" as the "possible source for the rodents to enter." *Id.* at 7. The report directed that "holes in the wall and ceiling need to be sealed to minimize entrance for the rodents." *Id.*

On April 4, 2019, NMED Environmental Health Bureau again conducted two inspections. Doc. 119-10. The first inspection report stated: "Observed a mouse run from behind stove to table near office. Mouse droppings observed in dry storage area of kitchen." *Id.* at 9. The second inspection report stated: "glue trap had 4 mice on it. Glue trap was located in the water closet in dining room B." *Id.* at 11. An additional "note" stated that "mice enter the facility in through the water closet," and attached a contract with "PDI" [Preventive Pest Control] for "pest control." *Id.* Following the April 4, 2019 inspections, Mr. Sanchez and Physical Plant Manager Almanza C. submitted an EID: Corrective Action Plan Form to Mr. Martinez, noting that work would be starting immediately on "removing the stack [that ran from the prep table to the roof] and covering any ceiling penetrations," and that Mr. Sanchez removed the trap with the dead mice and had the Summit Supervisor replace it. Doc. 107-12.

Ms. Estevan testified that, until approximately mid-2020, she saw rodents and/or rodent feces "almost every day, every other day," in the kitchen at Western. Doc. 119-2 at 3. On one occasion, she saw a nest of baby rodents in a box of "hair bouffants" in the kitchen. *Id.* She also testified that, until approximately mid-2020, she needed to place items on her "waste log" because they had been chewed up by mice or otherwise contaminated by rodents "every day, every other day." *Id.* at 8. Ms. Estevan testified that, at some point, she observed mice going up into a vent in the kitchen. *Id.* at 10. She asked for the vent to be removed, and it was removed by maintenance. *Id.* On January 12, 2018, she submitted a work order to Western for an "exterminator to address the rodent infestation" inside a wall and the "diet line." Doc. 119-7 at 2. There is no indication in the record that this work order was fulfilled. Ms. Estevan confirmed during her deposition that, when she made that work order, it was accurate to characterize the rodent issue at Western as an "infestation." Doc. 120-2 at 6.

Several individuals whose incarceration at Western overlapped with that of Ms. Zapata and Ms. Garcia attested that they saw "large numbers of rodent and rodent feces every day throughout the prison," with the "largest number of rodents" being seen "in the prison's kitchen," where they worked alongside Ms. Zapata and/or Ms. Garcia.[1] Doc. 119-5 at 1 (Declaration of Evangeline Chavez-Quintana); *see also id.* at 6 (Declaration of Shannon McDevitt) (attesting that the "rodent infestation" at Western was "worst in the kitchen and cafeteria"); *Id.* at 9 (Declaration of Ladonna Evans) (attesting that she found "rodents or rodent feces in the

---

[1] The Summit Defendants seek to discount the declarations of kitchen workers other than Plaintiffs as "hearsay declarations" that "go far beyond the inmates' personal knowledge." Doc. 142 at 12. But a declaration "resting on personal knowledge and setting forth admissible facts is legally competent to oppose summary judgment." *Sanchez v. Vilsack*, 695 F.3d 1174, 1180 n.4 (10th Cir. 2012). In considering the parties' motions for summary judgment, the Court has considered the kitchen workers' declarations only to the extent that they rest on personal knowledge and set forth admissible facts.

cookware in the [] kitchen almost every day that [she] worked there"); *Id.* at 14 (Declaration of Jeannette Stinnett) (attesting that "she regularly saw rodent feces and evidence that rodents had chewed into bags of food," and that "one of the first things [she] did when [she] arrived in the [] kitchen in the morning for [her] shift was to clean up the rodent feces that had accumulated overnight"). Ms. Chavez-Quintana attested that "a food service job" was "the worst job you could possibly have" at Western, because of rodents in the kitchen. *Id.* at 2.

Mr. Sanchez testified that, during the relevant period, while Western had a contract with a pest control company, PDI, which sprayed for "insects" twice monthly, PDI was not contracted to provide rodent control services. Doc. 107-4 at 4. Instead, for rodent control, Mr. Sanchez "was given glue traps" and "purchase[d] live traps and place[d] them throughout the facility; kitchen, B dining area, and all housing units." *Id.* at 5. Ms. Lucero-Ortega testified that glue traps "were effective as long as the inmates didn't mess with them, throw them away or use them for other things," such as "using them to remove body hair." Doc. 106-4 at 8-9. On the other hand, Ms. Estevan testified that the glue traps did not work to control the rodent problem in the kitchen. Doc. 119-2 at 9; *see also id.* (reading aloud an email message she had written in April 2019, stating, "the mice are not going anywhere. All I have is mouse traps, and those ain't working"). Similarly, both Ms. Chavez-Quintana and Ms. McDevitt attested that the "glue traps and other traps designed to capture rodents were completely ineffective," Doc. 119-5 at 2, 5, and Ms. Garcia testified that "the sticky traps honestly weren't doing nothing." 107-7 at 4.

Ms. Evans attested that, on one occasion, she "followed [Ms.] Estevan's orders" and threw away a rodent "stuck in a glue trap" and "put a new glue trap down in the same spot"; when she "looked at the new glue trap a few minutes later," there was another rodent's tail already "stuck to the trap." Doc. 119-5 at 10. Ms. Zapata testified that Ms. Estevan "had us

stomping on the mice that were alive on the sticky traps and throwing them in the trash." Doc. 108-7 at 5. Similarly, Ms. Chavez-Quintana attested that "on several occasions," Ms. Chavez-Quintana "saw [Ms.] Zapata killing rodents with a broom in the kitchen," and on "four or five occasions," she herself "also killed rodents with a broom in the kitchen." Doc. 119-5 at 2. Ms. McDevitt similarly attested that she and Ms. Zapata were tasked with "killing rodents," and that Ms. Estevan ordered them "to kill rodents whenever she saw them in the kitchen." *Id.* at 5. According to Ms. McDevitt, she "killed rodents almost every day that [she] worked in the [] kitchen," and "regularly" saw Ms. Zapata "kill rodents with a broom or mop while she worked in the women's kitchen." *Id.* Ms. Stinnett similarly attested that she saw Ms. Garcia "on several occasions" "killing rodents in a trash bag after [Ms.] Estevan directed her to do it." *Id.* at 14. Ms. McDevitt also attested that she "found rodent nests approximately once or twice per week" while working in the kitchen," and "sometimes [] would shake the vent that extended from the floor to the ceiling in the [] kitchen and rodent nests would drop out onto the floor." *Id.* at 2-3; *see also id.* at 13 (Declaration of Ms. Stinnett) (attesting that, "[i]n the kitchen, we sometimes found nests with rodent babies and pieces of dead rodents in them"). According to Ms. McDevitt, neither Mr. Sanchez nor Ms. Estevan gave them "gloves or any other protective gear when [they] were ordered to kill rodents or dispose of rodent nests in the kitchen." *Id.* at 6.

Ms. Stinnett attested that she "often saw rodents running across bags of food in the [] kitchen." *Id.* at 14. Similarly, Ms. Evans attested that she "regularly saw rodents running in and out of the hollow legs" of a table on which she "sometimes prepped food," and that, when she asked Ms. Estevan if they could "get rid of the table," she responded that "if she threw the table away she would take the cost of the table out of [Ms. Evans's] paycheck," and told her to "stop worrying about rodents and get back to work." *Id.* at 10. Ms. Evans also attested that she

observed a "pink blob [] fall onto the floor" when Ms. Estevan slammed a kitchen door, that the blob "split into 4-6 rodent babies that wriggled across the floor," and that, "when [Ms.] Estevan saw the rodent babies, she simply walked away." *Id.* at 11.

According to Ms. Chavez-Quintana, Ms. Estevan "regularly ordered inmates working in the kitchen to scoop out [rodent] feces [discovered in food] and still serve the remainder of the food." *Id.* at 2; *accord* Doc. 129-4 at 2 (Declaration of Amanda Chavez) (attesting that "[w]hen rodent feces [were] found in the food, [Ms.] Estevan ma[de] the inmates remove the feces and continue serving the food"); *id.* at 4 (Declaration of Amber Morrison) (attesting that Ms. Estevan did not throw away "food that rodents got into"); *id.* at 12 (Declaration of Mary Espino) (attesting that Ms. Estevan "sometimes [told] kitchen workers to remove the rodent feces from the food and still serve[d] the food to inmates," and "refuse[d] to throw contaminated or spoiled food away"); *id.* at 12 (Declaration of Rebecca Weaver) (attesting that "[w]hen rodents ate through the plastic dry food bags, [Ms.] Estevan . . . still made us serve the food"). Ms. McDevitt similarly attested that she "regularly found holes in food bags chewed by rodents," and "regularly found and removed rodent feces from dry food bags," and that Ms. Estevan "order[ed] her to still use the food" in those bags. Doc. 119-5 at 6. Ms. Evans similarly attested that Ms. Estevan told her "to look for bags in the dry storage room that had been gnawed into by rodents," and that, upon finding a bag that not only had holes in it but also "had a large amount of rodent feces in it," Ms. Estevan told her "to scoop out the rodent feces and keep the remainder of the bag of cereal," and then "served cereal from that same bag to inmates that morning." *Id.* at 9-10. Further, Anna Delgado attested that "[w]hen cleaning out dry storage, we found rodent feces in cereal bins and bags of chips, and we were still asked to serve the food. If we stated that we did not want to serve it, we would be disobeying an order from [Ms.] Estevan." Doc. 129-4 at 8.

According to Ariana Rael-Schleisman, "[w]hen we complained about the rodent feces to [Ms.] Estevan, she would say: 'We're not wasting it. Just eat it.'" *Id.* at 10.

At her deposition, Ms. Estevan denied having directed inmates to sift through bags of food for rodent feces. Doc. 126-4 at 9. She testified that if she found contaminated food, she "would put it in a plastic bag, double bag it and then let sallyport know that we had hot trash." *Id.* at 12. She further testified that until approximately mid-2020, this happened "frequently, meaning like maybe every other day." *Id.* She also testified that she never saved any of the bags that rodents had chewed on, but rather discarded the bags immediately. *Id.* at 5, 7.

Ms. Chavez-Quintana attested that she "was present with Plaintiffs when a dead rodent was discovered in a large vat of oatmeal that was being served to inmates." Doc. 119-5 at 3. Ms. Stinnett similarly attested that on one occasion she saw "half of a dead rodent, including the head and front paws, at the bottom of a vat of food that had been served to inmates." *Id.* at 14.

Ms. Chavez-Quintana, Ms. McDevitt, Ms. Evans, and Ms. Stinnett all similarly attested that "[t]he only time the [] kitchen and cafeteria were thoroughly cleaned was in preparation for an inspection." *Id.* at 2, 4, 9, 14; *see also id.* at 9 (Declaration of Ms. Evans) (testifying that "[r]ight before an inspection was expected, I and other inmates working in the kitchen were given access to all the soap and supplies we needed to clean the kitchen," but "[i]f an inspection wasn't expected, we never received enough soap and other supplies"). Ms. Zapata testified that Summit staff and corrections staff would "talk about inspectors coming" and "lock [them] down . . . until the inspectors left," and would have them "clean up before they [came]." Doc. 126-1 at 2. On the other hand, Mr. Sanchez testified that no one other than he and the Warden knew in advance that an inspection was going to occur. Doc. 107-4 at 11. Mr. Martinez testified that Mr. Sanchez was the only one who knew in advance about the inspections. Doc. 134-2 at 2. Ms.

Estevan testified that she was not given advance warning that an inspector was on his way, and never directed anyone to conduct pre-inspection cleanings. Doc. 126-4 at 10-11.

Stacy Bond, who worked as a mental health clinician at Western from November 2018 until December 2020, attested that for the entirety of her tenure at Western, she "heard regular complaints from inmates about the rodent infestation" there. *Id.* at 17. She "personally saw numerous rodents" at Western, "especially near the areas where food [was] prepared for inmates." *Id.* She attested that it was common knowledge that there was a "rodent infestation" at Western, and that she and other health staff "raised concerns about the rodent infestation" but "no one in a position of authority" at Western "took overt steps to bring the infestation to an end." *Id.* at 18.

Sarah Johnson, the acting supervisor of the education department at Western from December 2017 to June 2021, testified that "it was apparent from day one that there were mice and other kinds of rodents around the facility," that "students" "often" complained to her "about what was going on in the kitchen and in the dining hall," including "rodent excrement in the food" and "rodents in the kitchen [and] dining [area]," and that she assisted students in filing grievances regarding those issues. Doc. 119-3 at 2. Ms. Stinnett testified that she "filed grievances 2-3 times about the rodent infestation," and that New Mexico Correctional Department ("NMCD") "staff sometimes laughed when we filed grievances about the infestation." Doc. 119-5 at 15. Ms. Johnson also testified to her own observation of rodents running on the floor of the dining area, Doc. 119-3 at 4, and in the education building where she worked, noting that "there wasn't a room that we didn't see one or more [mice] in at some point in time." *Id.* at 7.

Several of the women who worked in the kitchen with Ms. Zapata and Ms. Garcia attested to the "danger posed by the rodent infestation to the physical health of inmates." Doc. 121-5 at 2 (Declaration of Ms. Chavez-Quintana). Ms. Chavez-Quintana attested that, she "felt extreme stress every day [she] worked in the kitchen because of the rodent infestation," and "felt extreme stress living, working, eating and sleeping at [Western] because of the rodent infestation." *Id.* at 3. Ms. Evans attested that, during her incarceration at Western, she "became terrified of rodents," "was particularly scared that [she] might contract Hantavirus Pulmonary Syndrome or some other dangerous disease transmitted by rodents," and "did everything [she] could to avoid eating food served from the [Western] kitchen because [she] knew it was contaminated by rodents." *Id.* at 11; *see also id.* at 7 (Declaration of Mc. Devitt) (attesting to her fear of contracting "Hantavirus Pulmonary Syndrome or some other dangerous disease transmitted by rodents"). Similarly, Ms. Stinnet attested that she believes "the infestation posed a serious danger to [her] physical and mental health," including the danger of contracting Hantavirus." *Id.* at 14-15; *see also id.* at 18 (Declaration of Ms. Bond) (attesting to the dangerousness of "a rodent infestation [] to a person's mental and physical health, especially in a congregate setting").

Neither Ms. Zapata nor Ms. Garcia ever had any conversations with Ms. Lucero-Ortega or Mr. Martinez, about rodents or otherwise. Doc. 106-5 at 3; Doc. 106-7 at 5; Doc. 108-5 at 3; 108-7 at 5. Ms. Lucero-Ortega does not recall having any conversations with any inmates regarding the presence of rodents at Western, but testified that, when she was in the kitchen, "a lot of [her] focus was usually discussing it with Summit staff and with the Summit supervisor" (Ms. Estevan). 106-4 at 9-11.

Ms. Lucero-Ortega testified that she never saw rodents or rodent feces in either the kitchen or the chow hall during her weekly rounds within the facility but heard reports about the presence of rodents in and around food service from her FSSOs and her Deputy Wardens. *Id.* at 4-6. Ms. Johnson recalled in the "realm" of a dozen meetings attended by Ms. Lucero-Ortega, Mr. Sanchez, and Ms. Estevan during which the presence of rodents at Western was discussed. Doc. 119-3 at 5. Ms. Johson recalled that Ms. Estevan was "actually trying very hard to press for solutions to the issue." Doc. 126-5 at 1. Ms. Estevan similarly recalled weekly or bi-weekly meetings held by the Wardens (both Ms. Lucero-Ortega and Mr. Martinez) and attended by department heads where the subject of rodents was regularly discussed. Doc. 120-2 at 4; *see also* Doc. 126-4 at 3 (Deposition of Ms. Estevan) (testifying that she brought up the presence of rodents at least occasionally in department head meetings). Mr. Sanchez recalled "discussing the prevention of rodents with the Warden[s]." Doc. 119-12 at 5. Mr. Martinez recalled that Mr. Sanchez "did report some incidences [relating to mice] to [him], but not to th[e] magnitude of daily," and not as an "infestation." Doc. 121-8 at 7; Doc. 108-4 at 4; *see also* Doc. 108-4 at 8 (testifying that there were mice and mice droppings at Western but that there is a "big difference between an infestation and a few mice").

Mr. Sanchez testified that he saw mouse droppings at Western, but did not recall how many times. Doc. 107-4 at 9-10. He estimated that it happened more frequently than once a year but less frequently than once a month. *Id.* He testified that mouse droppings were "a sanitation issue," and that he would have it "cleaned up and sanitized." *Id.* He testified to having seen live rodents two or three times, dead rodents once or twice a month, either caught in traps or in "old equipment," and a rodent's nest inside "a piece of old equipment not being used." *Id.* at 10; Doc. 126-3 at 10. He further testified to having received reports "a couple of times" that inmates

found mice droppings on their food tray, but by the time he went to the dining hall to investigate these reports, there was no evidence for him to substantiate the claims. Doc. 107-4 at 15.

Mr. Sanchez testified that Western did "have rodents," but that he did not believe that the presence of rodents amounted to an "infestation," stating, "[w]e have all kinds of wildlife here at Western, so I thought, you know, it's part of the everyday." *Id.* at 12, 14; Doc. 121-7 at 5. However, according to documentation of an interview conducted with him on April 21, 2020, Mr. Sanchez stated that before recent efforts to keep dry goods in "plastic totes," "you would see [mice] [] daily" in the kitchen, and that, "in the past, we had issues but according to my last EID inspection, it's like 100 percent better [there are] no signs of [mouse] feces in area that it use[d] to be." Doc. 121-4 at 3.

Mr. Sanchez testified that he "felt like [he] was doing everything within [his] power at 100 percent to . . . do the rodent control." Doc. 107-4 at 13. However, he also testified that he approached several individuals, including the Wardens, EID inspector, and Deputy Wardens, about getting a new pest control company to provides services that "would fit the facility better," meaning the provision of "actual rodent control where [the company] would monitor it themselves, coming "on site" to "check traps, put bait stations out, possibly poisons around the perimeter of the facility, things like that, that PDI did not offer the facility." *Id.* at 13. He explained: "The equipment they would use would, I feel would have been more beneficial for the facility instead of just placing glue traps and live traps everywhere." *Id.* at 14. Neither Ms. Lucero-Ortega nor Mr. Martinez, however, recalls having a conversation with Mr. Sanchez about hiring a different pest control company. Docs. 121-8; 129-9.

Ms. Zapata testified that she had a conversation with Mr. Sanchez about whether "they were going to fix the [rodent] problem so we could stop having to clean up after them." Doc.

107-5 at 2. She recalled "bringing up the subject of . . . what are you guys doing about the rodent problem . . . this is ridiculous . . . we are tired of having to kill them and clean them." *Id.* She recalled that "he kind of said, 'Well, we are taking care of it. There are the mouse traps.' And that was that." *Id.* Mr. Sanchez remembered that Ms. Zapata "came to [him] with a complaint because she worked in the kitchen," but did not remember the substance of her complaint. Doc. 126-3 at 11. Ms. Garcia testified that she told Mr. Sanchez about the rodent infestation one day when they were in the chow hall. Doc. 107-7 at 4. She recalled coming out from where they served food in dining hall and he was standing in the doorway. *Id.* He responded that "the sticky traps were the solution." *Id.*

Ms. Stinnett attested that "[o]n numerous occasions, [she] witnessed [Mr.] Sanchez and [Ms.] Estevan blame each other for the . . . unsanitary conditions in the [] kitchen and cafeteria." Doc. 119-5 at 14. During her deposition, Ms. Lucero-Ortega laid the blame for the rodent issue on Summit, including Ms. Estevan, stating, "We had issues with the cleanliness of the kitchen" because of the failures of "Summit staff and their employees." Doc. 106-4 at 6. She testified that when Ms. Estevan complained to her about rodents, she would respond, "Well, let's start with cleaning up your mess." Doc. 129-1 at 4. According to Ms. Lucero-Ortega, Ms. Estevan "did not like it when [she] went in there" and "did not like [her] having to tell her to clean up," and so "their conversations weren't always in the best of terms." *Id.*

Ms. Estevan, on the other hand, testified about her frustration with Western's Wardens for their lack of responsiveness to the issue of rodents in the kitchen at Western. She recalled regularly communicating about this issue to Ms. Lucero-Ortega and Mr. Martinez, during each individual's tenure as Warden. Doc. 119-2 at 4-5. She testified that it was "[l]ike talking on deaf ears." *Id.* at 5. Ms. Estevan testified that she would "report stuff," like "the mouse holes, the

mouse droppings," and she "just felt like nothing was being done"; then when the inspectors came, they would point the finger at her. *Id.* at 13-14; *see also id.* at 14 (testifying, "[y]ou would offer suggestions, and you would be shut down, stuff like that. It's frustrating").

Ms. Estevan reached out to her boss at Summit, Ian Tillotson, when she "felt like it was overwhelming" that "nothing was being done" by the Wardens about the presence of rodents. *Id.* at 5. He would give her "directives on how to handle certain situations." *Id.* Mr. Tillotson testified that the presence of rodents in the kitchen was a regular subject on his weekly calls with Ms. Estevan. Doc. 126-6 at 1. Mr. Tillotson testified that he had an in-person conversation with Ms. Lucero-Ortega, telling her that the issue of rodents in the kitchen "needed to be corrected immediately because it could add to potential contamination issues," and that it was "a public safety issue." Doc. 119-9 at 3. He recalls that, "to the best of [his] knowledge, [Ms. Lucero-Ortega] said that they were taking care of it and would continuously be working on the situation." Doc. 126-6 at 3.

Ms. Estevan testified that, until mid-2020, she spoke to Mr. Sanchez about the presence of rodents and/or rodent feces at the facility "every other day, every two days," and notified him of possible rodent contamination of food. Doc. 119-2 at 2, 3. Mr. Sanchez similarly testified that Ms. Estevan would bring up the issue of rodent control with him, and he "would provide her with sticky traps because she knew her department and she knew the problem areas," and that, "once, twice a week [he] would check the traps in the kitchen to replace them with fresh ones." Doc. 126-3 at 9. Ms. Estevan similarly testified that Mr. Sanchez would "get his staff and the biohazard team to come in and clean [] up" rodents and/or rodent feces. Doc. 119-2 at 2. According to Ms. Estevan, Mr. Sanchez also would give her "ideas," such as "putt[ing] everything in plastic bins," and "clean[ing] certain things," and would bring her "sticky mouse

traps." *Id*. Mr. Sanchez testified that he had been taught by EID to use "sealable bins, preferably plastic bins or totes . . . to store bagged items" in "dry storage areas." Doc. 107-4 at 6. Ms. Estevan testified that Mr. Sanchez would tell her: "Well, you need to clean this . . . or change the mouse traps and we will get bins." *Id.*

According to Ms. Estevan, based on her conversations with Mr. Sanchez, she asked first Ms. Lucero-Ortega and then Mr. Martinez about being provided bins for the kitchen. Doc. 119-2 at 12. She testified that she was still having the same conversations with Mr. Martinez as she had done with Ms. Lucero "because the mice were still . . . chewing the bags of [] the bread and roll mix. So it's just . . . you hear what Mr. Sanchez is saying, but then there is also the all mighty dollar that who is going to pay for them." *Id.*

Ms. Estevan testified that, ultimately, Mr. Tillotson told her to "use the card and go out and [purchase bins]." *Id.* at 12. As a result, she "just went out and bought them" without waiting for an answer from Western. Doc. 126-4 at 8. Ms. Estevan continued to believe that the "state should have helped" with funding the bins. Doc. 119-2 at 12. Similarly, Mr. Tillotson testified that any equipment for the storage of food, including plastic bins, fell under "the small wares budget," which was "the client's responsibility." Doc. 129-3 at 5.

On the other hand, Ms. Lucero-Ortega testified that although Ms. Estevan "was under the impression" that Western was responsible for the cost of the bins, under their "food service contract, [] the responsibility fell on the vendor, and so therefore [Ms. Estevan] had to purchase those bins." Doc. 129-1 at 2. According to Ms. Lucero-Ortega, she advised Ms. Estevan of her financial responsibility for the bins. *Id.* at 3; *see also* Doc. 129-1 at 5 (Deposition of Ms. Lucero-Ortega) (testifying that she had a conversation with Ms. Estevan "on the fact that she needed to purchase those bins," and that Ms. Estevan "was not too happy about having to purchase those

bins”). Mr. Martinez testified that Ms. Estevan never communicated to him a problem with rodents at Western, let alone approached him about purchasing bins to alleviate that problem. Doc. 121-8 at 3.

In July 2017, the issue of rodents at Western was raised in the context of a class action, *Duran v. Grisham*, No. 77-CV-721 LF/SCY. *Duran* was commenced in 1977, at which time the plaintiffs alleged federal constitutional violations of inmates in the custody of the State of New Mexico. Doc. 106-1 at 1. After extensive litigation, the parties entered into a settlement agreement resolving all then-pending motions, and the Court issued an order (the “1991 Consent Decree”) adopting the parties’ agreement on September 20, 1991. *Id.* at 2. By July 16, 1999, all of the substantive requirements of the 1991 Consent Decree had been satisfied and vacated, except for certain restrictions on overcrowding, which were to remain in place in perpetuity. *Id.* The litigation was dormant until late 2015, when a class member revived it by filing *pro se* motions for an emergency injunction and a contempt order. *Id.* Class counsel resumed active representation of the plaintiff class, and on August 31, 2016, the Court approved a settlement reached by the parties of the pending disputes. *Id.*

Relevant here, on July 5, 2017, class counsel filed a motion for declaratory, injunctive, and remedial relief, arguing that defendants were violating the 1991 Consent Decree and the parties’ 2016 settlement agreement. *Id.* In the motion, the plaintiff class alleged ongoing Eighth and Fourteenth Amendment violations, including, *inter alia*, “environmental conditions including vermin.” *Id.* at 3. Specifically, the motion stated: “Rodent infestations have been reported by numerous inmates at [Western] . . . in Grants, NM, where hantavirus is prevalent. Class members at [Western] report rodents running through the kitchen and cafeteria and being served food with rodent droppings in it.” Doc. 106-8 at 6.

After negotiations, the parties ultimately entered into a revised settlement agreement, which was executed on August 14, 2019 (the "Second Revised Settlement Agreement"). The Second Revised Settlement Agreement provided in relevant part that "NMCD will retain professionally licensed exterminators to be deployed at least monthly for the duration of this Revised Settlement Agreement at [Western] to mitigate concerns about rodents and vermin at the facilities." Doc. 106-3 at 9.

On February 14, 2020, the Court entered its Order Granting Final Approval of Second Revised Settlement Agreement ("2020 Order"). Doc. 106-1. In the 2020 Order, the Court specifically noted that, by September 1991, the plaintiff class was defined as "all those inmates who are now, or in the future may be, incarcerated in the Penitentiary of New Mexico at Santa Fe or at any maximum, close, or medium security facility open for operation by the State of New Mexico after June 12, 1980." *Id.* at 15. This definition, the Court explained, included "all female inmates in NMCD's custody, regardless of classification level." *Id.* The 2020 Order also recognized that the Second Revised Settlement Agreement provided for "prospective relief, *i.e.*, relief other than compensatory monetary damages," in a "civil action with respect to prison conditions." *Id.* at 22.

Two NMED Environmental Health Bureau inspection reports completed on January 22, 2020 indicated that no violations were noted. Doc. 107-13. Indeed, Ms. Estevan testified that, once she started using bins, they "didn't see as [many] mice," and that, by the time she left Western in 2021, she no longer saw rodent feces. Doc. 119-2 at 3. She attributed this both to her regular use of bins and to Western "giv[ing] [them] a whole new kitchen basically." Doc. 126-4 at 12.

Based on the foregoing, Plaintiffs Ms. Zapata and Ms. Garcia commenced the instant action in this Court. In their First Amended Complaint for the Recovery of Damages Caused by the Deprivation of Civil Rights, Plaintiffs bring an Eighth Amendment claim against all Defendants, arguing that their failure to adequately address the presence of rodents at Western caused inhumane conditions of confinement. Doc. 44 at ¶¶ 232-260. Plaintiffs bring an additional state law negligence claim against Summit and Ms. Estevan, arguing that they breached their duty to provide food "fit for human consumption." *Id.* at ¶¶ 261-273. Defendants each have filed a motion for summary judgment seeking judgment as a matter of law in their favor, and those motions are now before the Court.

## LEGAL STANDARD

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' and a fact is material when it 'might affect the outcome of the suit under the governing substantive law.'" *Ibarra v. Lee*, No. 22-5094, 2023 WL 6939236, at *2 (10th Cir. 2023) (quoting *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016)). In other words, "[f]actual disputes are genuine where "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and disputed factual issues are "material if under the substantive law [they are] essential to the proper disposition of the claim." *Ibarra*, 2023 WL 6939236, at *7 (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013)).

The movant has the initial burden of establishing that there is an absence of evidence to support the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant meets this burden, the non-movant must come forward with specific facts, supported by

admissible evidence, that demonstrate the existence of a genuine dispute. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1526 n.11 (10th Cir. 1992). A court errs in denying a motion for summary judgment "only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Allen v. Wal-Mart Stores, Inc.*, 241 F.3d 1293, 1296 (10th Cir. 2001). Accordingly, in deciding a motion for summary judgment, the court "construe[s] the factual record and the reasonable inferences therefrom in the light most favorable to the nonmoving party." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Ibarra,* 2023 WL 6939236, at *7 (quoting *Emmett v. Armstrong*, 973 F.3d 1127, 1130 (10th Cir. 2020)). "At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Ibarra*, 2023 WL 6939236, at *7 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The weighing of evidence, the reconciliation of inconsistent testimony, and the assessment of a witness' credibility is solely within the province of the jury." *Allen*, 241 F.3d at 1297.

In the instant case, Ms. Lucero-Ortega, Mr. Sanchez, and Mr. Martinez move for summary judgment as to Plaintiffs' claims in part on the basis of qualified immunity. Qualified immunity protects government officials performing discretionary functions "when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011). In keeping with the purposes of qualified immunity, "special rules apply when an official raises a defense of qualified immunity on summary judgment." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 779 (10th Cir. 1993). Specifically, "qualified immunity requires a two-step sequence." *Morris v. Noe*,

672 F.3d 1185, 1191 (10th Cir. 2012) (citation omitted). "When a defendant asserts qualified immunity in a summary judgment motion, the plaintiff must show that (1) a reasonable jury could find facts supporting a violation of a constitutional right and (2) the right was clearly established at the time of the violation." *Ibarra*, 2023 WL 6939236, at *8 (quoting *Wilkins v. City of Tulsa*, 33 F. 4th 1265, 1272 (10th Cir. 2022)). "A defendant is entitled to qualified immunity if the plaintiff fails to satisfy either prong. *Id.* The court has "the freedom to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)).

"A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that his actions violate that right." *Lundstrom*, 616 F.3d at 1118-19 (citation omitted). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Fisher v. City of Las Cruces*, 584 F.3d 888, 900 (10th Cir. 2009) (citation omitted). Accordingly, a "plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it." *Lundstrom*, 616 F.3d at 1119. Specifically, a "plaintiff must show legal authority making it apparent that in light of pre-existing law a reasonable official would have known that the conduct in question violated the constitutional right at issue." *Id.*

This does not mean that the plaintiff must "present a case with an identical factual situation." *Id.* "[T]here need not be precise factual correspondence between earlier cases and the case at hand, because 'general statements of law are not inherently incapable of giving fair and clear warning.'" *Anderson v. Blake*, 469 F.3d 910, 913 (10th Cir. 2006) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). To the contrary, the Supreme Court has made clear that "officials can

still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful."); *see also Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) ("The *Hope* decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional."). "Thus, a right is clearly established when a precedent involves materially similar conduct or applies with obvious clarity to the conduct at issue." *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017) (citations omitted). The "salient question" is whether the state of the law at the time of the alleged misconduct gave the defendant "fair warning" that their alleged misconduct was unconstitutional. *Hope*, 536 U.S. at 741. To answer this question, the court looks to "Supreme Court or Tenth Circuit precedent on point or clearly established weight of authority from other courts finding the law to be as the plaintiff maintains." *Lundstrom*, 616 F.3d at 1119.

## DISCUSSION

Plaintiffs assert Eighth Amendment claims against all Defendants herein, namely, Ms. Lucero-Ortega, Mr. Sanchez and Mr. Martinez ("Correctional Defendants") and Ms. Estevan and Summit (the "Summit Defendants"). Additionally, Plaintiffs assert a state law negligence claim against the Summit Defendants. All Defendants argue that they are entitled to judgment as a matter of law on Plaintiffs' claims. Their arguments are addressed herein.

I. *Res Judicata*/Claim Preclusion

The Correctional Defendants, joined by the Summit Defendants, argue that, because a final judgment was reached in the *Duran* litigation that specifically addressed the issue of rodents at Western, Plaintiffs' Eighth Amendment claims are barred by the doctrine of *res judicata*. Doc. 106 at 11; Doc. 107 at 12; Doc. 108 at 11. "Claim preclusion, also known as *res judicata*, prevents a party from litigating a legal claim that was or could have been the subject of a previously issued final judgment." *Watkins v. Genesh, Inc.*, 135 F.4th 1224, 1230 (10th Cir. 2025) (citation omitted). The party invoking claim preclusion must show that three elements are established: (1) "a final judgment on the merits in a prior action"; (2) "the identity (i.e., sameness) of parties or their privies in the prior and instant suits"; and (3) "the identity of the cause of action in both suits." *Id.* (citation omitted). Under federal law, which applies here, "settlements have claim-preclusive effect between the parties to the settlement." *Denver Homeless Out Loud v. Denver, Colo.*, 32 F. 4th 1259, 1271 (10th Cir. 2022) (applying federal law where, as in *Duran*, a federal district court entered the final judgment adopting a settlement). Even where the three elements are satisfied, "there is an exception to the application of claim preclusion where the party resisting it did not have a full and fair opportunity to litigate the claim in the prior action." *Id.*

Defendants argue that the elements of claim preclusion are satisfied, as follows: (1) the Second Revised Settlement Agreement, adopted by the *Duran* Court in its 2020 Order, constitutes a final judgment on the merits in a prior action; (2) Plaintiffs herein were members of the Plaintiff class in *Duran* and Defendants are in privity with NMCD, who was a named defendant in *Duran*, and thus the parties and/or their privies are the same in both suits; and (3) the cause of action in *Duran* and the instant case are identical, namely, the violation of federal

constitutional law as a result of vermin at Western. Doc. 106 at 17; Doc. 107 at 12-18; Doc. 108 at 11-16. Plaintiffs refute this argument as to all three elements. The Court agrees that there is no privity between the defendants in *Duran* and Defendants herein. Because the absence of even one element of claim preclusion is sufficient to bar its application, the Court finds that Defendants have failed to carry their burden of establishing that claim preclusion applies.

According to Defendants, NMCD was a named defendant in *Duran*. Doc. 106 at 14. Pursuant to the terms of the Second Revised Settlement Agreement, NMCD agreed to take several enumerated measures to address plaintiffs' concerns. Doc. 106-3. The Second Revised Settlement Agreement was signed by counsel for Plaintiffs, on one side, and by Matthew Garcia, then General Counsel for Governor Michelle Lujan Grisham, Alisha Tafoya Lucero, Cabinet Secretary for NMCD, and Jennifer Saavedra, Assistant New Mexico Attorney General, identified collectively as "Defendants and Counsel for Defendants," on the other side. *Id.* It thus is undisputed that none of the Defendants herein (namely, Ms. Lucero-Ortega, Mr. Sanchez, Mr. Martinez, Ms. Estevan, and Summit) was a party to the *Duran* litigation or a signatory to the Second Revised Settlement Agreement. It is also undisputed that, in the instant action, each Defendant is "being sued in their individual capacities." Doc. 44 ¶ 12.

"A government official sued in his individual or personal capacity presents a different case from that of an official sued in his official capacity." *Gonzalez v. City & Cty. of Denver*, No. 13-civ-946, 2014 WL 641926, at * (D. Colo. Jan. 13, 2014). "[W]hile government employees are in privity with their employer in their official capacities, they are not in privity in their individual capacities." *Gonzales v. Hernandez*, 175 F.3d 1202, 1206 (10th Cir. 1999) (collecting cases). The law thus is clear that "[g]overnment employees in their *individual* capacities are not in privity with their government employer." *Ramirez v. Reddish*, 104 F.4th 1219, 1228 (10th Cir. 2024)

(quoting *Willner v. Budig*, 848 F. 2d 1032, 1034 n.4 (10th Cir. 1988) (emphasis in original)); *see also Kinslow v. Ratzlaff*, 158 F.3d 1104, 1106 (10th Cir. 1998) ("A judgment against a government does not bind its officials in subsequent litigation that asserts a personal liability against the officials.") (quoting 18 Charles A. Wright, Arthur R. Miller & Edwad H. Cooper, Federal Practice and Procedure, § 4458, at 508 (1981)). Nor are government employees sued individually "in privity with other government employees whom plaintiff had previously sued individually" in a prior action. *Spiess v. Meyers*, 483 F. Supp. 2d 1082, 1089 (D. Kan. 2007) (citing *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985) ("A victory in a personal-capacity action is a victory against the individual defendant, rather than against the entity that employs him.")).

Under this precedent, Defendants herein, government employees/contractors sued in their individual capacity, are not in privity with their employer NMCD or with Governor Grisham or Cabinet Secretary Lucero, government officials sued in their official and/or individual capacity in *Duran.* Defendants thus have failed to demonstrate identity of parties or their privies between the instant case and *Duran*. In the absence of a showing of identity of parties or their privies, the Court finds that Defendants have not demonstrated that claim preclusion applies to Plaintiffs' claims against any of the Defendants.

*Duran* does not bar the instant case for the additional, independent reason that Plaintiffs herein seek damages, while the class action suit in *Duran* sought only injunctive relief. "[T]he general rule is that a class action suit seeking only declaratory and injunctive relief does not bar subsequent individual damages claims by class members, even if based on the same events." *Hiser v. Franklin*, 94 F.3d 1287, 1291 (9th Cir. 1996). Indeed, "every federal court of appeals that has considered the question has held that a class action seeking only declaratory or

injunctive relief does not bar subsequent individual suits for damages." *Id.* (collecting cases). "[S]everal of the cases holding that class members' subsequent damages claims are not barred have relied on notions of due process." *Id.*; *see, e.g., Tetzlaff v. Swinney*, 678 F. Supp. 812, 813-14 (D. Nev. 1987) (holding that consent decree approved by court in prior class action for injunctive and declaratory relief could not, consistent with due process, bar plaintiff's claims for damages in present case). Accordingly, where, by its terms, a consent decree in a prior action "addresses only injunctive relief – not damages . . . *res judicata* does not bar . . . individual actions for damages." *Golbert v. Walker*, No. 18-civ-8176, 2021 WL 1056989, at *5 (N.D. Ill. Mar. 18, 2021).

For example, in *Martin v. Davies*, the plaintiff was a pretrial detainee in Cook County Jail in 1987. 917 F.2d 336, 339 (7th Cir. 1990). Five years earlier, a consent decree had been entered in *Duran v. Elrod*, a case involving the rights of pretrial detainees at Cook County Jail. *Id.* The Court explained that because the *Duran* consent decree was "continuing in nature," the plaintiff was a member of the *Duran* class and was bound by the decree. *Id.* The plaintiff, however, asserted "damages claims regarding denial of access to the jail law library," and argued that those claims were not governed by the *Duran* decree. *Id.* at 339-40. Noting that the *Duran* decree did "not address damage claims," but "[i]n fact, by its terms, [] limit[ed] itself to equitable claims," the Court held that the plaintiff's claims for damages were not "governed by *Duran.*" *Id.* The Court thus held that it was erroneous for the district court to have dismissed the plaintiff's claims on those grounds. *Id.*

As was the earlier consent decree at issue in *Martin*, the *Duran* consent decree invoked herein was specifically limited to equitable claims. As the Court's 2020 Order explicitly stated, the *Duran* Second Revised Settlement Agreement provided only for "prospective relief, *i.e.*,

relief other than compensatory monetary damages." Doc. 106-1 at 22. Indeed, the Second Revised Settlement Agreement provided for the following prospective relief: "NMCD will retain professionally licensed exterminators to be deployed at least monthly for the duration of this Revised Settlement Agreement at [Western] to mitigate concerns about rodents and vermin." Doc. 106-3 at 9. In contrast, Plaintiffs herein bring claims for *damages* arising out of the alleged violation of their Eighth Amendment rights – damages claims that were neither addressed nor resolved in *Duran*. Accordingly, while Plaintiffs may be members of the *Duran* class and thus bound by the decree entered therein for purposes of equitable relief, it would offend principles of due process to interpret the *Duran* Second Revised Settlement Agreement as foreclosing their ability to pursue their damages claims in the instant action.

Accordingly, Plaintiffs claims are not barred by *res judicata*/claim preclusion.

II. <u>Eighth Amendment Claims</u>

Plaintiffs assert that by failing to adequately address the presence of rodents in the kitchen and dining areas at Western, Defendants violated their rights under the Eighth Amendment. It is "settled that the treatment a prisoner receives in prison and the conditions under which [s]he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). While the Eighth Amendment "does not mandate comfortable prisons, [] neither does it permit inhumane ones." *Id*. "Eighth Amendment protections draw their meaning from the evolving standards of decency that mark the progress of a maturing society." *DeSpain v. Uphoff*, 264 F.3d 965, 973-74 (10th Cir. 2001); *see also Mitchell v. Maynard* 80 F.3d 1433, 1442 (10th Cir. 1996) ("Overall, the Eighth Amendment embodies broad and idealistic concepts of dignity, civilized standards, humanity and decency.") (citations omitted). Accordingly, "prison officials [must] provide humane conditions of confinement by

ensuring inmates receive the basic necessities of adequate food, clothing, shelter and medical care and by taking reasonable measures to guarantee the inmates' safety." *DeSpain*, 254 F.3d at 974.

To establish an Eighth Amendment violation, an inmate must "prove an objective component and a subjective component associated with the deficiency claimed." *Womble v. Chrisman*, 173 F.4th 1186, 1196 (10th Cir. 2026). "The objective component requires conditions sufficiently serious so as to deprive inmates of the minimal civilized measure of life's necessities or conditions sufficiently serious so as to constitute a substantial risk of serious harm." *Id.* (citations omitted). "There is no requirement that an inmate suffer serious medical problems before the condition is actionable." *Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir. 2001). The objective component inquiry "relies on the particular facts of each situation," and the circumstances, nature, and duration of the challenged conditions must be carefully considered." *DeSpain*, 264 F.3d at 974. In particular, "[t]he frequency and duration of the condition, as well as the measures employed to alleviate the condition, must be considered when considering the objective component." *Id*. "While no single factor" is controlling, "the length of exposure to the conditions is often of prime importance." *Id*. Relatedly, "[i]t is important to consider the conditions of confinement as a whole because several deprivations in combination may constitute a constitutional violation when they have a mutually enforcing effect that produces the deprivation of a single identifiable human need." *Mitchell*, 80 F.3d at 1442 (citations omitted).

The subjective component requires that "the prison official had a 'sufficiently culpable state of mind.'" *Benshoof v. Layton*, 351. F. App'x 274, 277 (10th Cir. 2009) (quoting *Farmer*, 511 U.S. at 834). "In conditions-of-confinement cases, the inmate must establish 'deliberate indifference' to inmate health or safety." *Benshoof*, 351 F. App'x at 277 (quoting *Farmer*, 511

U.S. at 834). This means showing that "defendants knew [plaintiffs] faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. In terms of the requisite *mens rea*, "deliberate indifference requires that 'the official both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Benshoof*, 351 F. App'x at 277 (quoting *Farmer*, 511 U.S. at 837). Importantly, however, "whether an official had knowledge may be inferred from circumstantial evidence," and "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *DeSpain*, 264 F.3d at 975. "If an official is aware of the potential harm but takes reasonable efforts to avoid or alleviate that harm, he bears no liability under this standard." *Id.*

In determining whether an inmate has produced sufficient evidence to establish the objective and subjective components, the Court looks "only to whether [the plaintiff]'s version of the facts would allow a reasonable fact finder to conclude the defendants violated [their] Eighth Amendment rights." *Benshoof*, 251 F. App'x at 277. Accordingly, the Court "must accept [the plaintiff]'s version of the facts and grant summary judgment only if he fails to allege facts that would allow a reasonable fact finder to conclude that the defendants violated his rights under the Eighth Amendment." *Id.; see also DeSpain*, 264 F.3d at 972 (explaining that, on summary judgment, the court "consider[s] the material facts as they were alleged by the non-moving party").

In moving for summary judgment on Plaintiffs' Eighth Amendment claims, the Summit Defendants argue that, in the first instance, they cannot be held liable under § 1983 for federal constitutional violations as they are not "state actors." Each of the Correctional Defendants individually, in addition to the Summit Defendants collectively, contend that Plaintiffs are unable

to prove either the objective or subjective components of an Eighth Amendment violation. Each of the Correctional Defendants further argues that, in any event, any constitutional right allegedly violated was not clearly established at the time of Plaintiffs' incarceration, which began in 2017. Finally, Summit argues that, even if Ms. Estevan is liable for violating Plaintiffs' Eighth Amendment rights, Summit cannot be held vicariously liable therefor. As set forth herein, the Court finds that Plaintiffs' version of the facts would allow a reasonable fact finder to conclude that all of the Defendants violated their clearly established Eighth Amendment rights.

*The Summit Defendants Are State Actors*

The Summit Defendants argue that they cannot be held liable under § 1983 for federal constitutional violations as they are not "state actors." Doc. 126 at 11. Here, the State contracted out to Summit "the exclusive right to provide and operate food services for the inmates and staff of [Western]." *Price v. Suarez*, No. 09-civ-51, 2011 WL 635225, at *3 (D. Utah Feb. 11, 2011). Courts consistently have held that, where, as here, "the state has delegated its constitutional duties . . . to a private entity, that entity can fairly be said to 'represent the state' as required for a § 1983 claim." *Khan v. Barela*, No. 15-civ-1151, 2021 WL 107245, at *7 (D.N.M. Jan. 12, 2021). In this case, "[t]he State, and therefore [Western], had a constitutional obligation to provide inmates with 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it.'" *Price*, 2011 WL 635225, at *3 (quoting *Ramos v. Lamm*, 639 F.3d 559, 570-71 (10th Cir. 1980)). Western "delegated that obligation to [Summit], and [Summit] voluntarily assumed the obligation by contract." *Id.* For this reason, Summit's "provision of food to the inmates was state action, and Summit therefore acted under color of state law for purposes of § 1983." *Id.* (applying *West v. Atkins*, 487 U.S. 42 (1988), which held that physician under contract

to provide medical services to inmates at state prison was state actor for purposes of § 1983, to facts analogous to those here where jail contracted out to private corporation the exclusive right to provide and operate foods services). As an employee of Summit, Ms. Estevan, too, was a "state actor" for purposes of § 1983. *Id.*

*The Objective Component of Plaintiffs' Eighth Amendment Claim*

The facts as presented by Plaintiffs establish the objective component of an Eighth Amendment violation. A series of NMED Environmental Health Bureau inspections of the kitchen, dining, and storage areas of Western over the course of the period from April 2017 to April 2019 revealed the continued presence of mice. Specifically, the April 10, 2017 inspection found "mice droppings present in the facility," with only two traps available, gaps beneath doors where mice could enter the kitchen, and signs that mice had chewed through the insulation in "cooler #4." Two months later, the July 29, 2017 inspection still found "evidence of mouse dropping[s]" in "cooler #4." The next inspection on January 10, 2018 again found "mice droppings" in the same areas. A full year later, on January 23, 2109, the inspectors still found mouse droppings in the same areas, and "holes" in the wall and ceiling that remained open for mice to enter. Four months later, on April 4, 2019, the inspectors witnessed a live mouse running across the kitchen in addition to observing four mice in a glue trap, the continued presence of mouse droppings, and the continued presence of points of entry for mice. Corrective actions taken in response to each of these inspections failed to remedy the issue of mice in the kitchen, dining, and storage areas, as evidenced by the fact that the inspection reports continued to cite similar violations involving mice through April 2019.

Declarations, testimony, and statements of kitchen workers, prison staff, and even Defendants themselves demonstrate the severe, constant, and lengthy nature of the rodent issue

in the kitchen, dining, and storage areas of Western. Ms. Chavez-Quintana attested to the large number of rodents and rodent feces she saw every day in the kitchen. Ms. Evans attested that she found rodents or rodent feces in the cookware in the kitchen almost every day. Ms. Stinnett attested that she regularly saw rodent feces, and upon arrival for her morning shift in the kitchen, routinely cleaned up rodent feces that had accumulated overnight, and also sometimes found nests "with rodent babies and pieces of dead rodents in them." Ms. Devitt attested that she "found rodent nests approximately once or twice per week" while working in the kitchen.

Indeed, Ms. Estevan herself testified that, until approximately mid-2020, she saw rodents and/or rodent feces "almost every day, every other day," in the kitchen, and had to dispose of mice-contaminated foodstuffs and supplies and place those items on her waste log "every day, every other day." She also saw a nest of baby rodents in the kitchen. Ms. Estevan specifically described the problem as an "infestation." While Mr. Sanchez testified that he did not believe the presence of mice at Western amounted to an "infestation," he stated in an interview in April, 2020 that, before recent efforts, mice were seen daily in the kitchen and there had been regular signs of mouse feces in certain areas.

A mental health clinician and the acting supervisor of the education department at Western each recounted that it was "common knowledge" that the facility had a rodent infestation. Ms. Bond attested that she regularly heard complaints from inmates about the infestation, personally saw numerous rodents where food was prepared, and raised concerns about the infestation to prison authorities. Ms. Johnson similarly testified that it was "apparent from day one" that there were mice and other rodents in all areas of the facility, that she observed rodents running on the floor of the dining area, that her students complained to her about rodent excrement in food and rodents in the kitchen and dining area, and that she assisted

her students in filing grievances about these issues.

The record demonstrates that, while Western had a contract with a pest control company, PDI, to provide professional extermination of "insects," they did not similarly retain PDI, or any other company, to provide professional extermination of rodents. Rather, the only measures employed to address the rodent condition at Western during the relevant period were glue traps and, to a lesser extent, live traps. Ms. Lucero-Ortega testified that glue traps "were effective as long as the inmates didn't mess with them," and Mr. Sanchez once told Ms. Garcia, "the sticky traps are the solution."

There, however, is contrary evidence showing that the glue traps and other methods employed were manifestly insufficient to alleviate the rodent problem. Ms. Estevan submitted a work order to Western in January 2018 asking for an "exterminator to address the rodent infestation." There is no indication that this work order was fulfilled and, over a year later, in April 2019, Ms. Estevan wrote in an email message, "The mice are not going anywhere. All I have is mouse traps, and those ain't working." Mr. Sanchez, ostensibly recognizing the limited efficacy of "just placing glue traps and live traps everywhere," at one point approached (without results) the Wardens, EID inspector, and Deputy Wardens about getting a new pest control company to provide professional rodent control services. Repeated grievances filed by inmates, including Ms. Stinnett, and by Ms. Johnson on behalf of inmates made clear to prison authorities the continued presence of mice, and therefore the ineffectiveness of the glue traps to eradicate them.

Both Ms. Chavez-Quintana and Ms. McDevitt attested that "the glue traps and other traps designed to capture rodents were completely ineffective," and Ms. Garcia testified that "the sticky traps honestly weren't doing nothing." The glue traps could not handle the sheer number

of mice present – as Ms. Evans attested, following Ms. Estevan's orders, she threw away a rodent "stuck in a glue trap" and "put a new glue trap down in the same spot," only to find another rodent's tail already "stuck to the trap" when she looked only a "few minutes later."

Precisely because the traps were ineffective, inmate kitchen workers, including Ms. Garcia and Ms. Zapata, were forced to kill rodents themselves. Ms. Zapata testified that Ms. Estevan "had us stomping on the mice that were alive on the sticky traps and throwing them in the trash." Ms. Zapata, Ms. Garcia, Ms. Chavez-Quintana, Ms. McDevitt, and Ms. Stinnett regularly – almost every day – "killed rodents with a broom or mop" and also using trash bags. According to kitchen workers, it was Ms. Estevan who directed them to kill mice using these methods; Ms. Estevan ordered them "to kill rodents whenever she saw them in the kitchen."

The ineffectively controlled rodent issue led to unsanitary and potentially unsafe conditions. In terms of handling the rodents, Ms. McDevitt testified that neither Mr. Sanchez nor Ms. Estevan gave the kitchen workers "gloves or any other protective gear when [they] were ordered to kill rodents or dispose of rodent nests in the kitchen." In terms of cleaning up after rodents, Ms. Evans testified that, unless an inspection was expected, kitchen workers "never received enough soap and other supplies" to clean the kitchen thoroughly. Perhaps most disturbingly, there is significant evidence regarding rodent contamination of food prepared in the kitchen and served in the dining areas. Ms. Stinnett attested that she "often saw rodents running across bags of food in the kitchen, and Ms. Evans attested to regularly seeing "rodents running in and out of the hollow legs" of a table on which she did food prep. Although Ms. Estevan denied directing inmates to sift through bags of food for rodent feces and testified that she always threw away contaminated food, no less than eight kitchen workers attested that, upon discovery of rodent feces in food or holes in dry food bags where rodents had gnawed into them – which

discovery was a regular occurrence – Ms. Estevan ordered them not to throw the food away, but rather to remove the rodent feces or other evidence of rodents and serve the food anyway. The kitchen staff had no choice but to comply, as refusing to serve the contaminated food "would be disobeying an order from Ms. Estevan." Ms. Chavez-Quintana attested that she "was present with Plaintiffs when a dead rodent was discovered in a large vat of oatmeal that was being serviced to inmates," and Ms. Stinnett similarly attested to having seen "half of a dead rodent, including the head and front paws, at the bottom of a vat of food that had been served to inmates."

Accordingly, while Defendants have presented testimony, including that of Ms. Lucero-Ortega, Mr. Sanchez, and Mr. Martinez, that the presence of mice did not rise to the level of an infestation, Defendants have fallen far short of "establish[ing] an undisputed record." *Thompson v. City of Phila.*, No. 20-civ-3134, 2022 WL 17364640, at *3 (E.D. Pa. Dec. 1, 2022). To the contrary, the evidence discussed herein "detailing the nature, severity, and duration" of the presence of mice, "among other unsanitary conditions," is sufficient to support the opposite conclusion, namely, that there was "an extensive, persistent infestation" in the kitchen, dining, and storage areas at Western. *Byrd v. Hobart*, 761 F. App'x 621, 624 (7th Cir. 2019). Rather than pointing to "isolated incidents," Plaintiffs have established "a pattern occurring on a regular basis over [two years]." *Womble*, 770 F. App'x at 924. This "chronic rodent infestation," which lasted for an extended duration and which, all the while, remained unresolved by the only measures employed to alleviate the condition, "show[s] a sufficiently serious condition," as required to establish the objective component of an Eighth Amendment violation. *Penny v. Ahern*, No. 19-civ-6307, 2020 WL 1245343, at *2 (N.D. Cal. Mar. 16, 2020); *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) (noting that the Seventh Circuit has "held that a prolonged pest infestation,

specifically a significant infestation of cockroaches and mice, may be considered a [constitutional] deprivation."); *Gonzalez v. Ahern*, No. 19-civ-7423, 2020 WL 6802472, at *8 (N.D. Cal. Nov. 19, 2020) ("Plaintiffs' allegations of a prolonged infestation of rodents and birds in the kitchen is sufficient to show an objectively unreasonable serious risk of harm to the health and safety of prisoners."); *Byrd*, 761 F. App'x at 624 (finding objective component met based on analogous evidence of a kitchen "consistently overrun with mice," which "sometimes get on and into food that is then served to inmates," where "extermination services have not resolved the problem").

The Correctional Defendants question whether "these conditions were of such severity or duration as to rise to the level of a constitutional violation" because Plaintiffs "sought treatment [n]either during [n]or after incarceration" for the "alleged 'serious physical and mental harm.'" Doc. 106 at 20-21; Doc. 107 at 22-22; Doc. 108 at 20-21. The Summit Defendants similarly point to a lack of "evidence that there was any risk to Plaintiffs' physical health due to the presence of mice seen in the kitchen and dining room." Doc. 126 at 13. These arguments misconstrue the nature of Plaintiffs' claim.

As stated above, "[t]here is no requirement that an inmate suffer serious medical problems before the condition is actionable." *Shannon*, 257 F.3d at 1168. The relevant question is whether Plaintiffs have demonstrated conditions sufficiently serious so as to deprive inmates of the minimal civilized measure of life's necessities or conditions sufficiently serious so as to constitute a substantial *risk* of serious harm. Accordingly, "the fact that no harm has yet materialized does not defeat" Plaintiffs' claims. *Byrd*, 761 F. App'x at 624; *see also Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012) (correcting misconception that "creation of a mere hazard to health, as opposed to an actual impairment of health, can never be a harm sufficient to

support an Eighth Amendment violation").

As evidence that the unsanitary conditions created by the unabated mouse infestation presented an increased risk of injury, Plaintiffs present the declarations of several kitchen workers who attest to their fear of contracting Hantavirus Pulmonary Syndrome ("HPS" or "Hantavirus"). The Tenth Circuit has described Hantavirus as "a rare, deadly disease caused by exposure to airborne particles of the urine of infected mice and characterized in its early stages by flu-like symptoms." *Haceesa v. United States*, 309 F.3d 722, 723–24 (10th Cir. 2002); *accord Thomas*, 697 F.3d at 615 ("[I]nhaling microscopic particles of saliva, droppings, or urine from mice infected with hantavirus can infect a person with potentially fatal HPS; rodent contact can cause other fatal diseases as well (famously, but not currently, Bubonic Plague)."). The danger of contracting Hantavirus from exposure to mice "is not subject to reasonable factual dispute and is capable of determination using sources whose accuracy cannot be reasonably questioned, and [the Court] takes judicial notice thereof." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.,* 565 F.3d 683, 703 n.22 (10th Cir. 2009) (stating that the court may take judicial notice of "a record of a state agency that is not subject to reasonable dispute"); *see also* Fed. R. Evid. 201(b). The New Mexico Department of Health Website contains detailed information about the potential for residents of New Mexico to contract Hantavirus, a "very serious illness of the lungs," from exposure to mice. *See* NM Health, "Hantavirus Pulmonary Syndrome," https://www.nmhealth.org/about/erd/ideb/zdp/hps/ (last visited Nov. 2, 2026). The website states that "[a]nyone who lives in an area where mice are found can get hantavirus, [which] includes people from all parts of New Mexico." *Id.* According to the website, "[i]n New Mexico, deer mice and other similar mice carry hantavirus," which "is found in mice droppings and urine," and that individuals may get Hantavirus "by breathing in the virus . . . "when droppings or urine

containing the virus are stirred up and the virus is put in the air as mist or dust . . . by touching their eyes, nose, or mouth after they have touched droppings or urine that contains the virus, [or] from a mouse bite." *Id.* "[T]here is no specific treatment for HPS," and "[p]eople who have HPS will most likely be in the hospital." *Id.* To protect against contracting Hantavirus, the website instructs people to clean mice droppings and urine by "[s]pray[ing] them with ready-made disinfectant or bleach and water" and using "rubber gloves" to then wipe them up "with a paper towel." *Id.* In terms of disposing of dead rodents, the website instructs people to "spray the dead rodent with the ready-made disinfectant, place it in a plastic bag, and bury it or throw it away," washing "hands immediately" thereafter. *Id.*

In light of the indisputable danger of contracting Hantavirus from exposure to mice, the Court cannot agree that "there is no objective indication that the conditions [at Western] were so severe as to pose a substantial risk of serious harm." Doc. 106 at 20; Doc. 107 at 21; Doc. 108 at 20. Inmates and prison employees alike observed mice droppings and mice on a regular basis for an extended period, often "literally in and on the food." *Byrd*, 761 F. App'x at 624. In requiring inmates to dispose of dead rodents and/or clean up mice droppings, inmates were provided with neither rubber gloves nor "ready-made disinfectant or bleach and water," as instructed by NM Health. Glue traps proved ineffective, and no other means were employed to alleviate the condition, despite the fact that, at this stage of our evolving standards of decency, rodent control provided by a professional company is a viable option. Under these circumstances, a reasonable jury could conclude that the risk of harm to Plaintiffs was "both substantial and obvious." *Id.* Plaintiffs' version of the facts thus demonstrates that they were incarcerated under conditions that were not only "sufficiently serious so as to deprive inmates of the minimal civilized measure of life's necessities," but also "posed a substantial risk of serious harm," in satisfaction of the

objective component of their Eighth Amendment claim. *Womble*, 173 F.4th at 1196.

*The Subjective Component of Plaintiffs' Eighth Amendment Claim*

To determine whether Plaintiffs have produced sufficient evidence to establish the subjective component of their Eighth Amendment claim, the Court looks to whether Plaintiffs' version of the facts shows that each Defendant was (1) aware of the substantial risk of harm that the mouse infestation posed and (2) failed to take reasonable efforts to avoid or alleviate that harm. Each of the Correctional Defendants argues that the evidence fails to show either their awareness of a substantial risk of harm or their failure to reasonably address that risk; the Summit Defendants appear to concede their awareness of the substantial risk but argue that they took reasonable efforts to address it. The Court disagrees with these arguments.

Ms. Lucero-Ortega, Mr. Sanchez, and Mr. Martinez each contend that "[t]here is nothing to suggest that [she or he] was aware of a substantial risk to inmate health or safety." Doc. 106 at 23; Doc. 107 at 24; Doc. 108 at 23. In support of this contention, Ms. Lucero-Ortega states that "she never saw a rodent" or "rodent droppings or other clear signs that rodents were present while making her rounds" at Western, Doc. 106 at 23, Mr. Sanchez states that "the presence of mice never led to an infestation or a problem," Doc. 107 at 24, and Mr. Martinez states that "he saw only one rodent during the twenty months that he worked at [Western], first as a Deputy Warden and then as Warden." Doc. 108 at 23. Even if Ms. Lucero-Ortega never saw rodents or signs of rodents, Mr. Martinez only saw one rodent, and Mr. Sanchez does not subjectively define the presence of rodents as an "infestation" or "problem," there is ample evidence that each of these individuals was personally made aware of the circumstances, nature, and duration of the mouse condition in the kitchen, dining, and storage areas of Western which, as this Court has already determined, posed a substantial risk of harm to Plaintiffs.

Specifically, Ms. Lucero-Ortega was provided documentation regarding the inspections conducted in April 2017, July 2017, and January 2018, Mr. Martinez was provided documentation regarding the inspection conducted in April 2019, and Mr. Sanchez signed two inspection reports in January 2019 as the "person in charge," and authored the EID Corrective Action Plan Form following the April 2019 inspection. As detailed above, all of these reports demonstrated the unabated presence of mice in, and the continued points of entry for mice into, the facility. According to her own testimony, Ms. Lucero-Ortega heard reports about the presence of rodents in and around food services from her FSSOs and her Deputy Wardens. She also testified that when she was in the kitchen, her "focus" was discussing the presence of rodents with Ms. Estevan. Ms. Johnson testified to having attended approximately 12 meetings attended by Ms. Lucero-Ortega and Mr. Sanchez where Ms. Estevan tried "very hard to press for solutions" to the rodent issue. Ms. Estevan similarly testified to weekly or bi-weekly meetings held by both Ms. Lucero-Ortega and Mr. Martinez where the subject of rodents was regularly discussed, and also testified that she communicated "regularly" with the Wardens (both Ms. Lucero-Ortega and Mr. Martinez) about the continuing issue of mice. Mr. Sanchez, too, testified to discussing the prevention of rodents with the Wardens. Mr. Martinez also admitted to reports by Mr. Sanchez of incidences relating to mice. Mr. Tillotson testified that he had an in-person conversation with Ms. Lucero-Ortega, telling her that the issue of rodents in the kitchen "needed to be corrected immediately because it could add to potential contamination issues," and that it was a "public safety issue." Ms. Estevan testified that, until mid-2020, she spoke to Mr. Sanchez about the presence of rodents and/or rodent feces at the facility "every other day, every two days," and notified him of possible rodent contamination of food. Mr. Sanchez corroborated this testimony, noting that Ms. Estevan would regularly bring up the issue of rodent control with him.

Ms. Zapata and Ms. Garcia each testified to having asked Mr. Sanchez about whether they were going to fix the rodent problem so that inmates would not have to "clean up after them." Mr. Sanchez testified that he recalled a complaint from Ms. Zapata related to the kitchen. Ms. Bond attested that she and other health staff "raised concerns about the rodent infestation" to people in "a position of authority." Ms. Johnson testified that she assisted students in filing grievances regarding rodents, and Ms. Stinnett testified that she filed grievances two to three times about rodents and rodent feces in the kitchen; it is reasonable to assume that the Warden received these grievances. Mr. Sanchez testified as to having seen live and dead rodents, rodent droppings, and a rodent's nest, and noted in an interview in April 2020 that, before recent efforts, "you would see mice daily in the kitchen." Contrary to the Correctional Defendants' contentions, this evidence establishes that Ms. Lucero-Ortega, Mr. Sanchez, and Mr. Martinez were each aware of the rodent infestation, which, as detailed above, posed a substantial risk to inmate health and safety.

As to deliberate indifference, each Defendant points to certain facts in the record to establish that they made reasonable efforts to address the rodent problem. Ms. Lucero-Ortega enumerates the following evidence to show that she was not deliberately indifferent: "[w]hen she realized that there was evidence of mice in the kitchen, she required each of her staff to conduct weekly inspections"; "[w]hen she became aware of bags of food being chewed in the dry storage areas, she insisted that plastic bins be purchased"; "[s]he had Ultrasonic Mice Repellers purchased in an effort to eliminate mice"; "[d]uring the time that she was warden, the weather stripping was replaced on the front door to the kitchen, the threshold to the kitchen door was replaced, all cracks on the bottom of the cooler door were sealed and sticky traps were set"; and "[i]f inspections revealed the presence of mice, the Bio Hazard crew was called out and cleaned

the area and set more traps, if necessary." Doc. 106 at 23-24.[2] Mr. Sanchez, for his part, notes as follows: when he "occasionally observed rodents and droppings at the facility," he "addressed it immediately and had the area cleaned and sanitized," and "[i]f issues arose during the inspection by EID, he addressed those issues immediately or had his porters or maintenance address those issues immediately." Doc. 107 at 24-25. Additionally, Mr. Sanchez notes that he was not in a position to hire an extermination company to provide rodent control, but did "make the suggestion," which action, he contends, "belies the concept of deliberate indifference." *Id.* at 25. As to his own deliberate indifference, Mr. Martinez states: "[w]hen he learned of concerns about the cleanliness of the kitchen, he ordered an extra crew to do a deep clean of the kitchen nightly"; he "continued the requirement that his staff do daily inspections of the kitchen"; while he was warden, "the stack in the kitchen, which the inspector believed provided mice access to the kitchen, was immediately torn down and ceiling perforations repaired"; and "[i]f inspections revealed the presence of mice, the Bio Hazard crew was called out and cleaned the area and set more traps, if necessary." Doc. 108 at 23.[3] The Summit Defendants similarly argue that they

---

[2]Ms. Lucero-Ortega makes the additional argument that she cannot be held liable merely as a supervisor of "another individual whose conduct violated the Constitution." *Id.* at 24. It is true that "a prison official cannot be held liable solely based upon h[er] supervisory position." *Womble v. Chrisman*, 770 F. App'x 918, 922 (10th Cir. 2019). Nonetheless, "a supervisor may be liable where an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Id.* Here, Plaintiffs do not appear to argue that Ms. Lucero-Ortega should be held liable for others' constitutional violations. In any event, this Court considers only the evidence of her personal participation and exercise of control or direction in determining whether Ms. Lucero-Ortega can be held constitutionally liable.

[3] Mr. Martinez makes the additional argument that he cannot be held liable merely as a supervisor of "another individual whose conduct violated the Constitution." *Id.* at 24. As explained above, while "a prison official cannot be held liable solely based upon his supervisory position," he nonetheless may be liable where an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Womble*, 770 F. App'x at 922. Here, Plaintiffs

"acted reasonably to address the presence of mice in the kitchen and dining room" by "report[ing] the issue to prison officials on multiple occasions," "stor[ing] food in plastic bins to minimize rodents' access to the food," "properly [throwing] out food that was potentially contaminated," and "us[ing] sticky traps provided by NMCD." Doc. 126 at 14.

While this evidence demonstrates that "Defendants took *some* measures to address [the rodent problem], a reasonable jury could find that those measures were inadequate and that Defendants knew so given the persistence of the [rodent] problem." *Womble*, 173 F.4th at 1202 (emphasis added); *see also Shannon*, 257 F.3d at 1168. Indeed, "[k]nowingly persisting in an approach that does not make a dent in the problem is evidence from which a jury could infer deliberate indifference." *Gray v. Hardy*, 826 F.3d 1000, 1009 (7th Cir. 2016). Because there is ample evidence to show that Defendants did just that – knowingly persisted in employing measures that manifestly fell short of addressing the rodent issue –their continued reliance on those measures does not shield them from liability. *See Thompson*, 2022 WL 17364640, at *3 ("[T]he existence of a policy and its efficacy are different issues. Maintaining policies known to be inadequate would not shield a [defendant] from liability."). *Id.*

Specifically, the record shows that requiring weekly inspections of the kitchen, purchasing Ultrasonic Mice Repellers, directing that isolated repairs be made to prevent entry by mice, taking individual corrective actions in response to inspections, cleaning or instructing others to clean up after mice, and setting or instructing others to set glue traps manifestly failed to alleviate the infestation of mice, which continued unabated for a two-year period. The glue

---

do not appear to argue that Mr. Martinez should be held liable for others' constitutional violations. In any event, this Court considers only the evidence of his personal participation and exercise of control or direction in determining whether Mr. Martinez can be held constitutionally liable.

traps could not handle the sheer number of mice present and, precisely because the traps were ineffective, inmate kitchen workers, including Ms. Garcia and Ms. Zapata, were forced to kill rodents themselves, using their feet, brooms, mops, and trash bags, without any protective gear or gloves. As Ms. Estevan herself stated, the mice were "not going anywhere," and all she had were mouse traps that did not work. Several inmate kitchen workers similarly attested that the glue traps and other traps authorized by the Wardens and provided by Mr. Sanchez were "completely ineffective," and Mr. Sanchez and the Wardens were advised of that fact by numerous individuals on numerous occasions.

The record further shows that requests for more effective means of abating the rodent problem went unheeded. Ms. Estevan asked for an "exterminator to address the rodent infestation," and Mr. Sanchez approached the Wardens, EID inspector, and Deputy Wardens about retaining a pest control company to provide professional rodent control services, explaining that the equipment that an outside company would use "would have been more beneficial for the facility instead of just placing glue traps and live traps everywhere." Despite the fact that a pest control company was contracted to exterminate "insects," no such professional services were secured to address the rodent infestation. Indeed, it was not until the Second Revised Settlement Agreement in *Duran* that NMCD agreed to retain professionally licensed exterminators to address the rodent issue. And while Ms. Lucero-Ortega suggests that she could not make certain policy decisions and Mr. Sanchez asserts that he was "not in a position to hire an extermination company," none of the Defendants provides any evidence to counter the undisputed facts that Ms. Lucero-Ortega and Mr. Martinez, in their role as Warden, "had complete oversight" and were responsible for the "administrative functions of running a prison facility, including budgeting and managing the development and implementation of

appropriate policies and procedures" and "ensur[ing] facility safety," and that Mr. Sanchez, in his role as FSSO, was "responsible for pest control" at Western.

Indeed, even the simple fix of securing food in plastic bins became a flashpoint in a battle over responsibility for the rodent problem and, as a result, was not timely implemented. While Ms. Lucero-Ortega asserts that she "insisted" that plastic bins be purchased as soon as she became aware of mice-chewed food bags, and the Summit Defendants assert that they "stored food in plastic bins," there is evidence that tells a more nuanced and less reasonable story.

According to Ms. Lucero-Ortega, the issues with the cleanliness of the kitchen resulted from the failures of "Summit staff and their employees." She testified that when Ms. Estevan complained to her about rodents, she would respond, "Well, let's start with cleaning up your mess." According to Ms. Lucero-Ortega, Ms. Estevan "did not like it when she went in there" and "did not like her having to tell her to clean up," and so "their conversations weren't always in the best of terms."

In contrast, Ms. Estevan testified about her frustration with Western's Wardens for their lack of responsiveness to the issue of rodents in the kitchen. She recalled regularly communicating about this issue to Ms. Lucero-Ortega and Mr. Martinez, during each individual's tenure as Warden.. She testified that it was "like talking on deaf ears." Ms. Estevan testified that she would "report stuff," like "the mouse holes, the mouse droppings," and she "just felt like nothing was being done"; then when the inspectors came, they would point the finger at her.

In the context of this ongoing disagreement, after being advised by Mr. Sanchez to put everything in plastic bins, Ms. Estevan asked first Ms. Lucero-Ortega and then Mr. Martinez about being provided bins for the kitchen. She testified that she was still having the same

conversations with Mr. Martinez as she had done with Ms. Lucero "because the mice were still chewing the bags of the bread and roll mix. So it's just you hear what Mr. Sanchez is saying, but then there is also the all mighty dollar that who is going to pay for them." Ms. Estevan testified that, ultimately, Mr. Tillotson told her to "use the card and go out and purchase bins." As a result, she "just went out and bought them" without waiting for an answer from Western.

Ms. Estevan continued to believe that the "state should have helped" with funding the bins. Similarly, Mr. Tillotson testified that any equipment for the storage of food, including plastic bins, fell under "the small wares budget," which was "the client's responsibility." Ms. Lucero-Ortega, however, testified that although Ms. Estevan "was under the impression" that Western was responsible for the cost of the bins, under their "food service contract, the responsibility fell on the vendor, and so therefore Ms. Estevan had to purchase those bins."

It appears from a statement made by Mr. Sanchez in an April 2020 interview that it was not until "recently," *i.e.,* sometime just before April 2020, that plastic totes began to be used to store dry goods. According to both Mr. Sanchez and Ms. Estevan, and as evidenced by a 2020 inspection report finding no violations, the bins worked. Mr. Sanchez and Ms. Estevan both attributed the amelioration of the rodent issue by mid-2020 in significant part to the use of the bins. However, throughout the two-year period of Plaintiffs' incarceration, while the battle waged over who was responsible for causing the rodent issue and who should pay for bins to address that issue, bins were not purchased. As a result, mice continued to chew through bags and contaminate food, and inmates were forced to serve and eat potentially contaminated food. Viewed in the light most favorable to Plaintiffs, the evidence shows that Defendants exhibited deliberate indifference by sacrificing the safety and health of inmates to make a point about who

was financially responsible for the cost of bins – bins that they knew could have, and ultimately did, provide an effective solution.

Finally, Plaintiffs have presented evidence of behavior on the part of Ms. Estevan that "contravene[d]" her duty "to treat those behind bars with basic human dignity." *Nickerson v. Providence Plantation*, No. 19-civ-30, 2021 WL 978827, at *4 (D.R.I. Mar. 16, 2021). Specifically, kitchen workers, including Ms. Zapata, testified that Ms. Estevan ordered them to kill mice by stomping on them and using brooms, without any protective gear. Ms. Evans testified that, on one occasion, she asked Ms. Estevan if they could get rid of a table because she regularly saw mice running in and of its hollow legs. Ms. Estevan responded that if she threw the table away, she would take the cost of the table out of Ms. Evans's paycheck, and that she should stop worrying about rodents and get back to work. Kitchen workers also testified that Ms. Estevan regularly ordered them to scoop out rodent feces discovered in food and still serve the remainder of the food. Ms. Rael-Schleisman testified that, when they complained about this, Ms. Estevan would say, "We're not wasting it. Just eat it." This evidence, taken as true, satisfies the requirement of deliberate indifference. *Id.*

For these reasons, Plaintiffs' version of the facts shows that each Defendant knew of the substantial risk of harm that the mouse infestation posed and failed to take reasonable measures to abate that harm, in satisfaction of the subjective element of their Eighth Amendment claim. *Womble*, 173 F.4th at 1202.

*Clearly Established Law*

The Correctional Defendants argue that they are entitled to qualified immunity because "[t]here are no cases in the Supreme Court, Tenth Circuit, or the New Mexico Supreme Court[4]

[4] New Mexico Supreme Court decisions are not relevant to the qualified immunity analysis,

with particularly analogous fact patterns." Doc. 106 at 19; Doc. 107 at 20; Doc. 108 at 19. Plaintiffs, however, are not required to "present a case with an identical factual situation" in order to overcome qualified immunity. *Lundstrom*, 616 F.3d at 1119; *see also Anderson*, 469 F.3d at 913 ("[T]here need not be precise factual correspondence between earlier cases and the case at hand."). A right is clearly established *either* "when a precedent involves materially similar conduct" *or* when a precedent "applies with obvious clarity to the conduct at issue." *Apodaca*, 864 F.3d at 1076 (citations omitted). Ultimately, the "salient question" is whether the state of the law at the time of the alleged misconduct – which began here in 2017 – gave Defendants "fair warning" that their alleged misconduct was unconstitutional. *Hope*, 536 U.S. at 741. The Court finds that, under Supreme Court and Tenth Circuit precedent, "a reasonable official would have known that the conduct in question violated the constitutional right at issue." *Lundstrom*, 616 F.3d at 1119.

In 1994, the Supreme Court established that the Eighth Amendment imposes a duty on prison officials to provide humane conditions of confinement, including adequate shelter and reasonable safety from serious bodily harm. *Benshoof*, 351 F. App'x at 278 (quoting *Farmer*, 511 U.S. at 832). Even earlier, in 1977, the Tenth Circuit held in *Battle v. Anderson* that "it is incumbent on the incarcerating body to provide the individual with a healthy habilitative environment." 564 F. 2d 388, 295 (10th Cir. 1977). Shortly thereafter in 1980, in *Ramos v. Lamm*, the Tenth Circuit made clear that a "healthy habilitative environment" "includes providing nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." 639

---

which requires the Court to look to "Supreme Court or Tenth Circuit precedent on point or clearly established weight of authority from other courts." *Lundstrom*, 616 F.3d at 1119.

F.3d 559, 570-71 (10th Cir. 1980). The *Ramos* Court also made clear that "a state must provide an inmate with shelter which does not cause his degeneration or threaten his mental and physical well being, which includes providing "reasonably adequate . . . sanitation [and] hygienic materials." *Id.* at 568. In determining that the food service areas at the prison in the case before it were "grossly inadequate and constitutionally impermissible," the Court noted, *inter alia*, that "[t]he floors, walls, windows, and food storage shelves throughout the food service area [were] soiled with dirt and rodent droppings, the rodent "infestation [was] extensive," and "food [was] often left uncovered allowing the rodents . . . to contaminate it." *Id.* at 571.

The Court finds that *Ramos* is sufficient to put a reasonable officer on notice that it would be unconstitutional to allow a rodent infestation of the circumstances, nature, and duration described by Plaintiffs to continue unabated for two years, to persist in employing glue traps and other measures that were obviously ineffective to eradicate the infestation, to compensate for the ineffectiveness of those measures by routinely ordering inmates to kill rodents by stomping on them or with brooms and to dispose of rodents and rodent feces without protective gear, to routinely order inmates to serve food that has been contaminated by rodents, and to allow food to be served to inmates that has been contaminated by rodents. *See Benshoof*, 351 F. App'x at 279 (holding that *Ramos* was "sufficient to put a reasonable officer on notice that it would be unconstitutional to house an inmate in a cell containing a swarm of stinging insects and to refuse the inmate either a transfer to another cell or any effective means of eradicating the infestation"); *see also Shields v. Duncan*, No. 14-civ-2231, 2017 WL 491170, at * 14-15 (D. Colo. Feb. 6, 2017) (finding that "the right to be free from cruel and unusual punishment by preventing lengthy exposure to inadequate heating, bedding, plumbing and hygiene was clearly established in *Ramos*"). Defendants failed to meet their constitutional obligation, as clearly established in

*Ramos*, to provide "a healthy habilitative environment," by failing to provide sanitation sufficient to eradicate the rodent infestation, failing to provide hygienic materials for purposes of disposing of dead mice and their droppings, and failing to ensure that food was prepared and served under conditions that did not expose inmates to contamination by rodents.

The Court thus finds that the constitutional rights allegedly violated by Defendants were clearly established as of 2017.

*The Summit Defendants Are Liable for Maintaining a Custom or Policy*

Summit argues that it cannot be sued based on its vicarious liability for Ms. Estevan's alleged Eighth Amendment violations. Doc. 126 at 14-15. "[U]nder current Tenth Circuit precedent, private companies cannot be held vicariously liable under § 1983 for the tortious acts of its employees." *Khan*, 2021 WL 107245, at *6. Accordingly, to hold Summit liable under § 1983 for the actions of Ms. Estevan, Plaintiffs must establish that Summit "caused the constitutional violation by instituting a policy or custom that was the direct cause or moving force behind the constitutional violations." *Id.* (citations omitted).

Viewed in the light most favorable to Plaintiffs, the facts are sufficient to establish that a Summit policy or custom caused the constitutional violations. As Plaintiffs argue, the record demonstrates that Summit took astonishingly "little action" to ensure that the kitchen was operated safely and sanitarily, that Mr. Tillotson "only had a single conversation" with Ms. Lucero-Ortega about the rodent problem, and that Summit "incentivized" Ms. Estevan to serve contaminated food to inmates "by offering bonuses for meeting an absurdly low cost-per-meal target and for forcing her to keep to an austere budget that wasn't realistic given the amount of food waste being generated due to rodent contamination at the prison." Doc. 129 at 17-18. The evidence is sufficient to draw the reasonable inference that the absence of action to ensure the

safety and sanitation of the kitchen, Mr. Tillotson's holding of only one conversation with Ms. Lucero-Ortega, and Ms. Estevan's serving of contaminated food were grounded in Summit policies and customs. Notably, Plaintiffs point to evidence that Summit imposed a "cost per meal target" on Ms. Estevan and based her yearly bonus in part on "exceeding the previous year's bottom line." *Id.* It is reasonable to infer that Ms. Estevan strove to meet the targets set for her, despite failing to do so at least some of the time. *See* Doc. 129-3 at 7. Accordingly, Plaintiffs' evidence, if proven, would establish that Summit policies, including those regarding target costs and bonuses, caused the delay in the purchase of bins, Ms. Estevan's orders that kitchen workers save, rather than discard, contaminated food, and serve that food to inmates, and Ms. Estevan's improper comment to a kitchen worker that if she threw away the table frequented by mice she would deduct the cost of the table from the worker's paycheck.

Because Plaintiffs thus have shown that a Summit custom or policy of improper sanitation or unsafe food was the driving force behind the constitutional violations they allege, Plaintiffs may pursue their Eighth Amendment claim against Summit.

III. Negligence Claims

In Count II, Plaintiffs assert negligence claims against the Summit Defendants for breaching their duties to "provide Plaintiffs with sanitary and nutritionally adequate food while they were incarcerated at [Western]" and to "treat Plaintiffs with basic human decency" by subjecting them "to horrifically repulsive food service practices." Doc. 44 ¶¶ 261-273. In their Motion for Summary Judgment, the Summit Defendants argue that these claims fail for two reasons: first, they are immune from suit under the New Mexico Tort Claims Act ("NMTCA"), and second, as a matter of law, Plaintiffs cannot establish two of the essential elements of their negligence claims. The Court disagrees with both arguments.

First, the Summit Defendants argue that, if they are considered state actors acting under color of law for purposes of Plaintiffs' Eighth Amendment claims, then they should be immune from suit under the NMTCA both because Plaintiffs failed to provide them with notice of their cause of action within 90 days, as is required under the notice provisions of the NMTCA, and because Plaintiffs' claims do not fit within any of the waiver provisions of the NMTCA. Doc. 126 at 15-16. Neither Ms. Estevan nor Summit, however, is entitled to invoke the protections of the NMTCA.

To act "under color of state law" under § 1983 and to act as a "governmental entity" or "public employee" under the NMTCA "are distinct concepts." *Giron v. Corrs. Corp. of Am.*, 14 F. Supp. 2d 1245, 1252 (D.N.M. 1988). The NMTCA reflects "the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act." N.M. Stat. Ann. § 41-4-2(A). "Consistent with this purpose, the New Mexico Tort Claims Act grants governmental entities and employees a general immunity from tort liability, but waives that immunity in certain defined circumstances." *Kellum v. Bernalillo Cty.*, No. 14-civ-163, 2015 WL 12861332, at *2 (D.N.M. June 1, 2015). For purposes of the NMTCA, a "governmental entity" means "the state or any local public body." N.M. Stat. Ann. § 41-4-3(B). In turn, "local public body" is defined in relevant part as "all political subdivisions of the state and their agencies, instrumentalities and institutions." N.M. Stat. Ann. § 41-4-3(C). The term "public employee" means an officer, employee or servant of a governmental entity, *excluding independent contractors*," with certain exceptions not applicable here. N.M. Stat. Ann. § 41-4-3(F) (emphasis added).

Summit is a foreign, for-profit corporation and the contractor that provided food services

for inmates housed at Western. Doc. 44 ¶ 9. Summit "is not a state or local public body," but rather a "for-profit corporation" that falls within none of the exceptions enumerated at § 41-4-3(F). *Kellum*, 2015 WL 12861332, at *2. Accordingly, Summit "does not meet the statutory definitions for coverage under the [NMTCA]." *Id.* Nor have the Summit Defendants provided any evidence that "under the totality of the circumstances [New Mexico or NMCD] is so intertwined with [Summit] that [Summit] has become an alter ego of [New Mexico or NMCD]." *Id*. at *3. Accordingly, Summit is not covered by the NMTCA. *Id.* It follows that Ms. Estevan "was an independent contractor's employee, and not a public employee, under the [NMTCA]." *Giron*, 14 F. Supp. 3d at 1252. The NMTCA "therefore grants [her] no immunity from tort liability." *Id.*

Additionally, the Summit Defendants argue that Plaintiffs have failed to establish either a breach of their duty to Plaintiffs or damages, each of which is essential to their negligence claim. "Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." *Doe 13 v. Boys & Girls Clubs of Am., Inc.*, No. A-1-CA-42446, 2026 WL 2620397, at *2 (N.M. Ct. App. Aug. 31, 2026). As to the breach of their duty of care, the Summit Defendants argue that they "demonstrated food-safety planning and actions that are consistent with standard industry practices designed for food-safety and regulatory compliance." Doc. 126 at 17. In support of this argument, they assert that they "performed appropriate actions to prevent the presence of mice within the foodservice operations at [Western], to ensure regulatory compliance of the foodservice operations and to provide sanitary food for the inmates." *Id.* at 17-18. This assertion, however, is contradicted by the evidence detailed above regarding Ms. Estevan's awareness of and deliberate indifference to

the danger that the rodent infestation posed to the health and safety of inmates. Plaintiffs' evidence, if true, would establish that Ms. Estevan breached her duty of care, both to the kitchen workers whom she ordered to kill rodents and serve rodent-contaminated food and to the inmates who were forced to consume that food. As to damages, the Summit Defendants argue that Plaintiffs "sustained no harm, injuries, or damages from the presence of mice in the facility." *Id.* at 18. As detailed above, however, the risk of harm posed by a rodent infestation, both physically and emotionally, is obvious and well-documented, and the Court has taken judicial notice thereof. The Summit Defendants thus have failed to show that Plaintiffs cannot, as a matter of law, pursue their negligence claims against them.

## CONCLUSION

For the foregoing reasons, the Court finds as follows: Plaintiffs' claims are not barred by claim preclusion; Plaintiffs' evidence, taken as true, establishes the objective and subjective components of an Eighth Amendment violation as to all Defendants; the constitutional rights allegedly violated were clearly established as of 2017; Summit is a state actor for purposes of § 1983; Plaintiffs have adequately established that Summit's policies and customs caused the constitutional violations; the Summit Defendants are not entitled to invoke the NMTCA; and Plaintiffs have established a genuine issue of material fact as to their negligence claim.

**IT IS THEREFORE ORDERED** that Defendant Roberta Lucero-Ortega's Motion for Summary Judgment [Doc. 106], Defendant Arthur Sanchez's Motion for Summary Judgment [Doc. 107], Defendant Leon Martinez's Motion for Summary Judgment [Doc. 108], and Defendants Summit Food Service LLC's and Berleen Estevan's Motion for Summary Judgment [Doc. 126] are **DENIED**.

DATED this 16th day of November 2026.

MARTHA VAZQUEZ
Senior United States District Judge